UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RODNEY DESJARDINS,

                Plaintiff,

                                        Case No. 2:19-cv-00252

v.

                                        Hon. Paul L. Maloney

COMMUNITY ACTION ALGER
MARQUETTE,

                Defendant.
_____/

HANSHAW BURINK, PLC
SANDRA HANSHAW BURINK (P-68619)
Attorney for Plaintiff
501 Hillside Drive
Marquette, MI 49855
(906) 273-1551
shburink@hb-lawoffices.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
MEGAN P. NORRIS (P-39318)
NHAN HO (P-82793)
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com
ho@millercanfield.com
_____/

**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

NOW COMES Defendant, Community Action Alger-Marquette ("CAAM") , through its attorneys, Miller, Canfield, Paddock and Stone, P.L.C., and hereby moves this Honorable Court to dismiss the Complaint of Plaintiff, Rodney DesJardins ("Plaintiff") pursuant to Fed. R. Civ. P. 56(c), for the following reasons:

1.      Plaintiff's Complaint set forth seven counts of action: (1) Failure to accommodate in violation of the American with Disabilities Act ("ADA"), (2) discrimination in violation of the ADA, (3) interference with Plaintiff's leave under the Family and Medical Leave Act ("FMLA"); (4) discrimination and/or retaliation against Plaintiff for taking FMLA leave; (5) age discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"); (6) retaliation in violation of ELCRA; and (7) retaliation in violation of Title VII of the Civil Rights Act ("Title VII").

2.      At all times relevant hereto, Plaintiff was Defendant's Housing Services Director, responsible for planning, directing, and administering the operation of the housing services program.  Plaintiff reported to the Executive Director.  Additionally, Plaintiff regularly met with his direct reports and other staff members to develop program missions and goals in accordance with community needs and assist in long-range program planning.  Plaintiff also trained, assigned work, evaluated performances, and otherwise supervised housing component staffs.

3.      From the time of Plaintiff's hiring until late January 2018, Amy Lerlie was the Executive Director of CAAM.  On October 17, 2017, an employee who reported to Plaintiff filed an EEOC Charge alleging she had been sexually harassed by Lerlie, that she complained to Plaintiff, and that she believed she had been demoted in retaliation for filing her Charge.  A few weeks later, on November 15, 2017, Plaintiff made two complaints, alleging a hostile work environment created by Lerlie.  Upon receiving Plaintiff's complaints, CAAM conducted an

investigation into Lerlie's actions, and upon its conclusion, Lerlie was removed from her position as Executive Director in late January 2018.

4.      On January 30, 2018, Plaintiff submitted a Charge of Discrimination to the EEOC, claiming that he was retaliated by Lerlie because he opposed her actions. Subsequently, Plaintiff withdrew his charge.

5.      In May 2018, Michelle LaJoie became Defendant's Executive Director and Plaintiff's supervisor.  In late September 2018, Plaintiff filed grievances against LaJoie, alleging that she failed to perform the duties of an Executive Director and mistreated him.

6.      Immediately after filing his grievances against LaJoie, Plaintiff requested FMLA "stress leave" from October 2 to October 15, 2018.  His request was granted the same day.  Plaintiff was told that he would need to present a fitness-for-duty certificate to be restored to employment, and if such certification was not timely received, his return to work could be delayed.

7.      In the middle of his leave, on October 10, 2018, Plaintiff provided Defendant with a note from his doctor stating that Plaintiff was "capable of performing all essential job functions if allowed to work in an alternate work location."  Plaintiff's doctor requested that Plaintiff be allowed to work in CAAM's Munising office instead of the Marquette office for the next 30 days (*i.e.*, October 10, 2018 through approximately November 9, 2018).

8.      CAAM did not agree that Plaintiff could perform all of his essential job functions, many of them interactive in nature, from the Munising office.  Particularly, in CAAM's judgment, Plaintiff would need to be present in the Marquette office for certain face-to-face, personal interaction and supervision with the subordinates whom Plaintiff supervised, his co-directors, and the Executive Director, who supervised Plaintiff.  After engaging in an interactive process with Plaintiff, CAAM compromised by offering Plaintiff a half-and-half telework and in person

schedule, and even proposed the possibility for some other combination of this schedule that would be effective.  Additionally, Plaintiff was informed that CAAM would be open to changes to Plaintiff's schedule, work setting, etc., during the time Plaintiff worked in the Marquette office if those would aid Plaintiff in the performance of his essential functions.  Plaintiff rejected CAAM's proposals, despite multiple attempts by CAAM to reengage Plaintiff in the interactive process; Plaintiff insisted that the only acceptable accommodation was to allow him to work full time at the vacant Munising office.

9.      In the absence of a fitness-for-duty certificate and in light of Plaintiff's rejection of Defendant's offered accommodation as well as refusal to reengage in the interactive process to identify other accommodations, Defendant extended Plaintiff's FMLA leave.  When Plaintiff exhausted his FMLA leave, he was allowed to remain off work.

10.     On January 17, 2019, Plaintiff sent an email to all staff members of Defendant, except LaJoie and the human resources manager, whom Plaintiff  referred to as "[f]ormer friends and colleagues".  Inviting the recipients to share with anyone who was not included, Plaintiff informed everybody that he would not be returning to work at CAAM and wished them all well.  Interpreting Plaintiff's agency-wide email as a notice of his resignation, CAAM notified Plaintiff that they accepted his resignation.  While denying he had resigned, Plaintiff never asked to return to work or attempted to return to work and instead began employment.

11.     Plaintiff's claims under the ADA fail on the merits.  Plaintiff was not a qualified individual with a disability as defined under the ADA.  He also abandoned the interactive process and failed to respond to Defendant's suggestions for alternative accommodations.  With regard to Plaintiff's discrimination claim, Plaintiff cannot show that he was subject to a materially adverse

employment action or that any decision regarding his employment was discrimination based on his alleged disability.

12.     Similarly, because Plaintiff cannot show that CAAM took any adverse employment action against him and that CAAM's legitimate business reasons underlying its actions were pretext for unlawful discrimination and/or retaliation, Plaintiff's discrimination and retaliation claims under the ELCRA and Title VII fail as a matter of law.  Plaintiff fails to show any circumstances giving rise to discrimination to establish a *prima facie* case of age discrimination.

13.     Plaintiff's FMLA claims also fail.  Plaintiff cannot deny that he was given all FMLA leave that he requested; indeed, Plaintiff received more leave as an accommodation.  There is no evidence CAAM took any adverse employment action against Plaintiff or that any action taken against Plaintiff was because of his request for leave.

14.     Pursuant to L. Civ. R. 7.1, on March 30, 2021, CAAM provided Plaintiff's counsel with all of the arguments set forth in this Motion and Brief and requested that Plaintiff agree to dismiss his claims against CAAM for the reasons set forth herein.  Such concurrence has been denied, making this motion necessary.

WHEREFORE, Defendant requests that this Honorable Court dismiss Plaintiff's Complaint in its entirety with prejudice and award Defendant its costs and attorney fees incurred in this action.

Respectfully submitted,


/s/Megan P. Norris (P39318)
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com

Dated:  March 30, 2020

UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RODNEY DESJARDINS,

        Plaintiff,

                                     Case No. 2:19-cv-00252

v.

                                     Hon. Paul L. Maloney

COMMUNITY ACTION ALGER
MARQUETTE,

        Defendant.
_____/

HANSHAW BURINK, PLC
SANDRA HANSHAW BURINK  (P-68619)
Attorney for Plaintiff
501 Hillside Drive
Marquette, MI  49855
(906) 273-1551
shburink@hb-lawoffices.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
MEGAN P. NORRIS  (P-39318)
NHAN HO (P-82793)
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan  48226
(313) 963-6420
norris@millercanfield.com
ho@millercanfield.com
_____/

**BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. i

STATEMENT OF THE ISSUES ........................................................................ vi

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 2

    A.      BACKGROUND ................................................................. 2

    B.      PLAINTIFF'S EMPLOYMENT WITH CAAM ................................ 3

    C.      CAAM POLICIES ................................................................ 4

    D.      COMPLAINTS AGAINST THE FORMER EXECUTIVE DIRECTOR ............ 4

    E.      THE NEW EXECUTIVE DIRECTOR ............................................ 5

    F.      PLAINTIFF'S LEAVE AND DEMAND TO WORK IN MUNISING ............... 7

    G.      PLAINTIFF'S RESIGNATION .................................................. 12

    H.      POST-CAAM EMPLOYMENT ................................................. 14

    I.      PLAINTIFF'S COMPLAINT .................................................... 14

STANDARD OF REVIEW ............................................................................... 15

ARGUMENT .................................................................................................... 16

    I.      PLAINTIFF'S ADA CLAIMS FAIL AS A MATTER OF LAW ...................... 16

        A.      Plaintiff Does Not Have a Disability As Defined By The ADA. ............ 16

        B.      Plaintiff Is Not A Qualified Individual. .................................... 18

        C.      Plaintiff's Failure-To-Accommodate Claim Also Fails Because He Failed To Participate In Good Faith In The Interaction Process. ............ 21

        D.      Plaintiff's Discrimination Claim Under the ADA Also Fails Because CAAM Did Not Take Any Adverse Employment Action Against Plaintiff. ................................................................. 23

        E.      Plaintiff's Discrimination Claim Under the ADA Fails Because Plaintiff Cannot Show that CAAM's Actions Were Because Of His Disability. ...................................................................... 25

    III.      PLAINTIFF'S CLAIMS Of DISCRIMINATION AND RETALIATION UNDER THE ELCRA AND TITLE VII FAIL AS A MATTTER OF LAW. ................................................................................... 28

        A.      CAAM Did Not Take Any Adverse Employment Action Against Plaintiff. ...................................................................... 28

## TABLE OF CONTENTS
(continued)

**Page**

B.  Plaintiff's Age Discrimination Claim Under ELCRA Also Fails Because He Fails To Show Any Circumstances Which Give Rise to An Inference Of Unlawful Discrimination. ......................................... 28

C.  CAAM Has Legitimate Reasons for Its Actions, Which Plaintiff Could Not Show To Be Pretext For Discrimination Or Retaliation. ....... 30

III.  PLAINTIFF'S FMLA CLAIMS FAIL AS A MATTER OF LAW. ................... 30

A.  CAAM Did Not Interfere With Plaintiff's Rights To Take FMLA Leave. ..................................................................................................... 30

B.  Plaintiff's FMLA Retaliation Claim Fails. ............................................. 32

CONCLUSION ................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Potter,*
193 F. App'x 440 (6th Cir. 2006) ............................................................21

*Anderson v. Avon Prod., Inc.,*
340 F. App'x 284 (6th Cir. 2009) ............................................................16

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...............................................................................15

*Barrett v. Kirtland Cmty. Coll.,*
245 Mich. App. 306, 628 N.W.2d 63 (2001) ...........................................28

*Bilinsky v. Am. Airlines, Inc.,*
928 F.3d 565 (7th Cir. 2019) ..................................................................20

*Booth v. Nissan North America, Inc.,*
927 F.3d 387 (6th Cir. 2019) ..................................................................17

*Brumley v. United Parcel Serv., Inc.,*
909 F.3d 834 (6th Cir. 2018) ..................................................................21

*Burns v. Coca-Cola Enterprises, Inc.,*
222 F.3d 247 (6th Cir. 2000) ..................................................................16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...............................................................................15

*Chen v. Dow Chem. Co.,*
580 F.3d 394 (6th Cir. 2009) ..................................................................25

*Coats-Hall v. United Airlines,*
No. 07-14699, 2009 WL 261539 (E.D. Mich. Feb. 4, 2009) ...................29

*Doren v. Battle Creek Health Sys.,*
187 F.3d 595 (6th Cir. 1999) ..................................................................16

*Edgar v. JAC Prod., Inc.,*
443 F.3d 501 (6th Cir. 2006) ..................................................................30

*EEOC v. Ford Motor Co.,*
782 F.3d 753 (6th Cir. 2015) .........................................................18, 19, 21

*Fink v. Ohio Health Corp.*,
    139 Fed. Appx. 667 (6th Cir. 2005).........................................................................30

*Fricke v. E.I. Dupont Co.*,
    219 F. App'x 384 (6th Cir. 2007).........................................................................18

*Gecewicz v. Henry Ford Macomb Hosp. Corp.*,
    683 F.3d 316 (6th Cir. 2012) .........................................................................23

*Gleed v. AT&T Mobility Servs., LLC*,
    613 Fed. Appx. 535 (6th Cir. 2015).........................................................................25

*Green v. BakeMark USA, LLC*,
    683 F. App'x 486 (6th Cir. 2017) .........................................................................25

*Groening v. Glen Lake Cmty. Schs.*,
    884 F.3d 626 (6th Cir. 2018) .........................................................................24

*Gutierrez v. 78th Jud. Dist. Ct.*,
    No. 1:07-CV-1268, 2009 WL 2584748 (W.D. Mich. Aug. 18, 2009) ...............................31

*Hankins v. The Gap, Inc.*,
    84 F.3d 797 (6th Cir. 1996) .........................................................................18, 22

*Hardesty v. Kroger Co.*,
    758 F. App'x 490 (6th Cir. 2019) .........................................................................18

*Hedrick v. W. Rsrv. Care Sys.*,
    355 F.3d 444 (6th Cir. 2004) .........................................................................18

*Hibbler v. Reg'l Med. Ctr. at Memphis*,
    12 F. App'x 336 (6th Cir. 2001).........................................................................19

*Hopson v. DaimlerChrysler Corp.*,
    306 F.3d 427 (6th Cir. 2002) .........................................................................15

*Huffman v. Speedway LLC*,
    621 F. App'x 792 (6th Cir. 2015).........................................................................32

*Humenny v. Genex Corp.*,
    390 F.3d 901 (6th Cir. 2004) .........................................................................29

*Hummel v. Cty. of Saginaw*,
    118 F. Supp. 2d 811 (E.D. Mich. 2000).........................................................................16

*Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*,
    176 F.3d 921 (6th Cir. 1999) .........................................................................20

*Jakubowski v. Christ Hosp., Inc.*,
  627 F.3d 195 (6th. Cir. 2010) ............................................................................22

*James v. James Marine, Inc.*,
  805 F. Supp. 2d 340 (W.D. Ky. 2011) ...............................................................31

*Keith v. County of Oakland*,
  703 F.3d 918 (6th Cir. 2013) .............................................................................22

*Kleiber v. Honda of Am. Mfg., Inc.*,
  485 F.3d 862 (6th Cir 2007) ..............................................................................22

*Leitner v. Potter*,
  No. 1:09-CV-274, 2010 WL 3890955 (W.D. Mich. Sept. 29, 2010) ......................18

*Lewis v. Humboldt Acquisition Corp.*,
  681 F.3d 312 (6th Cir. 2012) .............................................................................26

*Lytle v. Malady*,
  458 Mich. 153, 579 N.W.2d 906 (1998)..............................................................28

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................................................15

*McDonald v. UAW-GM Ctr. for Human Res.*,
  738 F. App'x 848 (6th Cir. 2018) .......................................................................23

*Mion v. Aftermarket Tool & Equip. Group*,
  990 F.Supp. 535 (W.D. Mich. 1997) ..................................................................31

*Mitchell v. Vanderbilt Univ.*,
  389 F.3d 177 (6th Cir. 2004) .............................................................................23

*Moore v. J.B. Hunt Transp., Inc.*,
  221 F.3d 944 (7th Cir. 2000) .............................................................................16

*Moore v. Philip Morris Co.*,
  8 F.3d 335 (6th Cir. 1993) .................................................................................15

*Neely v. Benchmark Fam. Servs.*,
  640 F. App'x 429 (6th Cir. 2016).................................................................16, 17

*Seeger v. Cincinnati Bell Tel. Co., LLC*,
  681 F.3d 274 (6th Cir. 2012) .............................................................................32

*Shimko v. Lowe's Home Centers, LLC*,
  No. 4:17-CV-11709, 2019 WL 934857 (E.D. Mich. Feb. 26, 2019).......................26

*Smith v. Allstate Ins. Co.*,
195 Fed. Appx. 389 (6th Cir. 2006)................................................................................27

*Smith v. Honda of Am. Mfg., Inc.*,
101 F. App'x 20 (6th Cir. 2004) ....................................................................................22

*Suchanek v. Univ. of Kentucky*,
No. CIV.A. 3:10-19-DCR, 2011 WL 3045986 (E.D. Ky. July 25, 2011) ..............................31

*Tinsley v. Caterpillar Financial Services Corp.*,
766 F. App'x 337 (6th Cir. 2019)...................................................................................17

*Town v. Michigan Bell Tel. Co.*,
455 Mich. 688, 568 N.W.2d 64 (1997)............................................................................29

*Verkade v. U.S. Postal Serv.*,
378 F. App'x 567 (6th Cir. 2010)..............................................................................26, 30

*Williams v. AT&T Mobile Services LLC*,
847 F.3d 384 (6th Cir. 2017) .........................................................................................19

*Wilson v. Firestone Tire & Rubber Co.*,
932 F.2d 510 (6th Cir. 1991) .........................................................................................24

*Wright v. Memphis Light, Gas & Water Div.*,
558 Fed. Appx. 548 (6th Cir. 2014)................................................................................27

*Yochim v. Carson*,
935 F.3d 586 (7th Cir. 2019) .........................................................................................23

**Statutes**

42 U.S.C. § 12111.....................................................................................................18, 19

42 U.S.C. § 12112.........................................................................................................18

**Other Authorities**

29 C.F.R. § 825.312.......................................................................................................26

29 C.F.R. § 1630.2(n)(3).............................................................................................19, 22

29 CFR § 1630.2(o)(3)....................................................................................................22

EEOC, *What You Should Know About COVID-19 and the ADA, the
Rehabilitation Act, and Other EEO Laws* (updated Dec. 16, 2020) .......................................20

WHD Opinion Letter FMLA2019-1-A, 2019 WL 1514982 (Mar. 14, 2019) .............................31

WHD Opinion Letter FMLA2019-3-A, 2019 WL 4324268 (Sept. 10, 2019)...............................32

## <u>STATEMENT OF THE ISSUES</u>

1.    Should Plaintiff's ADA claims be dismissed because:

> Plaintiff did not have a disability as defined by the law;

> Plaintiff could not perform the essential functions of his job with or without reasonable accommodation;

> Plaintiff failed to engage in the interactive process in good faith; and

> Plaintiff cannot show that he suffered any adverse employment action because of his disability?

> Defendant answers: YES

2.    Should Plaintiff's discrimination and retaliation claims under the ELCRA and Title VII be dismissed because Plaintiff cannot show that CAAM took any adverse employment action toward him and its business reasons behind its action were pretext for unlawful discrimination and/or relation?

> Defendant answers: YES

3.    Should Plaintiff's age discrimination under ELCRA be dismissed because Plaintiff cannot show any circumstances giving rise to inference of age discrimination?

> Defendant answers: YES

4.    Should Plaintiff's FMLA interference claim be dismissed because Plaintiff undisputedly was provided with all of his FMLA leave?

> Defendant answers: YES

5.    Should Plaintiff's FMLA retaliation/discrimination claim be dismissed because Plaintiff cannot show that he suffered an adverse employment action due to his exercise of FMLA rights?

> Defendant answers: YES

## <u>INTRODUCTION</u>

After having taken approved leave under the Family and Medical Leave Act ("FMLA"), Plaintiff, Rodney DesJardins, insisted that Defendant, Community Action Alger Marquette ("CAAM") allow him to return to work at a vacant remote office where his staff members and his supervisor did not work.  Despite CAAM's multiple attempts to engage in an interactive process to offer Plaintiff alternative accommodations for Plaintiff's alleged impairment so that he could perform the essential functions of his job and meet CAAM's business needs, Plaintiff refused to be flexible and stopped all discussions regarding his accommodation request.

In the absence of a fitness-for-duty certificate and in light of Plaintiff's rejection of CAAM's offered accommodation along with his refusal to reengage in the interactive process to identify other accommodations, CAAM extended Plaintiff's FMLA leave and allowed him to remain on leave after the FMLA leave expired.  Just a week after CAAM's latest communication with Plaintiff regarding the continuation of his employer-sponsored benefits during his leave, Plaintiff, on his own volition, sent an email to staff members of CAAM, whom he saluted as "[f]ormer friends and colleagues."  Welcoming the distribution of the emails to anyone who was not included, Plaintiff indicated in his email that he would no longer be returning to work at CAAM and wished them all well.  CAAM interpreted Plaintiff's correspondence as a notice of resignation, and accepted Plaintiff's desire to end his employment.  Although Plaintiff denied that he resigned, he never attempted to return to work and in fact obtained alternative employment shortly thereafter.

As shown below, there is no dispute of material facts, and Plaintiff's claims under the American with Disabilities Act ("ADA"), Elliott-Larsen Civil Rights Act ("ELCRA"), Title VII of the Civil Rights Act ("Title VII), and FMLA fail as a matter of law.  Plaintiff, who said that he could do anything except work at a particular CAAM location, undisputedly was not a qualified

individual with a disability as understood by the law.  Plaintiff's failure-to-accommodate claim also fails because he, not CAAM, was responsible for the failure of the interactive process.  With regard to Plaintiff's discrimination claim, Plaintiff cannot show that he was subject to a materially adverse employment action or that any decision regarding his employment was made because of any protected characteristic, as opposed to Plaintiff's professed inability to work.  For these same reasons, Plaintiff's claims of age discrimination and retaliation under ELCRA, as well as his claim of retaliation under Title VII, lack merit for the same reasons.  Plaintiff also fails to show any circumstances giving rise to discrimination to establish a *prima facie* case of age discrimination. Finally, Plaintiff's claims of interference and retaliation under the FMLA also fail.  Plaintiff cannot deny that he was given all FMLA leave that he requested.  There is no evidence that any action taken against Plaintiff was because of his request for leave.  Accordingly, this Court should grant summary judgment and dismiss Plaintiff's claims.

## STATEMENT OF FACTS

### A.    BACKGROUND

CAAM is a non-profit that has three primary programs: (1) CAAM provides food and nutrition resources to individuals and families through congregate dining sites, Meals on Wheels, and food pantries;[1] (2) the Agency conducts several early childhood education programs such as Head Start;[2] and (3) CAAM operates a number of housing programs that provide resources, financial assistance, counseling, and other services to low-income citizens, the elderly, and veterans.[3]  Each of these three missions is headed by a component director (Service Nutrition

---

[1] *See Community Nutrition*, https://www.communityactionam.org/congregate-dining.

[2] *See Early Childhood Education*, https://www.communityactionam.org/early-head-start.

[3] *See Housing & Utility*, https://www.communityactionam.org/homelessness-solutions.

Program Director, Head Start Director, and Housing Service Director) who reports to the Executive Director, who in turn reports to the Board of Directors (LaJoie 12, 18).[4]

During Plaintiff's employment, CAAM had two offices. The main office is located in the City of Marquette, where the Executive Directors, the component directors, and a large number of staff members work (65-67, 82;[5] LaJoie 19).  The other office was located Munising and was utilized by one staff member and Plaintiff once a week until his FMLA leave beginning October 2018 (161).[6]

## B.   PLAINTIFF'S EMPLOYMENT WITH CAAM

At the age of 55, Plaintiff begun his employment with CAAM in November 10, 2014 as the Support Service for Veterans Family Program Manager (37, 39, 43-44).  In January 2015, Plaintiff was promoted to the position of Housing Service Director (59).  In this position, Plaintiff was responsible for planning, directing, and administering the operation of the housing services program (60, Ex. 4).[7]  Like the other component directors, Plaintiff performed his work under the supervision of the Executive Director, who needed to know what her subordinates were doing and to interact with them to ensure the proper operation of the programs and resolve issues when they arose (170; Ex. 3; LaJoie 14, 21-23).

Other than planning and administrating housing programs, the essential functions of a Housing Service Director also include recommending personnel actions including hiring,

---

[4] Cited pages from the deposition of Michelle LaJoie are attached as Exhibit 1.

[5] Unless otherwise noted, cited pages refer to Plaintiff's deposition and are attached as Exhibit 2.

[6] The staff member working out of the Munising office subsequently went on maternity leave and then resigned, leaving this office vacant (161, 166).  After Plaintiff's employment with CAAM ended, this office was permanently closed (217).

[7] Plaintiff claimed that this job description is "inadequate and inaccurate," but then admitted that other than three irrelevant inaccuracies, the job description accurately describes his job functions (61-63).

promotion, or termination; training; assigning work; evaluating performance; and otherwise supervising housing component staff (Ex. 3).   Most of Plaintiff's staff worked in Marquette County, and a large portion of them worked out of the Marquette office (65-67, 164, 168-169).

## C.   CAAM POLICIES

CAAM's employment policies, which were applicable to Plaintiff, are set out in the regularly updated Employee Handbook, which Plaintiff had access to and reviewed (44-45, 52). Undisputedly, CAAM's policies prohibit discrimination against any individuals based on their protected characteristics, such as age or disability (52; Ex. 4, at 1-2). "[R]equested accommodations will be analyzed and reviewed to insure that this policy is being properly implemented (Ex. 4, at 2).  CAAM also has a Family and Medical Leave policy consistent with the requirements under the FMLA (52).  This policy sets out the eligibility requirements to take FMLA leave, leave entitlements, the job-protected status of the leave, the qualifying reasons to take leave, requirements to provide documentation for taking and returning from leave, as well as the rights of an employee to have health benefits maintained during leave. (Ex. 4, at 25-26).

## D.   COMPLAINTS AGAINST THE FORMER EXECUTIVE DIRECTOR

In October 2017, Stacia Lynn, a direct report of Plaintiff, brought a complaint against then-Executive Director, Amy Lerlie, and filed an EEOC charge against CAAM, alleging that Lerlie had sexually harassed and retaliated against her (72-73).  Following an anonymous complaint to CAAM's Board of Directors about the hostile work environment at the agency, on November 15, 2017, while on an approved FMLA leave awaiting heart surgery, Plaintiff also made two complaints alleging that Lerlie created a hostile work environment: one to then-HR Manager, Lucy Grove and the other to the Board (78-81, 83).  Upon receiving Plaintiff's complaints, Grove advised Plaintiff that the board's Executive Committee had met and directed an investigation be

conducted (84).  A "prominent local attorney" was retained to conduct the investigation, and Plaintiff and 14 other employees were interviewed (88-89, 91).  As a result of the investigation, Lerlie was removed from the Executive Director position (116).

On January 24, 2018, Plaintiff filed his first Charge of Discrimination with the EEOC, claiming that he was retaliated by Lerlie because he opposed her actions (104-105).  After CAAM submitted its position statement (which was after Lerlie had left the agency), Plaintiff withdrew his charge (109, 218-219).  Plaintiff admits that throughout this whole process concerning his complaints against Lerlie and the filing of his EEOC charge, nobody said anything to Plaintiff about his age, disability, or need to take FMLA leave (116-117).

## E.    THE NEW EXECUTIVE DIRECTOR

After Lerlie left CAAM, the Executive Director position was vacant (109).  Plaintiff, who admittedly did not want to be the new Executive Director, applied for the job (109, 139-140).  He was a finalist for the position, but ultimately Michelle LaJoie,[8] a housing director at another agency, was selected to be the new Executive Director (109, 140, 143).  Plaintiff thought LaJoie "would make a good executive director" and he "was relieved that he did not get the job" (139-140).

LaJoie began her role as the Executive Director in May 2018 (LaJoie 10).  LaJoie expects her subordinates (the component directors) to work closely beside her so they can keep her informed of their day-to-day operations and together resolve any problems that may occur (LaJoie 14, 21-23).  Accordingly, LaJoie prefers to have the directors work in the central office in Marquette where she works, and that the staff members have regular working hours (LaJoie 25, 60).

---

[8] LaJoie was 50 years old at the relevant time (LaJoie 9).

Although she is attentive to all components of CAAM, given her background in housing, LaJoie has had a more hand-on approach with the housing component, giving more particular and specific directions to the Housing Service Director than other directors who perform roles that she has never done (143-144; LaJoie 23-24).  After becoming the Executive Director, LaJoie identified many areas where Plaintiff needed to improve, particularly his lack of communication with her and with CAAM's outside partners (LaJoie 32-35; *see also* Mahoski 32-34).[9]  Plaintiff admits LaJoie may not have thought he was doing a good job, which also contributed to the more hand-on approach LaJoie took with him than with other component directors (133).  While believing that LaJoie treated him differently than other directors,[10] Plaintiff admits that LaJoie never said anything about his age, his gender, his taking leave, his medical condition, or the complaints that he and other employees had made against the previous Executive Director (132-133).

In late September 2018, Plaintiff sent four grievances regarding LaJoie to the Chair of the Board of Directors (133-134), three of which have nothing to do with discrimination, retaliation, or Plaintiff taking FMLA leave (126, 129-130; *see* Ex. 6).  In the last grievance, Plaintiff claimed that he had endured "discriminatory and abusive behavior" from LaJoie (Ex. 7).  In his grievance, Plaintiff described a meeting with senior staff, during which Plaintiff told LaJoie that his health had suffered as a result of the actions of the previous Executive Director, and LaJoie suggested that he take FMLA leave (*Id.* at  1).[11]  Plaintiff said that LaJoie had a "negative management style," which, Plaintiff believed, "was always directed at [him]." (*Id.*).  He complained about

---

[9] Cited excerpts from Shari Mahoski's deposition transcript are attached as Exhibit 5.

[10] The Head Start Director was Corey Holcomb and the Service Nutrition Program Director was Lori Stephens-Brown; they both were about 45 years old at the relevant time (56-57).

[11] Plaintiff admitted that he did not go on FMLA at LaJoie's suggestion, and he did not receive any discipline for not taking leave (132).

LaJoie's criticism of his work as a Housing Service Director, his staff, and the Housing Service components (*Id.* at 1-5).  He also took issue with LaJoie's requirement that all staff members of the agency work a set schedule (*Id.* at 1-2, 5-6).  Illustrating this problem, Plaintiff described a day when he, despite having agreed to abide by LaJoie's requirement that staff work a set schedule, came in early and left early without letting LaJoie know, and she pointed that out to him (*Id.* at 5-6, 9-10).  Plaintiff then asserted his belief that he was being discriminated because of his age and gender, as well as retaliated against for previously filing an EEOC charge against CAAM (which was withdrawn before LaJoie came on board) (*Id.* at 6).  Despite Plaintiff's complaint that LaJoie criticised his work, his title, benefits, and pay always remained the same (138).  And, he was never formally disciplined (LaJoie 33-35).

## F.    PLAINTIFF'S LEAVE AND DEMAND TO WORK IN MUNISING

Having filed his grievances the Friday before, on Monday, October 1, 2018, Plaintiff requested FMLA "stress leave" for his anxiety (Ex. 8).  The next day, Plaintiff's doctor sent CAAM an incomplete "Certification of Health Care Provider for Employee's Serious Health Condition) (Ex. 9).  In the Certification, Plaintiff's doctor indicated that Plaintiff had "anxiety," due to which Plaintiff was unable to perform "all job functions" (*Id.* at 3); that the "[p]robable duration of condition" was "unknown," though it was estimated that Plaintiff's "period of incapacity" was from October 2 through October 16 (*Id.* at 3-4); and that "[i]f continuing to work in hostile work environment," Plaintiff's condition would cause periodic flare-ups preventing Plaintiff from performing his job functions, during which it was medically necessary for Plaintiff to be absent from work (*Id.* at 4).  The frequency of the flare-ups was, however, "unknown" to Plaintiff's doctor (*Id.*).

Plaintiff's request for FMLA leave was approved on the same day, without Plaintiff having to provide any additional documentation or a second opinion (157, Ex. 10). The Human Resource

7

Manager at the time, Shari Mahoski, sent Plaintiff a letter informing him that he was eligible for FMLA and he could start taking FMLA leave from October 2 to October 15, 2018, per his request (Ex. 10, at 1).  Mahoski informed Plaintiff that he would have to provide a release prior to his return on October 15, 2018 (*Id.*). Enclosed with the letter was a FMLA Designation Notice, in which Plaintiff was specifically informed, "You will be required to present a fitness-for-duty certificate to be restored to employment.  If such certification is not timely received, your return to work may be delayed until certification is provided" (*Id.* at 2).

In the middle of Plaintiff's scheduled leave, on October 10, 2018, CAAM was provided with notes from Plaintiff's doctor stating that Plaintiff was "capable of performing all essential job functions if allowed to work in alternate work location" (Ex. 11; 160).  Plaintiff requested to work out of the Munising office for 30 days (*Id.*).[12]  On the next day, Mahoski responded to Plaintiff's request with a letter, which indicated that it was unclear to CAAM (1) how working from the Munising office enabled Plaintiff to perform the essential functions of his job, including supervising staff working in Marquette, (2) how this requested accommodation addressed anxiety and work-related stress, and (3) how working for 30 days in Munising would help Plaintiff return to his usual work location in Marquette. (Ex. 12, at 2).  Mahoski assured Plaintiff that CAAM would be "committed to engaging in the interactive process with [Plaintiff] to arrive at a reasonable accommodation" (*Id.*).  To do so, more information was needed, and thus Plaintiff was asked to have the disability accommodation request form filled out by his doctor (*Id.*).  Additionally, Mahoski indicated that she would like to schedule a time to meet with Plaintiff to discuss a reasonable accommodation (*Id.*).  In the meantime, as Plaintiff was not fully released to return to

---

[12] Plaintiff testified that the 30 days were chosen because that would be the length of time for his grievances to be investigated, after which Plaintiff expected that LaJoie would be disciplined, and that would change whether he could work or not (172-173, 189).

work, he was asked to remain off work until there was sufficient medical information to facilitate the reasonable accommodation discussion (*Id.*).

In response to Mahoski's letter, Plaintiff disagreed with Mahoski about his ability to supervise his staff from a remote office where no one worked, stating that his work location "is irrelevant to the performance of the essential functions of my job" (Ex. 13, at 1; 165). He further alleged that the anxiety and work-related stress that he was experiencing was "a direct result of daily personal, face to face interaction with an abusive supervisor" and the thirty days would allow CAAM enough time to complete the investigation into his grievances against LaJoie (Ex. 13; 169).

On October 15, 2018, Plaintiff's doctor sent CAAM a completed "Medical Inquiry Form in Response to an Accommodation Request" (Ex. 14). Therein, Plaintiff's doctor indicated that Plaintiff has "Severe Anxiety Adjustment Disorder," which affects his major life activity of "working" (*Id.* at 3). Plaintiff, however, admitted that at the time he requested an accommodation, he could do everything, except working directly face-to-face with LaJoie (169-172). In the Medical Inquiry Form, Plaintiff's doctor also indicated that Plaintiff's condition affected his digestive bodily functions (Ex. 14, at 3). However, none of the medical records obtained from Plaintiff's doctor for this period of time indicated any digestive issues (Ex. 15).[13]

On October 19, 2018, Plaintiff met with Mahoski and Francella Quinnell to discuss possible reasonable accommodations (173). During this meeting, it was proposed to Plaintiff that he could work two-and-a-half days in Munising and two-and-a-half days in Marquette, provided that he could continue supervising and training his employees, updating his supervisor,

---

[13] Indeed, a few weeks earlier, on September 21, 2018, despite having diagnosed Plaintiff with "Adjustment disorder with anxiety," Plaintiff's doctor indicated, regarding Plaintiff's gastrointestinal condition: "No nausea, vomiting. Normal bowel movement. Appetite normal. No bleeding. No abdominal pain or bloating" (Ex. 15, at 2).

9

participating in meetings, and performing other functions of his position (173, 176-177; Ex. 16).

Plaintiff agreed to consider CAAM's proposal (180).  After the meeting, Mahoski sent Plaintiff a

letter memorializing the discussion, including CAAM's proposal and understanding that Plaintiff

would review it with his lawyer and doctor to provide CAAM with a response by October 22, 2018

(Ex. 17, at 1).  At this time, because there had been no fitness-for-duty certificate from Plaintiff's

doctor that would allow him to return to work, CAAM extended Plaintiff's FMLA leave until

October 24, 2018 (*Id.* at 2; 175).

Plaintiff did not consult with his doctor about CAAM's proposal, nor did he respond by

the agreed time, so Mahoski sent him a letter on October 24, 2019, asking him to reach out to her

so that both CAAM and Plaintiff could continue the interact process (Ex. 18).  Later that day,

Plaintiff sent an email to Mahoski, indicating that he found CAAM's proposal unacceptable and

was adamant that he be provided with his original request of working solely out of Munising office

(182, Ex. 19).

The following day, Mahoski sent Plaintiff another letter in an attempt to revive the

interactive process considering Plaintiff's unyielding insistence on his original request (Ex. 20, at

1).  Mahoski expressed CAAM's commitment to "in good faith to try and find a reasonable

accommodation that will work for us and for you" (*Id.*).  Mahoski reiterated the agency's belief

that for Plaintiff to effectively perform his duties, he needed to be in the Marquette office at least

part of the time, specifically: "You are a component supervisor, and in the agency's judgment, this

is an interactive job that requires at least some face-to-face, personal interaction and supervision

with the people you supervise and with the people who supervise you" (*Id.*).  Accordingly,

Mahoski asked that Plaintiff go back to his doctor and ask whether there would be some type of

accommodation that would be effective for Plaintiff to be physically present in the Marquette

10

office at least part of the time (*Id.*).  While CAAM had suggested a half-and-half schedule, Mahoski indicated that the agency would be open to consider "some other combination of this schedule that w[ould] be effective" and also "changes in schedule, work setting, etc., during the time you would be in the Cornerstone office, if your doctor believes those techniques will be effective" (*Id.*).  Additionally, Mahoski also attached with her letter a printout of accommodation ideas for "anxiety disorder" from the Job Accommodation Network[14] for Plaintiff to consult with his doctor and provide her with a counterproposal (*Id.* at 2).  Since there had been no release to return to work provided by Plaintiff's doctor, meaning the reason for FMLA leave continued to exist, CAAM extended Plaintiff's FMLA leave for another week (*Id.* at 2-3).

On October 29, 2018, he responded to Mahoski's letter, indicating that he would review the information Mahoski provided and talk with his therapist in two weeks and then his doctor to see if any other accommodations would be recommended (Ex. 21; 194).  Consequently, Plaintiff's FMLA leave was extended for another two weeks to give him sufficient time to meet with his doctors, which Plaintiff admitted was appropriate (194; Ex. 22, at 1).  Wanting to keep the interactive process engaged, Mahoski also asked to schedule a meeting with Plaintiff after he had a chance to speak with his therapist and doctor (Ex. 22, at 1).

On November 26, 2019, Plaintiff met with Mahoski and Quinnell the second time to discuss Plaintiff's accommodation (Ex. 23).  During this meeting, Plaintiff indicated that he had not seen his doctor, and while he sent the information Mahoski had provided to his therapist, there was no appointment scheduled at this point (*Id.* at 1).  Although 30 days had passed since the date he requested accommodation, Plaintiff continued to insist that he be allowed to work out of

---

[14] The Job Accommodation Network is a service provided by the United States Department of Labor's Office of Disability Employment Policy.  *See* https://askjan.org/about-us/index.cfm.

Munising and avoid interaction with his supervisor until the investigation concluded (*Id.*).[15]  After 15 minutes of discussion, the meeting ended when Plaintiff got upset and threw the paperwork at Mahoski (*Id.*; 197; Mahoski 20).

Since Plaintiff never provided a return-to-work release from his doctor, he continued to be out on leave (202).  In another attempt to reengage with Plaintiff in the interactive process to get him back to work, on December 18, 2018, Mahoski sent Plaintiff a letter indicating that his FMLA leave had been extended until December 28, 2019 so that he could discuss CAAM's proposed alternative accommodation with his medical treaters (*Id.*; Ex. 25).  Plaintiff was informed that after December 28, 2019, he would exhaust his FMLA leave entitlement (Ex. 25).

There is no record of Plaintiff ever discussing any alternative accommodations with his doctor or therapist (Ex. 15; Ex. 26).[16]  Plaintiff never return to CAAM with any other counterproposal (187).  Plaintiff admitted he was the one stopping all negotiations regarding his request for accommodation (209-210).

## G.     PLAINTIFF'S RESIGNATION

After Plaintiff exhausted his FMLA leave, he did not return to work and never provided a release allowing him to go back to work (LaJoie 75, Mahoski 32).  Plaintiff, nonetheless, remained an employee of CAAM; he was never sent a letter of termination, nor did anyone tell Plaintiff that he was terminated (205).  As late as January 9, 2019, CAAM continued paying its employer-portion of the cost to maintain Plaintiff's employer-sponsored insurances (207-208; Ex. 27).

---

[15] The interview part of the investigation, conducted by Mahoski, ended in November 28, 2018, and the Executive Committee released its decision to the full board in January 2019 (Ex. 24).

[16] After October 15, 2018, Plaintiff did not visit his doctor until May 28, 2019 (Ex. 15, at 15-16). There is also no record of any meeting between Plaintiff and his therapist after October 9, 2018 (Ex. 26, at 6).  Plaintiff's full medical records can be made available for the Court's review upon request.

However, since Plaintiff exhausted his paid leave,[17] he was asked to pay the employee's share of the costs to maintain his benefits provided by CAAM (*Id.*).

After being informed that the Executive Committee had found, through an investigation, that Plaintiff's grievances were not substantiated, on January 15, 2019, Plaintiff sent a letter to the entire Board indicating that he was "uncertain" about his status with the agency (145; Ex. 28, at 1).  Plaintiff complained about not being allowed to work fully out of Munising office for 30 days as an accommodation (even though 30 days had passed since he made his request and his doctor never cleared him to return to work), as well as about the investigation into his grievances (Ex. 28, at 2).  Plaintiff then indicated that he had retained counsel to bring actions against CAAM and all further communication from CAAM to Plaintiff must go through his attorney (Ex. 28, at 3).

Two days later, Plaintiff, on his own volition, sent an email to all CAAM employees except LaJoie and Mahoski (Ex. 29; 210).  Saluting the recipients as "[f]ormer colleagues and friends," Plaintiff invited them to distribute his email to anyone who was not included (Ex. 29).  He then informed everyone that he would not be returning to work at CAAM and wished them all well (*Id.*), writing:

- "It's becoming increasingly apparent that I won't be coming back.  I tried, but it was not to be.  I apologize the for timing and the manner of my departure, especially to my staff.  It could not have come at a worse time, but it could not be helped."
- "…I'm sure housing services will improve now that I'm gone."
- "I'm sorry, I can't anymore.  I will no longer risk my physical, mental, emotional and spiritual health.  I will not die for this cause."

(*Id.*).  Plaintiff ended his email with, "Fair winds and following seas" (*Id.*).  Plaintiff admits that from October 2, 2018 until January 17, 2019, he had no communication with LaJoie and nobody

---

[17] Plaintiff was out of paid leave in late December 2018 (207).

harassed him (212).  However, he, on his own, determined that he could not work for CAAM anymore (210).

Plaintiff's email was shared with LaJoie and Mahoski, who interpreted Plaintiff's email as a resignation (Lajoie 70).  A letter was then sent to Plaintiff, which acknowledged the receipt of Plaintiff's email to agency-wide staff members indicating his intention to not return to CAAM and accepted Plaintiff's resignation (Ex. 30).  In response, Plaintiff said that he had not resigned and considered himself terminated (*See* Ex. 31).  CAAM explicitly told Plaintiff that it never terminated Plaintiff (Ex. 32).  And, despite being informed of CAAM's interpretation of his January 17 email as the act of resignation and insisting that he did not resign, Plaintiff never asked to return to CAAM as an employee (*See* Ex. 31).

## H.     POST-CAAM EMPLOYMENT

Two months after Plaintiff resigned from CAAM, he was hired by the Michigan Department of Health and Human Services as the Social Security Outreach Access and Recovery navigator (27-29).  In this role, he has been working with LaJoie (203-204).  Plaintiff has not looked for any different or additional employment since he started his current job (29-30).

## I.     PLAINTIFF'S COMPLAINT

On December 13, 2019, Plaintiff filed his Complaint, alleging 7 counts: (1) failure to accommodate in violation of the American with Disabilities Act ("ADA"), (2) discriminatory discharge in violation of the ADA; (3) interference of Plaintiff's leave under the Family and Medical Leave Act ("FMLA"); (4) discrimination and/or retaliation against Plaintiff for taking FMLA leave; (5) age discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"); (6) retaliation in violation of ELCRA; and (7) retaliation in violation of Title VII of the Civil Rights Act ("Title VII") (ECF No. 1).

14

## <u>STANDARD OF REVIEW</u>

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).  Summary judgment is mandated under Rule 56 when the pleadings and evidence on file show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. *Id*.  "The substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id*.  Once the moving party makes this showing, the non-movant must present evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 324.

To carry his burden, Plaintiff, as the non-movant, "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He must present sufficient evidence to support a resolution of the factual issue in his favor.  *Anderson*, 477 U.S. at 249.  Entry of summary judgment is appropriated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Although all evidence is viewed in a light most favorably to Plaintiff, *Anderson*. 477 U.S. at 255, neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's burden, *Celotex*, 477 U.S. at 323-324, and he must present "significant probative evidence" in support of her claims, *Moore v. Philip Morris Co*., 8 F.3d 335, 340 (6th Cir. 1993).  "[T]he mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient..."  *Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 432 (6th Cir. 2002).

## ARGUMENT

### I.    PLAINTIFF'S ADA CLAIMS FAIL AS A MATTER OF LAW.

#### A.    Plaintiff Does Not Have a Disability As Defined By The ADA.

To have a claim under the ADA, Plaintiff must show that he has a "disability" as defined by the statute.  *See Burns v. Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 253 (6th Cir. 2000) (a plaintiff's "ability to show that he is 'disabled" within the meaning of the [ADA] is a 'threshold requirement' for recovery under the Act"); *Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 432 (6th Cir. 2016);[18] *Anderson v. Avon Prod., Inc.*, 340 F. App'x 284, 288 (6th Cir. 2009) (citation omitted). Here, as Plaintiff is alleging violations of the ADA based on his actual disability, he "must show not only that he was disabled – i.e., suffered a 'physical or mental impairment' – but also that such an 'impairment substantially limited one or more major life activities.'" *Neely*, 640 F. App'x at 433, citing 42 U.S.C. § 12102(1)(A) (alterations in the original omitted); *Burns,* 222 F.3d at 253

Although Plaintiff's doctor represented to CAAM that Plaintiff's mental impairment (anxiety disorder) affected his ability to work and digestive function, the sole conclusory statement by Plaintiff's doctor, unsupported by any facts, was insufficient to demonstrate that Plaintiff's anxiety "substantial limited" major life activities.  *Doren v. Battle Creek Health Sys.,* 187 F.3d 595, 598 (6th Cir. 1999); *Moore v. J.B. Hunt Transp., Inc.,* 221 F.3d 944, 951 (7th Cir. 2000) (holding that doctors' statement that plaintiff's impairment is substantially limiting did not defeat summary judgment because it did not provide specific facts but was "merely conclusory, restatement requirements of the law"); *see also Hummel v. Cty. of Saginaw,* 118 F. Supp. 2d 811, 817 (E.D. Mich. 2000), *aff'd,* 40 F. App'x 965 (6th Cir. 2002) (holding that the doctor's conclusory

---

[18] Unpublished decisions are attached as Exhibit 33.

statement was "woefully inadequate to create a fact issue").  A showing must be made by Plaintiff, and he cannot do so. *See Neely,* 640 F. App'x at 434.

Here, there is no record from Plaintiff's own doctor showing that there were any issues with Plaintiff's digestive function associated with the diagnosis of anxiety disorder.  Indeed, Plaintiff's doctor examined Plaintiff and found that his gastrointestinal system completely normal, despite diagnosing him with anxiety disorder.  In other words, it is undisputed that Plaintiff's condition did not "substantially limit" his digestive bodily function.

To demonstrate that his mental condition "substantially limited" his ability to work, Plaintiff must show that he is unable to perform a broad range of jobs because of his condition. *Tinsley v. Caterpillar Financial Services Corp.,* 766 F. App'x 337 (6th Cir. 2019) (a plaintiff arguing working as the major life activity "is still required to show that her impairment substantially limits her ability to 'perform a class of jobs or broad range of jobs'"); *Booth v. Nissan North America, Inc.*, 927 F.3d 387 (6th Cir. 2019) (an individual claiming a substantial limitation in working must prove that he is "preclude[d] from working in a class or broad range of jobs"). Here, Plaintiff does not even claim that he could not perform his own job; he only claims that he could not work with LaJoie while the investigation into his grievances was pending.[19]  In other words, according to Plaintiff, had he had he had another supervisor, he would have been able to perform his job.  Under well-established Sixth Circuit precedent, an impairment which only limits an employee's ability to work with a particular person does not substantially affect his ability to work. *Tinsley,* 766 F. App'x at 342 (holding that where the employee claimed only that she could not work with her manager because of his management style and indicating that she could work in

---

[19] Plaintiff has been working with LaJoie in his current employment and he seems to have no issues with that.

the same job if she worked for a different manager, this was not a "substantial limitations" of working); *Fricke v. E.I. Dupont Co.,* 219 F. App'x 384, 389 (6th Cir. 2007) ("Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA"); *Leitner v. Potter,* No. 1:09-CV-274, 2010 WL 3890955, at *20 (W.D. Mich. Sept. 29, 2010) ("The major life activity of working is not "substantially limited" if the plaintiff merely cannot work under a certain supervisor because of anxiety and stress").

Accordingly, Plaintiff does not have "disability" as understood by the ADA and his claims thereunder must fail.

### B.    Plaintiff Is Not A Qualified Individual.

The ADA only protects "an otherwise qualified individual with a disability."  42 U.S.C. § 12112(a).  To show that he is a "qualified individual with a disability," Plaintiff must demonstrate that he could perform the essential functions of his job with or without reasonable accommodation. 42 U.S.C. §12111(8); *Hankins v. The Gap, Inc.,* 84 F.3d 797 (6th Cir. 1996).

The inquiry into whether a job duty is an "essential function" is not intended to second-guess the employer's business judgment.  *See EEOC v. Ford Motor Co.,* 782 F.3d 753, 762 (6th Cir. 2015)*.*  Here, Plaintiff is asking this Court to act as a "super-personnel department" that reexamines CAAM's determination of its business need from Plaintiff's job, and the Sixth Circuit has time and time again rejected this type of attack.  *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019); *Hedrick v. W. Rsrv. Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004) ("As we have oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management'").  Further, an employee's opinion as to the "essential functions" of a position is insufficient to create a genuine issue of material fact.  *Ford Motor Co.*, 782 F.3d at 764 ("we do

18

not 'allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience') (citation omitted).

In other words, CAAM has the discretion to establish essential job functions, and its business judgment should be given a "significant degree" of deference.  42 U.S.C. § 12111(8); 29 C.F.R. §1630.2(n)(3).  Here, it is undisputed that CAAM deemed Plaintiff's being present in the main office, where many of his subordinates and supervisor work, an essential function of his job. CAAM's business judgment is consistent with the Sixth Circuit, which has said, "Regular, in person attendance is an essential function … of most jobs, especially the interactive ones." *Ford Motor Co.,* 782 F.3d at 762-63; *see also Williams v. AT&T Mobile Services LLC,* 847 F.3d 384, 391-92 (6th Cir. 2017); *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 339 (6th Cir. 2001).  Plaintiff's job was undisputedly interactive in nature; as part of his job, he was required to regularly communicate with the Executive Director to update her of his work and consult her if any issues arise for prompt resolution.   He was also required to supervise his staff, the majority of whom work in Marquette, and communicate with outside partners of CAAM.  These functions required him to have a regular presence (at least in a part-time capacity) in the Marquette office.

It is anticipated that Plaintiff will argue that his presence in the Marquette office is not essential because during the COVID-19 pandemic, CAAM allowed certain employees, including the current Housing Service Director, to work from home to ensure social distancing in the office and limit spread of the virus.  However, the EEOC, charged with the duty to enforce the ADA, has specifically rejected this argument:

> The fact that an employer temporarily excused performance of one or more essential functions when it closed the workplace and enabled employees to telework for the purpose of protecting their safety from COVID-19, or otherwise chose to permit telework, does not mean that the employer permanently changed a job's essential functions, that telework is always a feasible accommodation, or that it does not pose an undue hardship.

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (updated Dec. 16, 2020).  Here, LaJoie specifically testified that it was difficult for CAAM to operate when the current Housing Service Director worked from home fulltime given the inability to communicate face-to-face with him and many issues could not be resolved because of the lack of personal interaction (LaJoie 21-23).  This further demonstrates that Plaintiff's being present in the main office where the people he needed to interact with work was an essential function of his job.

Plaintiff may also try to raise an issue of fact as to whether in-person presence in the Marquette office was an essential function of his job by pointing to the fact that after his heart surgery in late 2017, he was allowed to work part-time out of the Munising office for a few weeks.  However, this was when Plaintiff had a different supervisor.  When LaJoie, the new supervisor came on board, she has the right to set out different expectations for CAAM employees, specifically regarding in-person attendance, based on her determination of the business need.  *See Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.,* 176 F.3d 921, 929 (6th Cir. 1999) (an employer can change "how it wanted plaintiff to do the job" and courts do not "second guess defendant's business judgment" behind such changes); *see also* EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* (1992) ("The ADA does not limit an employer's ability to establish or change the content, nature, of functions of a jobs"); EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* (1992); EEOC, *Enforcement Guidance: Workers' Compensation and the ADA* (1996) (same); *Bilinsky v. Am. Airlines, Inc.,* 928 F.3d 565, 572 (7th Cir. 2019) (employer could change the functions of telecommuting employees and require her to work face-to-face with team members, even though it meant that an employee with a disability

20

could no longer perform the job after the changes).  Here, LaJoie determined that it is essential that *all* of the component directors to work out of the Marquette office, where she worked, so that they can update her and inform her of any issues in CAAM programs that need to be resolved.  And, her judgment was proven to be correct, as a lot of the issues could not be resolved when the person currently in Plaintiff's position was not working onsite.  However Plaintiff disagreed with LaJoie and CAAM's business judgment, it is not the role of this Court to second guess it.

Reasonable accommodation never requires elimination of an essential job function.  *See e.g., Adams v. Potter*, 193 F. App'x 440, 445 (6th Cir. 2006).  Here, the only request for accommodation made by Plaintiff was for him to not be present in the Marquette office 100 percent of the time, which would essentially eliminate an essential function of his job.  Such an accommodation was *per se* unreasonable.  *Ford*, 782 F.3d at 761.

Moreover, it is undisputed that even with Plaintiff's proposed accommodation, he could not perform his job.  Plaintiff's request to work in a remote location was essentially a request to not have to see or communicate face-to-face with LaJoie for 30 days.  After 30 days passed, during which he did not see or communicate with LaJoie, Plaintiff still could not return to work.

In short, because Plaintiff could not perform the essential functions of his job with or without reasonable accommodation, he is not a qualified individual under the ADA, and his claims thereunder fail as a matter of law.

### C.    Plaintiff's Failure-To-Accommodate Claim Also Fails Because He Failed To Participate In Good Faith In The Interaction Process.

"[T]he ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing."  *Brumley v. United Parcel Serv., Inc.,* 909 F.3d 834, 840 (6th Cir. 2018).  Indeed, "An employer's refusal to provide an accommodation to the position of the employee's choice immediately upon the employee's request is not, in and of itself, a failure to accommodate

under the ADA." *Id.* Instead, accommodation does not need to be given until an interactive process is initiated to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome [the employee's] limitations." *Id.*; *see also* 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith and not "obstruct the process or refuse to participate." *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 871 (6th Cir 2007); *Keith v. County of Oakland,* 703 F.3d 918 (6th Cir. 2013); *Jakubowski v. Christ Hosp., Inc.,* 627 F.3d 195, 202 (6th Cir. 2010), *cert. denied,* 564 U.S. 1039 (2011). Although an employer should give consideration to the employee's preferred accommodation, an employer is free to choose any effective accommodation that is less expensive or easier to provide. *See Hankins,* 84 F.3d at 800–01 (saying that although an employer has a duty to offer a reasonable accommodation to a qualified employee, "an employee cannot make [the] employer provide a specific accommodation if another reasonable accommodation is instead provided"); *see also Smith v. Honda of Am. Mfg., Inc.,* 101 F. App'x 20, 25 (6th Cir. 2004) ("Where there is more than one reasonable accommodation, the choice of accommodation is the employer's").

Here, as indicated above, the accommodation requested by Plaintiff was not reasonable (*i.e.*, it would eliminate an essential function of Plaintiff's job). It is undisputed that CAAM went out of its way to engage in an interactive process with Plaintiff to provide him with alternatives that would address his concerns. CAAM not only tried to meet Plaintiff half way by offering a half-and-half telework and in person schedule, when Plaintiff flatly rejected CAAM's proposal, it also offered to consider any other suggestions from Plaintiff's doctor, including the possibility for

some other combination of remote/in-person schedule and any other accommodation that would be effective.  As such, CAAM has fulfilled its obligation (if any) to provide Plaintiff with reasonable accommodation.  *See Yochim v. Carson,* 935 F.3d 586 (7th Cir. 2019) (holding that although the employee wanted to work full-time at home, the employer adequately offered a reasonable accommodation by suggesting a schedule modification to address her medical requirements). Plaintiff's insistence on his one-and-only request and refusal to consider any alternative did not take away the fact that CAAM had satisfied its ADA obligation.  *See McDonald v. UAW-GM Ctr. for Human Res.,* 738 F. App'x 848, 855 (6th Cir. 2018) (holding that employer did not need to offer "a counter accommodation" when the employee rejected the employer's proposed accommodation based on her "preference").  Here, Plaintiff himself admitted, and the records unequivocally show, that Plaintiff never discuss with his doctors CAAM's proposal or any other alternative accommodations, and his inflexibility undisputedly broke down the interactive process.

Because it is undisputed that Plaintiff failed to engage in the interactive process in good faith, his failure-to-accommodate claim fails as a matter of law.

### D.     Plaintiff's Discrimination Claim Under the ADA Also Fails Because CAAM Did Not Take Any Adverse Employment Action Against Plaintiff.

To make a *prima facie* case of discrimination, Plaintiff must also show that he suffered an adverse employment action due to his disability.  *Gecewicz v. Henry Ford Macomb Hosp. Corp.,* 683 F.3d 316, 321 (6th Cir. 2012) (citation omitted).  "An adverse employment action is a 'materially adverse change in the terms or conditions of … employment *because of the employer's conduct*." *Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 182 (6th Cir. 2004) (alteration in the original omitted) (emphasis added).

Here, Plaintiff admitted that before January 17, 2019, he was never sent a termination letter, nor did anyone tell him that he was terminated.  In fact, just a week later, CAAM sent Plaintiff a letter indicating that it would continue maintain Plaintiff's employer-sponsored benefits with Plaintiff paying the employee's share.  Plaintiff, on his own, sent the email to CAAM staff members on January 17, 2020, in which he called them as "[f]ormer colleagues and friends" and said that: (1) he "tried [to come back], but it was not to be;" (2) his departure "could not be helped;" (3) the "housing services will improve now that [he was] gone;" (4) he was "sorry," he "c[ouldn't] anymore."  CAAM reasonably interpreted this email as a resignation letter, as Plaintiff himself admitted that he said in his email that he could no longer work for CAAM under the current condition.  And, despite claiming that he did not resign, Plaintiff never asked to return to work. Given these undisputed facts, no reasonable jury can find that CAAM terminated Plaintiff. Whether Plaintiff wants to call it resignation or not, he was the one voluntarily initiating the end of his employment.

Unavailing is Plaintiff's anticipated argument that he was constructively discharge because CAAM did not provide him with his one-and-only request for accommodation, which, as explained above, was not reasonable.  A constructive-discharge claim is "hard to prove. The employee must show that [his] working conditions were objectively intolerable and that [his] employer deliberately created those conditions in hopes that they would force her to quit." *Groening v. Glen Lake Cmty. Schs.,* 884 F.3d 626, 630 (6th Cir. 2018). And "[t]he employee has an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 515 (6th Cir. 1991) (internal quotation marks and citation omitted).

Here, Plaintiff cannot show that CAAM failed to reasonably accommodate him as required by the ADA, and there is no evidence that CAAM's denial of Plaintiff's one-and-only request for

24

accommodation was designed to force Plaintiff to resign from CAAM.  *Gleed v. AT&T Mobility Servs., LLC*, 613 Fed. Appx. 535, 540 (6th Cir. 2015) ("[T]he denial of an accommodation, by itself, is not sufficient to prove that an employer constructively discharged an employee").  Undisputedly, CAAM repeatedly attempted to engage Plaintiff in an interactive dialogue to discuss his accommodation, proposed alternative accommodation to Plaintiff in an effort to get him back to work, and offered to considered other accommodations from Plaintiff's doctors when Plaintiff flatly rejected CAAM's proposal.  Plaintiff admits that no one harassed him during his leave or during the time the interactive process was ongoing.  No reasonable jury could find that CAAM's rejection of Plaintiff's one request for accommodation, which CAAM determined in its business judgment to be unreasonable, was an intention to force Plaintiff to quit after all the effort CAAM put in to get Plaintiff back to work. *Green v. BakeMark USA, LLC*, 683 F. App'x 486, 496 (6th Cir. 2017) (holding that plaintiff cannot show that employer "deliberately created intolerable working conditions" when it "(1) openly communicated with [plaintiff's] doctor; (2) repeatedly attempted to arrange meetings with [plaintiff] to discuss potential accommodations; and (3) proposed alternative accommodations when necessary") (alteration in original omitted).

## E.   Plaintiff's Discrimination Claim Under the ADA Fails Because Plaintiff Cannot Show that CAAM's Actions Were Because Of His Disability.

Even if Plaintiff can establish a *prima facie* case of discrimination, CAAM has articulated a legitimate, non-discriminatory business reason for its actions.  Plaintiff cannot make the requisite legal showing to establish pretext.  "A plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009).  Plaintiff must show that his

alleged disability was the "but-for" cause of the employer's adverse employment decision.  *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 321 (6th Cir. 2012).

CAAM had legitimate business reasons for its actions, which Plaintiff cannot show to be a pretext for unlawful discrimination.  First, as indicated above, CAAM had a legitimate business reason for declining to provide Plaintiff with his one-and-only request for accommodation to work 100 percent from Munising office, because such an accommodation would be unreasonable as it would eliminate an essential function of Plaintiff's job – his ability to interact directly with his supervisor, his peers, and his direct reports.

CAAM also had a legitimate business reason to not return Plaintiff to work because Plaintiff's doctor never released Plaintiff to work unless Plaintiff would be provided with his one-and-only unreasonable request for accommodation.  An employer may require medical clearance following FMLA leave if the employer has a "uniformly-applied policy or practice that requires all similarly-situated employees ... who take leave for such conditions to obtain and present certification from the employee's health care provider that the employee is able to resume work."[3] 29 C.F.R. § 825.312(a).  And an employer may legally delay restoring the employee to her position until she submits the required fitness-for-duty certification "unless the employer failed to provide the notices required." 29 C.F.R. § 825.312(d); *Verkade v. U.S. Postal Serv.,* 378 F. App'x 567, 577 (6th Cir. 2010); *Shimko v. Lowe's Home Centers, LLC*, No. 4:17-CV-11709, 2019 WL 934857, at *7 (E.D. Mich. Feb. 26, 2019).  Here, CAAM undisputedly provided Plaintiff with the notice that he was "required to present a fitness-for-duty certificate to be restored to employment" and, "If such certificate is not timely received, [Plaintiff's] return to work may be delayed until certification is provided" (*See e.g.,* Ex. 10, at 2).  Undisputedly, no fitness-for-duty

certificate was provided by Plaintiff.  Thus, CAAM justifiably was unable to bring Plaintiff back to work.

Finally, CAAM has a legitimate business reasons to deem Plaintiff's January 17, 2019 email a notice of resignation.  The plain language of the correspondence clearly indicated Plaintiff's intention of not returning to work, despite having never been told that he was terminated and having (just one week earlier) received a letter indicating that his employer-sponsored benefits would continue with him paying the employee's portion of the cost (indicating there was still an employment relationship between Plaintiff and CAAM).  Plaintiff acknowledges that he said he could no longer work for CAAM.  And, after learning that CAAM interpreted his email to be a notice of resignation, Plaintiff's immediate acknowledgment of his employment being ended, coupled with zero effort to ask to return to work, were evident of his intention to no longer work for CAAM after January 17, 2019.

Plaintiff has no evidence that CAAM's legitimate business reasons did not, or were insufficient to, motivate CAAM's actions.  And, he cannot meet the requirement to provide evidence from which the fact finder could conclude that CAAM's action (if found to be "adverse employment action") was really because of Plaintiff's alleged disability (if found to be one understood by the ADA).  *Wright v. Memphis Light, Gas & Water Div.,* 558 Fed. Appx. 548, 555 (6th Cir. 2014) ("To survive summary judgment, '[the employee] was required to provide not only evidence from which the finder of fact could conclude that [the employer's] proffered reason is false, but also evidence from which the fact finder could conclude that [the employer's] action was intentionally discriminatory'"); *Smith v. Allstate Ins. Co.*, 195 Fed. Appx. 389, 395 (6th Cir. 2006) ("Hence, [the employee's] burden was to produce evidence . . .  sufficient not only to show the

falsity of [the employer's] explanation, but to support the inference that the real reason for the adverse action was the prohibited factor").

If anything, the actions by CAAM—taken in the span of months—would be entirely inconsistent had it been the CAAM's intention to discriminate against Plaintiff.  CAAM repeatedly attempted to reengage Plaintiff in the interaction process so that he could return to work.  After the 30-day period had passed from the time Plaintiff's doctor said Plaintiff was restricted, CAAM did not take any action against Plaintiff for his failure to return to work.  Indeed, CAAM extended Plaintiff's job-protected FMLA leave, and even allowed Plaintiff to stay out on unprotected leave when his FMLA leave had been exhausted, without taking any action against him.  In short, Plaintiff cannot show that CAAM's reasons for its actions were false or just pretexts for discrimination.

## III.   PLAINTIFF'S CLAIMS Of DISCRIMINATION AND RETALIATION UNDER THE ELCRA AND TITLE VII FAIL AS A MATTTER OF LAW.

### A.   CAAM Did Not Take Any Adverse Employment Action Against Plaintiff.

To establish a *prima facie* case of discrimination and retaliation under the ELCRA, Plaintiff must show that he was subject to an adverse employment action.  *Lytle v. Malady*, 458 Mich. 153, 173, 579 N.W.2d 906 (1998); *Barrett v. Kirtland Cmty. Coll.,* 245 Mich. App. 306, 315, 628 N.W.2d 63 (2001) (citation omitted).  As shown above, CAAM did not take any adverse employment action against Plaintiff.

### B.   Plaintiff's Age Discrimination Claim Under ELCRA Also Fails Because He Fails To Show Any Circumstances Which Give Rise to An Inference Of Unlawful Discrimination.

To establish a *prima facie* case of age discrimination, Plaintiff must also present circumstances giving rise to an inference of unlawful discrimination. *Lytle*, 458 Mich. at 173. Here, Plaintiff admitted that nobody at CAAM has ever said anything about his age.

Plaintiff may claim that inference of unlawful discrimination arises because Plaintiff believed that LaJoie treated him differently from the other component directors, who are younger than Plaintiff.  But the admitted facts do not justify such an inference.  For example, Plaintiff's claim that LaJoie did not allow him to set his schedule while allowing others to do the same is contradicted by Plaintiff's own admission that LaJoie required every staff at CAAM, not limited to just Plaintiff or his subordinates, to work either from 7:30 to 4:00 or 8:00 to 4:30, five days a week (137).  And, all component directors, not just Plaintiff, are required to work out of the Marquette office.  Plaintiff also claims that his performance was criticized more than other directors.  But, to raise an inference of discrimination, Plaintiff must show that "'all of the relevant aspects' of [the component directors'] employment situation were 'nearly identical' to those of [Plaintiff's'] employment situation."  *Town v. Michigan Bell Tel. Co.,* 455 Mich. 688, 700, 568 N.W.2d 64, 70 (1997).  Here, it is undisputed that the other component directors and Plaintiff oversaw completely different programs and performed completely different functions.  *See e.g., Coats-Hall v. United Airlines*, No. 07-14699, 2009 WL 261539, at *4 (E.D. Mich. Feb. 4, 2009) (employees responsible for completely different department were not similarly situated in all "relevant aspects").  Additionally, Plaintiff has no evidence that other component directors, like him, did not meet the LaJoie's communication and performance expectations.  *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004) ("to be deemed 'similarly situated,' the individuals with whom Appellant compares herself 'must have … engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it'"), citing *Gray v. Toshiba Am. Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir. 2001).

C.    **CAAM Has Legitimate Reasons for Its Actions, Which Plaintiff Could Not Show To Be Pretext For Discrimination Or Retaliation.**

As explained above, CAAM has legitimate business reasons for its actions, which Plaintiff cannot show were false or pretext for unlawful retaliation or discrimination.

III.    **PLAINTIFF'S FMLA CLAIMS FAIL AS A MATTER OF LAW.**

A.    **CAAM Did Not Interfere With Plaintiff's Rights To Take FMLA Leave.**

To prevail on an interference claim, Plaintiff must prove that: (1) he was an eligible employee, (2) CAAM was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which he was entitled. *Edgar v. JAC Prod., Inc.,* 443 F.3d 501, 507 (6th Cir. 2006) (internal citations omitted).

Here, Plaintiff cannot show that CAAM denied him any FMLA benefits to which he was entitled. CAAM provided Plaintiff with the FMLA leave he requested – and then some. Plaintiff alleges that CAAM interfered with his right to take FMLA leave "by failing to return him to the same or similar position as that which held prior to his leave and in ultimately terminating him" (ECF No. 1, PageID. 7, ¶ 49). But Plaintiff did not return to work, ask to return to work, or providing any medical documentation allowing him to return to work, at the conclusion of the 12 weeks. This is fatal to his FMLA claim. *See, e.g., Verkade,* 378 F. App'x at 577.

Plaintiff may claim that CAAM denied his rights under the FMLA because it did not provide him with a notice of rights and responsibilities after he requested leave. But, "[a]n employer's failure to comply with the notice requirements of the FMLA only supports a cause of action where 'the inadequate notice effectively interfere[s] with the plaintiff's statutory rights.'" *Fink v. Ohio Health Corp.,* 139 Fed. Appx. 667, 671 (6th Cir. 2005), quoting *Mion v. Aftermarket Tool & Equip. Group,* 990 F.Supp. 535, 539 (W.D. Mich. 1997). Here, while CAAM

did not provide Plaintiff with a document specifically entitled "Notice of Rights and Responsibilities," CAAM provided Plaintiff with notice that he was eligible for FMLA leave, that his request for leave was granted, that he was required to provide documents to support his leave and return from leave, that he was required to substitute paid leave during his FMLA leave, and that he had the rights to return to work after his FMLA leave.  Plaintiff admits that he was aware of his FMLA rights.  Additionally, it is undisputed that Plaintiff was given all the FMLA leave to which he was entitled.  *See e.g., Mion,* 990 F. Supp. at 539 (there was no FMLA interference even though employer failed to provide notice of FMLA rights to employee because she was provided with all of her FMLA leave); *Suchanek v. Univ. of Kentucky,* No. CIV.A. 3:10-19-DCR, 2011 WL 3045986, at *5 (E.D. Ky. July 25, 2011) (employer did not interfere with employee's leave even though it fails to provide employee with notice of FMLA rights because employee was provided with all the leave requested); *James v. James Marine, Inc.,* 805 F. Supp. 2d 340, 353 (W.D. Ky. 2011) (employer's failure to provide notice did not interfere with employee's FMLA rights because employee received twelve weeks of leave under the FMLA).

Plaintiff also complains that CAAM extended his FMLA leave when there was no release to return to work from Plaintiff's doctor even though Plaintiff did not ask for additional leave. However, "once [CAAM] determine[d] that [Plaintiff's] leave qualifies as FMLA leave, it must designate the leave as FMLA-qualifying leave and notify the employee of the designation." *Gutierrez v. 78th Jud. Dist. Ct.,* No. 1:07-CV-1268, 2009 WL 2584748, at *4 (W.D. Mich. Aug. 18, 2009) (Maloney, J.), citing 29 C.F.R. § 825.220(d) ("Employees cannot waive, nor may employers induce employees to waive, their prospective rights under FMLA"); *see also* WHD Opinion Letter FMLA2019-1-A, 2019 WL 1514982, at *2 (Mar. 14, 2019) ("Once an eligible employee communicates a need to take leave for an FMLA-qualifying reason, neither the

31

employee nor the employer may decline FMLA protection for that leave" and "the employer may not delay designating leave as FMLA-qualifying, even if the employee would prefer that the employer delay the designation"); WHD Opinion Letter FMLA2019-3-A, 2019 WL 4324268, at *3 (Sept. 10, 2019).[20]  Here, Plaintiff's doctor certified that he had a serious health condition for which he needed FMLA leave.  At the end of Plaintiff's requested leave, Plaintiff never provided CAAM with a medical release stating that he could return to work, and he requested accommodation because of the condition that was the basis of his leave.  Thus, the serious health condition for which Plaintiff needed FMLA leave continued to exist, and CAAM appropriately designated subsequent extensions of Plaintiff's leave as FMLA leave.[21]

In short, Plaintiff's FMLA interference claim fails as a matter of law.

### B.      Plaintiff's FMLA Retaliation Claim Fails.

To establish a *prima facie* case of retaliation under the FMLA, Plaintiff must show that: (1) he was engaged in a statutorily protected activity; (2) CAAM knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action.  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (citation omitted).  As explained above, CAAM did not take any adverse employment action against Plaintiff.  Plaintiff also has no evidence that any actions taken by CAAM was causally linked to his FMLA leave.

---

[20] The Department of Labor's Opinions Letters are attached as Exhibit 34.

[21] Plaintiff does not have a viable claim of FMLA interference based on the ground that he was involuntarily forced to take FMLA leave.  To recover from this theory, Plaintiff must show that (1) he did not have a job-restricting serious health condition, and (2) he sought FMLA leave at a later date, and such leave was not available because he was wrongfully forced to use FMLA leave in the past.  *Huffman v. Speedway LLC*, 621 F. App'x 792, 797 (6th Cir. 2015).  Here, Plaintiff undisputedly had a job-restricting serious health condition, and he never sought FMLA leave after October 2018.

Also as indicated above, CAAM's actions were supported by legitimate business reasons. Plaintiff has no evidence to show that such actions were pretexts for unlawful discrimination or retaliation for his exercise of FMLA rights. *Id.* at 285. Ultimately, Plaintiff could not meet the burden to show that CAAM intentionally discriminated or retaliated against him. *Id.*

Accordingly, Plaintiff's FMLA retaliation claim should be dismissed.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Defendant respectfully prays that this Honorable Court dismiss Plaintiff's Complaint in its entirety with prejudice.

Respectfully submitted,

/s/Megan P. Norris (P39318)
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com

Dated:  March 30, 2020

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Civil Rule 7.2(b)(ii), the undersigned counsel hereby certifies that the Brief in Support of Defendant's Motion for Summary Judgment consists of 10,458 words as defined by Local Civil Rule 7.2(b)(i).  This word count is generated using Microsoft Words for Microsoft 365 software.

Respectfully submitted,

/s/Megan P. Norris (P39318)
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com

Dated:  March 30, 2020

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 30, 2021, I electronically filed the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing to all attorneys

of record.

/s/Megan P. Norris (P39318)
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendant
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
norris@millercanfield.com