Page 1

1

2                     UNITED STATES DISTRICT COURT

3                     WESTERN DISTRICT OF MICHIGAN

4                          NORTHERN DIVISION

5

6     RODNEY DES JARDINS,

7             Plaintiff,

8                                    Case No. 2:19-cv-00252

9                                    Hon. Paul L. Maloney

10    -vs-

11    COMMUNITY ACTION ALGER-

12    MARQUETTE,

13            Defendant.

14    _____/

15    PAGES 1 TO 225

16

17            The Deposition of RODNEY DES JARDINS,

18            Taken via Veritext Remote

19            Commencing at 10:07 a.m.

20            Thursday, November 5, 2020

21            Before Ravin Neal, CSR-8420

22

23                  Court reporter, attorneys &

24                  witness appearing remotely.

25

Exhibit 2

1    Bay Shore Medical Clinic in Munising, Michigan.
2  Q   Is Dr. Blakeman in Marquette?
3  A   Yes, he is.  I believe so.
4  Q   Any other physicians that you have seen in the last
5    five years?  Not counting your dentist.
6  A   Okay.  I had a colonoscopy two years ago.  I don't
7    remember the name of the doctor.
8  Q   Okay.  Anything else you can think of?
9  A   No.
10 Q   Have you had any counseling or therapy of any kind?
11 A   Yes, I have.
12 Q   With whom?
13 A   The name is Patrice Evans, E-v-a-n-s.  She has a
14    private practice in Munising, and she was the --
15    was CAAM's EAP counselor, who was assigned to me
16    when I applied for EAP assistance.
17 Q   Are you currently on any medications?
18 A   Medications, yes.
19 Q   What are you on?
20 A   I am on Metoprolol for blood pressure and
21    pravastatin for cholesterol.
22 Q   How long have you been on Metoprolol?
23 A   Since I came out of heart surgery.
24 Q   And how long have you been on pravastatin?
25 A   The same.  Since November of 2017.

1  Q   Has your attorney sent you to any kind of physician
2    or treater of any kind to be examined?
3  A   No.
4  Q   Am I correct that you went on FMLA leave two times
5    during your employment with CAAM?
6  A   I don't believe so.
7  Q   You think just once?
8  A   Once.
9  Q   Okay.  Do you have any medical condition today that
10    you are claiming was caused by CAAM?
11 A   I suffer from anxiety, which was the result of my
12    employment with CAAM.
13 Q   Have you treated for that?
14 A   I -- I have learned self-management techniques,
15    thanks to my EAP counselor.  I am very mindful, and
16    I spend a great deal of time in the woods with my
17    dogs.
18 Q   Are you currently employed?
19 A   I am.
20 Q   Where?
21 A   Michigan Department of Health and Human Services.
22 Q   When did you start working for Michigan Department
23    of Health and Human Services?
24 A   March 18th, 2019.
25 Q   What do you do there?

1  A   I am the SOAR navigator for Michigan Prosperity
2    Regions I, II, and III.
3  Q   Can you tell me --
4  A   SOAR stands for Social Security Outreach Access and
5    Recovery.
6  Q   What does the SOAR navigator do?
7  A   SOAR navigator recruits, enrolls, trains and
8    coordinates the activities of SOAR practitioners
9    who provide assistance to people with disabilities
10    who are also homeless who are applying for Social
11    Security disability and supplemental security
12    income.
13 Q   Is that a full-time position?
14 A   Yes, it is.
15 Q   And what do you get paid?
16 A   I make $24.03 an hour.
17 Q   And do you generally work a 40-hour week, or
18    something less or something more?
19 A   I work 40-hour weeks.
20 Q   What was your pay, your last pay, at CAAM?
21 A   I believe it was $29.51 an hour.  It might have
22    been --
23 Q   Was that full-time?
24 A   Yes, it was.
25 Q   Do you have any business -- other than being mayor

1    which I understand is about to end, do you have any
2    business that you own or participate in outside of
3    your job for Michigan Department of Health and
4    Human Services?
5  A   No.
6  Q   Why did you decide not to rerun for mayor?
7  A   I have served for 24 years.  I have accomplished
8    everything I set out to accomplish when I first
9    took the job.
10 Q   And I am guessing, judging by the stipend you
11    receive, that's not a full-time job?
12 A   No.  We have a city manager form of government.
13 Q   Okay.  So what were the responsibilities of the
14    mayor?
15 A   I was the presiding officer at city commission
16    meetings.  I had one vote in five on the city
17    commission.  I had no veto power, no executive
18    authority.  I could marry people, I could proclaim,
19    and I could resolve.
20 Q   Did you receive any benefits, other than the
21    stipend?
22 A   No.
23 Q   Have you looked for any different or additional
24    employment since you started at Michigan Department
25    of Health and Human Services?

8 (Pages 26 - 29)

Page 30

1 A   No, I have not.
2 Q   And is your position with Michigan Department of
3     Health and Human Services as an employee or as an
4     independent contractor?
5 A   I work actually for the Michigan Public Health
6     Institute under contract to the MDHHS.
7 Q   And is that still what you do?
8 A   Yes.
9 Q   Okay.  Can you name that organization again?
10 A  Michigan Public Health Institute, MPHI.
11 Q  And then MPHI has a contact with Health and Human
12    Services?
13 A  Correct.  And I report directly to an MDHHS
14    employee.
15 Q  Okay.  And are you an employee with Michigan Public
16    Health Institute?
17 A  Yes.
18 Q  And they pay you?
19 A  Yes.
20 Q  And then they get paid whatever the contract says
21    from Department of Health and Human Services?
22 A  I assume so.
23 Q  What did you do to find -- well strike that.  Let
24    me ask this differently.
25        When did you first talk to somebody or

Page 31

1     apply, whatever -- whatever came first, about the
2     job that you have now?
3 A   I would say mid-February 2019.
4 Q   And between the last day of your employment with
5     CAAM and mid-February 2019, did do you anything
6     else to try to find employment?
7 A   I did some consulting for a developer looking to
8     build a housing complex in Munising, for which I
9     was paid $1,800.
10 Q  Anything else?
11 A  Nope.
12 Q  Do you like your current job?
13 A  I do.
14 Q  Does it have any opportunities for advancement?
15 A  No.
16 Q  Other than the -- the person that you -- that you
17    knew that you did some consulting for, did you talk
18    to anybody else about employment prior to mid
19    February 2019 when you talked to somebody about the
20    job you have now?
21 A  Talked to?  No.  I -- I did a lot of job search
22    because I was applying for unemployment, and I was
23    unable to find anything until this opportunity
24    presented itself.
25 Q  What did you do to look for work?

Page 32

1 A   I used my professional contacts.  I used the
2     Michigan Works website.  I used my -- my contacts
3     through the American Legion and through the
4     Veterans Community Action Team.  I used my network
5     that I have developed over the last 25 years of
6     human services.
7 Q   What kinds of jobs were you applying for?
8 A   Anything that I thought I could do.
9 Q   Okay.  Did you have any interviews with any place,
10    other than --
11 A  No.
12 Q  -- where you ended up?
13 A  No.
14 Q  Did you receive any offers, other than where you
15    ended up?
16 A  No.
17 Q  While you were working for CAAM, did you work any
18    place else, other than being mayor?
19 A  No.
20 Q  All right.  I want to go backwards.  Where did you
21    work immediately before CAAM?
22 A  I worked at the Superior Alliance for Independent
23    Living.
24 Q  How long did you work there?
25 A  Four years.  Four-and-a-half years.

Page 33

1 Q   What did you do you there?
2 A   I was a disability advocate.
3 Q   How did that job end?
4 A   I was recruited by the former executive director of
5     CAAM to come over and work at CAAM.
6 Q   So you resigned from Independent Living -- Superior
7     Alliance for Independent Living and started the job
8     at CAAM?
9 A   Yes.
10 Q  Okay.  Where did you work before Superior Alliance?
11 A  I worked at Pathways Community Mental Health.
12 Q  What did you do you there?
13 A  I was a vocational program coordinator.
14 Q  And how long were you there?
15 A  I was there from 2000 to 2009.
16 Q  Why did you leave that position?
17 A  Twenty-seven employees, who did not charge a large
18    enough percentage of their time no Medicaid, were
19    laid off.  I was one of them.
20 Q  Okay.  When you say did not charge enough of their
21    time, were you supposed to do a certain amount of
22    time that was -- that was related to Medicaid?
23 A  No.  I worked with a number of clients who did not
24    get Medicaid, and therefore the agency was not
25    reimbursed for my time helping them.

9 (Pages 30 - 33)

1 Q   And so did the -- did the agency also discharge
2     those clients?
3 A   No.  They just quit serving them.
4 Q   Before vocational program coordinator at Pathways
5     Community Mental Health, what did you do?
6 A   I was a freelance writer, lumberjack, and a
7     carpenter all at the same time.
8 Q   Prior to Pathways Community, what was the -- what
9     was the most recent -- what I am going to call
10    regular job, somebody issuing you a regular
11    paycheck -- that you had?
12 A   The Hiawassee Land Counsel Boy Scouts of America.
13 Q   What did you do for them?
14 A   I was a district executor.
15 Q   For how long?
16 A   One year.
17 Q   Approximately when?
18 A   '95, '96.
19 Q   And why was -- why were you only there one year?
20 A   I was working 90 hours a week for $24,000 a year.
21 Q   So when you left that job, did you have anything
22    else lined up?
23 A   I did not.
24 Q   Did you leave voluntarily?
25 A   I did.

1        MS. NORRIS:  Sandra, have you received
2     the exhibits?
3        MS. BURINK:  Yes, I have.
4        MS. NORRIS:  We are going to skip
5     Exhibit 1.
6        THE WITNESS:  Megan, can I clarify
7     something?
8        MS. NORRIS:  Yes, you can.
9        THE WITNESS:  I worked for a year for the
10    Action Shopper, which is an advertising publication
11    in Marquette.  I worked there as their editor.  But
12    quite frankly, I don't remember if it was before or
13    after I worked a year for the Boy Scouts of
14    America.
15       MS. NORRIS:  Great.  Thank you.
16       Give me just a minute.  I am going to try
17    to get the exhibits to myself.
18       MS. BURINK:  You are going to start with
19    two, you said?
20       MS. NORRIS:  Yeah.  I am going to start
21    with 2.
22       MS. BURINK:  Okay.  Just so I can print
23    it off for him.
24       MS. NORRIS:  Yep.
25

1 BY MS. NORRIS:
2 Q   Did you ever believe that you were discriminated
3     against in any of your prior positions?
4 A   No.
5 Q   Other than just freelancing, did you ever have your
6     own business?
7 A   I attempted to start a self -- I don't know what
8     you would call it.  I attempted, but I -- I
9     couldn't get any customer -- I tried to sell my
10    writing skills to various organizations.  And
11    that's why I ended up being a lumberjack.
12       MS. NORRIS:  Sandra, are you able to pull
13    up Exhibit 2 for him?
14       MS. BURINK:  Yep.  Let me grab that.  Let
15    me just go through it real quick.
16       THE WITNESS:  Okay.
17       (Marked for identification,
18       Deposition Exhibit 2.)
19 BY MS. NORRIS:
20 Q   Am I correct that that's your LinkedIn page?
21 A   Yeah.  But I haven't looked at it in more than a
22    year-and-a-half.
23 Q   Okay.  When did you first apply for a position at
24    CAAM?
25 A   November -- geez.  I don't know.  November 2014.

1     Yeah.  Actually it was October 2014.
2 Q   And did you know about CAAM before you applied?
3 A   Yes.
4 Q   How did you know about CAAM?
5 A   I worked for disability advocates who -- I was a
6     disability advocate and my clients frequently
7     needed housing assistance, and I worked with then
8     Housing Director, Amy Lerlie.
9 Q   Why did you decide to apply at CAAM?
10 A   She asked me to.
11 Q   What position were you applying for?
12 A   SSVF, Supportive Service for Veterans Family
13    Program Manager.
14 Q   What was the application possess?
15 A   I submitted a resume, and I was interviewed by
16    Jason Parks, who was the homeless programs manager,
17    and Michelle -- oh, I forget her last name.  Who
18    was the human resource director at the time.
19 Q   Could you look at Exhibit 3, please?
20       MS. BURINK:  Let me pull that up.  One
21    minute.
22       (Whereupon a brief off-the-record
23       discussion was held.)
24       THE WITNESS:  Dilligner was her name.  I
25    am sorry.  Michelle Dillinger.

Page 38

1              (Marked for identification,
2              Deposition Exhibit 3.)
3   BY MS. NORRIS:
4   Q    Okay.  Am I correct that Exhibit 3 is the -- the
5        cover letter or resume and application that you
6        submitted to CAAM in October of 2014?
7   A    There is a cover letter and an application.  I do
8        not see a copy of my resume here.
9   Q    Okay.  And at the point that you submitted this,
10       did you -- did you already know you were getting
11       the job?  In other words, Ms. Lerlie had said she
12       wanted you -- she wanted you.  Did you just have to
13       submit the paperwork to apply, or were you -- were
14       you actively competing for the job?
15  A    She asked me to submit an application because they
16       had just received the SSVF grant.
17  Q    And what is SSVF?
18  A    Supportive Services for Veterans Family.  I am
19       sorry.
20  Q    And so you were being hired -- were you being hired
21       specifically for something related to that grant?
22  A    I thought I was being recruited to run a new
23       program that they were providing.
24  Q    Once you submitted the application, what happened
25       next?

Page 39

1   A    Then I had an interview with Jason Parks and
2        Michelle Dillinger.
3   Q    Do you remember anything about that?
4   A    It was very brief.
5   Q    What was Jason Parks' title?
6   A    At the time, he was the homeless programs manager.
7   Q    And Michelle's title?
8   A    Human resource director.
9   Q    Do you remember anything about the interview, other
10       than it was very brief?
11  A    I remember bringing a copy of my resume to them,
12       and I remember Jason Parks saying that he was very
13       impressed with my resume.  Other than that, we
14       discussed my past work at Superior Alliance for
15       Independent Living and my military service.
16  Q    Anything else?
17  A    Not that I recall.
18  Q    Did you get an offer right then and there, or did
19       you have to do something else before you got a job?
20  A    I believe that I -- Amy Lerlie called the next day
21       and offered me the job.
22  Q    And was the job that she offered you the job you
23       thought you were applying for?
24  A    It was.
25  Q    Did you receive any sort of written offer?

Page 40

1   A    Not that I recall.
2   Q    Did you accept right away?
3   A    No.
4   Q    What did you have to do before you accepted?  What
5        did you have to learn or find out?
6   A    Well it was at a reduced rate of pay, not
7        significantly.  And I wanted to review the program
8        and see what I would be doing.  I wanted to review
9        the contracts and the -- performance contract, and
10       learn more about the program, who I would be
11       working with, what I would be doing, what the
12       expectations were.  And I did not want to leave my
13       former employer abruptly.
14  Q    You wanted to give some notice?
15  A    Yes.
16  Q    So reduced pay.  What was your starting pay, and
17       how reduced was it?
18  A    I believe I started at 17.79 an hour, and I had
19       been making 20.49 cents an hour at SAIL.
20  Q    So that's not an insignificant reduction.
21  A    No, it's not.
22  Q    Why did you --
23  A    I can tell you --
24  Q    Yeah.  Why did you --
25  A    -- by the -- between the time I applied for the job

Page 41

1        and the time I accepted it, the executive director
2        of CAAM retired, and Amy Lerlie looked like the
3        prospective new director.  She had been the housing
4        director before.  And I thought I saw a chance for
5        advancement there.
6   Q    She was moving up, so you thought this is the kind
7        of place where you can do that?
8   A    Exactly.
9   Q    You said you wanted to review the program.  What
10       was it that you wanted to review?
11  A    I wanted to review the NOFA, the Notice of Funding
12       Availability, and the contract between the Veterans
13       Administration and CAAM, which was AMCAB at the
14       time.  They had also recently assumed
15       responsibility and the contract for the Emergency
16       Solutions Grant with the State of Michigan, the
17       housing, and they had just recently acquired Lost
18       Creek Housing Development.  And the housing
19       department had went from three employees with a
20       $300,000 budget, to 14 employees with a
21       multi-million dollar budget.  And there was a lot
22       to absorb and embrace.
23  Q    When you say you wanted to look at -- I think you
24       said you wanted to look at the performance
25       contract.  What are --

11 (Pages 38 - 41)

Page 42

1  A   Yes.
2  Q   -- you talking about?  What is that?
3  A   The VA established benchmarks for what needed to be
4      done, how many veterans needed to be served, what
5      services they were to be provided, that sort of
6      stuff.
7  Q   And then did you make the decision to accept the
8      offer?
9  A   Yes.
10 Q   Do you know who made the decision to hire you?
11 A   Earl Hawn.
12 Q   Okay.  And who was Earl Hawn?
13 A   He was the director at the time, and I had a
14     follow-up interview with him.
15 Q   He is the one who retired?
16 A   Yes.
17 Q   Can you spell his last name for me?
18 A   H-a-a-n.  Oh, no.  Wait a minute.  Now I am not
19     quite sure.  I knew two gentleman named Hawn.  It's
20     either H-a-a-n or H-a-w-n.  I am sorry.
21 Q   Okay.  That's all right.
22         So after you had your interview, the
23     first interview, that you talked about with
24     Michelle Dietrich and the --
25 A   I am sorry.  I have to clarify that.  I did not

Page 43

1      meet with Earl before I took the job.  I met with
2      Earl before I took the housing director's job.
3  Q   Okay.  So when you first went, Earl was the
4      executive director.  He did not interview you?
5  A   No.
6  Q   Do you know if he played a role in the decision to
7      hire you?
8  A   I do not know.
9  Q   Do you know who did make the decision to hire you?
10 A   I assume it was Amy Lerlie.  She is the one who
11     offered me the job.
12 Q   Do you know if she needed anybody's approval?
13 A   I do not know.
14 Q   Did you ask anybody in the employment process
15     anything about the agency's employment practices?
16 A   Not that I recall, no.
17 Q   Did you negotiate the offer in any way?
18 A   Yes, I did.
19 Q   How?
20 A   She originally offered me a position at a housing
21     resource specialist rate of 14.49 an hour, and I
22     said I could not take the offer at that rate.  And
23     then she offered it to me at the program manager
24     rate of 17.75 an hour.
25 Q   So still lower than what you were earning, but a

Page 44

1      lot better than the original offer?
2  A   Yes.
3  Q   Am I right that you started to work for CAAM on
4      November 10, 2014?
5  A   I believe that's correct, yes.
6  Q   Okay.  And if my math is right, were you about 55
7      years old at that time?
8  A   Yes.
9  Q   How old was Amy Lerlie?
10 A   I believe she was 45.
11 Q   And how old was Earl Hawn?
12 A   I don't recall.
13 Q   When you were --
14 A   I never asked him.
15 Q   -- hired -- when you were hired, were you provided
16     information about CAAM's policies?
17 A   Yes, I was.
18 Q   Did you receive a handbook of some kind?
19 A   I had access to a handbook online, yes.
20 Q   Okay.
21 A   Electronic version.
22 Q   Okay.  And did you go look at it?
23 A   I am sorry?  You broke up there, Megan.  I didn't
24     hear the question.
25 Q   Did you -- did you go look at the handbook?

Page 45

1  A   I did look at the handbook.
2  Q   Under what circumstances did you go look for the
3      handbook, or what were you looking for?
4  A   It was part of my check-in orientation.  I was
5      required, I believe, to check that off on my list
6      of things I had to look at before I took the job.
7  Q   Was there anything in it that you saw -- when you
8      asked to look at it before you took the job, was
9      there anything that you saw that concerned you?
10 A   Not that I remember, no.
11 Q   Do you remember asking anybody any questions about
12     any provisions in the handbook?
13 A   I believe I may have asked Michelle Dillinger, some
14     questions about vacation days and sick days and
15     personal days, but I, you know -- I honestly don't
16     remember.
17 Q   Did the handbook change from time to time, if you
18     know?
19 A   They have reviewed it and updated it annually.
20 Q   Okay.  And would they just tell you you have to go
21     back and look at it online, or would you get a
22     physical copy of the handbook?
23 A   We were given a form to sign indicating we had
24     reviewed the changes.  And in most cases, we were
25     provided with a briefing on those changes.

12 (Pages 42 - 45)

Page 50

1 Q   Okay.  How many times?
2 A   Once.
3 Q   And was the one time that you actually reported it
4     the time that -- that you ended up making a
5     complaint to the board, or was there a different
6     time?
7 A   It was the episode with Stacia Lynn.  I was doing
8     her annual performance evaluation, which required
9     her to write a self-evaluation.  And she wrote a
10    self-evaluation and told me in that self-evaluation
11    that she felt she was being harassed and
12    discriminated against.
13           And I said, "If you give me this, I have
14    to take certain documents -- I have to take certain
15    actions.  Are you sure you want to do this?"
16           And she said no, and she yanked it back
17    from me, and tore it up and stuck it in her pocket.
18 Q   Did you -- did you understand that an employee
19    might use words like harassment to talk about
20    behavior that is not against the law.  It might
21    just be a not-nice boss, for example?
22 A   That is why we had that conversation.  I told her,
23    "If you use the word harassment and discrimination,
24    they have very specific meanings and I have to take
25    very specific actions.  Do you want to use these

Page 51

1     words?"
2            And she said no, and she took back her
3     self-evaluation and -- and kept it.
4 Q   And was what she was complaining about to you at
5     that time, was it -- did it involve anything sexual
6     in nature?
7 A   No.
8 Q   Did you have any obligation to train anybody about
9     the company's policies?
10 A   No.
11 Q   Did you have subordinates come to you -- not
12    necessarily with a complaint.  We have talked about
13    that.  But with questions about, you know, "What do
14    I do if this happens to me," or, "What do I do if I
15    need an accommodation," or, "What do I need to do
16    if I take a leave," or something like that?
17 A   No.
18 Q   I understood that yours and everybody else's
19    employment with CAAM was at-will?
20 A   I did.
21 Q   And you are familiar with that term?
22 A   I am.
23 Q   And you understand that means that you can be
24    terminated for any reason or no reason at all,
25    unless it's against the law; is that right?

Page 52

1 A   I understand that.
2 Q   Am I correct that CAAM had an equal opportunity
3     policy?
4 A   Yes, they did.
5 Q   And so CAAM said it could not discriminate or
6     harass, nobody else could discriminate or harass,
7     on the basis of characteristics such as age, sex,
8     race, national origin, disability, and the like; is
9     that right?
10 A   Yes.
11 Q   Okay.  And you were aware that CAAM had an FMLA
12    policy in accordance with the statute; is that
13    right?
14 A   Yes.
15 Q   Other than the -- the handbook that you were
16    required to sign off on every year when it was
17    updated, did you receive any other employment
18    policies?
19 A   Employment policies?
20 Q   Yes.
21 A   Not that I recall, no.
22 Q   Am i right that you were hired as a full-time
23    employee?
24 A   Yes.
25 Q   And what was your first title?

Page 53

1 A   SS -- Supportive Services for Veterans Families
2     Program Resource Specialist.
3 Q   Did that change?
4 A   Yes.
5 Q   When?
6 A   When I was promoted to housing director.
7 Q   Could you look at Exhibit 5 for me?
8            MS. BURINK:  One moment.
9            MS. NORRIS:  If you want to just show him
10    the computer, you can do that.  If you want to
11    print them out, you can, but you don't -- you don't
12    have to precipitate out everything.  He can --
13           MS. BURINK:  Okay.
14           MS. NORRIS:  I just -- I just need him to
15    have access to the document.  If there's something
16    he wants printed out because it's easier for him to
17    deal with it, that's fine, but --
18           MS. BURINK:  Is it easier for you to see
19    if I print it?
20           THE WITNESS:  (Indicating.)
21           MS. BURINK:  I'll just print it.
22           MS. NORRIS:  I have a lot of paper in
23    front of me, and you may not want that much paper
24    in front of you.
25           MS. BURINK:  I'll just print it, what --

14 (Pages 50 - 53)

Page 54

1   the smaller ones, so that --
2       MS. NORRIS: Yeah.
3       MS. BURINK: -- he can see it.
4       MS. NORRIS: That's fine.
5       MS. BURINK: Let me just --
6       MS. NORRIS: I skipped the manuals, so --
7       MS. BURINK: Oh, thank you. I thought
8   about that. I am like, I don't know if I have
9   enough paper. I haven't been to the store.
10      MS. NORRIS: No.
11      THE WITNESS: Thank you.
12      MS. BURINK: Yep.
13      (Marked for identification,
14      Deposition Exhibit 5.)
15      THE WITNESS: Okay. I am familiar with
16   this. I believe this was Jason Parks' job
17   description.
18  BY MS. NORRIS:
19  Q  Okay. So this is the housing resource manager job.
20    Did you ever held that job?
21  A  No. I --
22  Q  Okay.
23  A  This is when I referred to Jason Parks as my
24    homeless program manager. This was his actual job
25    description.

Page 55

1  Q  Did you have a written job description -- written
2    job description for your SSVF Resource Specialist
3    job?
4  A  I am sure that I did, Megan, but I don't recall.
5  Q  Okay.
6  A  It would have been SSVF Housing Resource
7    Specialist.
8  Q  Am I right that in December of 2014 you applied for
9    the housing service director position?
10  A  I did.
11  Q  And how did that come about?
12  A  Earl Hawn retired, and Amy Lerlie was promoted to
13    executive director which made the housing
14    director's position vacant, and she encouraged me
15    to apply for it.
16  Q  When you submitted your application for the
17    position, do you know if there were any other
18    candidates?
19  A  Yes.
20  Q  Okay.
21  A  I --
22  Q  So you knew it was a competitive --
23  A  Yes.
24  Q  -- process?
25    What did you have to do?

Page 56

1  A  I interviewed with the executive director and the
2    other two program directors. The executive
3    director at the time was Earl Hawn, and I
4    interviewed with him. And actually there were
5    three program directors at the time.
6  Q  How old was Earl Hawn, if you know?
7  A  I don't. I never asked him.
8  Q  Do you know if he was older, or younger, or about
9    the same age as you?
10  A  I would -- I would suppose that he was four or five
11    years older than I am.
12  Q  And who were the other program managers at the
13    time?
14  A  Corey Holcomb, Lori Stephens-Brown and, of course,
15    Amy Lerlie.
16  Q  Who was a --
17  A  Who had already been -- she had already been
18    selected an executive director, but had not yet
19    assumed the position.
20  Q  What was Lori's last name?
21  A  Stephens-Brown, S-t-e-p-h-e-n-s-Brown.
22  Q  And Amy was the director of housing at the time,
23    right?
24  A  Correct.
25  Q  What was Corey Holcomb the director of?

Page 57

1  A  She was the director of early childhood education.
2    And Lori Stephens-Brown was the director of
3    community nutrition.
4  Q  About how old was Corey?
5  A  I am guessing she was, at the time, 45.
6  Q  And about how old was Lori?
7  A  About the same age.
8  Q  Do you know who the other -- other contestants for
9    the position were?
10  A  I know that Jason Parks was one of them.
11  Q  And what position did he hold? Did he still hold
12    the housing services director position at that
13    time?
14  A  He was the homeless programs -- at the time, I
15    believe he was referred to as the homeless services
16    manager.
17  Q  Do you know if anybody else applied?
18  A  I do not know.
19  Q  How old was Jason Parks?
20  A  Oh, my gosh. He is a young man. I would guess he
21    was 30 years old at the time.
22    (Marked for identification,
23    Deposition Exhibit 6.)
24  BY MS. NORRIS:
25  Q  Your attorney has Exhibit 6 in front of her. I

15 (Pages 54 - 57)

Page 58

1    would like you to look at it if you can.  My only
2    question is just to have you say, "Yes, that's what
3    I submitted."  So if you can --
4  A   I am sorry?
5  Q   I said my only question is to have you say, "Yes,
6    that's what I submitted."  So if there is a way for
7    you to look at it without printing it all out --
8  A   I'll have to look --
9  Q   -- I'm not going to ask you any substantive
10    questions.  I just want to make sure that the
11    documents I have are the documents you submitted.
12  A   That looks like it, yes.
13  Q   So you -- did you interview with these people as a
14    panel or separately?
15  A   As a panel.
16  Q   Do you remember anything about that?
17  A   Yes.  It was -- it was about an hour-long
18    interview.  It was very detailed.  We discussed
19    expectations of a program director.  We expect
20    program -- or we discussed the -- my understanding
21    of the programs that were part of the housing
22    director's portfolio.  We discussed the fact that
23    the housing component had grown from three
24    employees -- was in the process of growing from
25    three employees to eighteen employees.  We

Page 59

1    discussed a number of employment-related things.
2  Q   And you got the promotion; is that right?
3  A   I did.
4  Q   Do you know who made the decision?
5  A   Earl Hawn.
6  Q   And how do you know that?
7  A   Because he pulled me into his office later to offer
8    me the job.  He said that Amy Lerlie had
9    recommended me for the position but that was his
10    call, and he offered me the job and I accepted it.
11  Q   And did you get a raise with that?
12  A   I did.
13  Q   To what, do you remember?
14  A   I think I went to $47,000 a year.
15  Q   Do you know what that translates to hourly?
16  A   Not off the top of my head, no.
17  Q   All right.  I am going to do the quick math here
18    with my fancy-dancy calculator and see if it comes
19    out to something that sounds right to you.
20  A   But it was salary.
21  Q   Right.  If I said that comes out to about 22.60,
22    does that sound right to you?
23  A   That seems reasonable, yes.
24  Q   So at this point you were no longer an hourly
25    employee.  You were exempt salary; is that right?

Page 60

1  A   Yes.
2  Q   What does the housing service director do?
3  A   He administers all of the programs under the
4    housing services umbrella of services.  I -- I
5    mean, that's -- that sounds redundant but I had --
6    when I left, I had 12 or 15 different revenue
7    streams and programs.  I had responsibility or
8    partial responsibility for 230 apartments.  I had a
9    staff of 18.  I had subcontracts.  I had financial
10    management procedures.  I had a lot of state and
11    federal reporting requirements, personnel to hire
12    and fire.  I had a great deal of autonomy as
13    director.
14  BY MS. NORRIS:
15  Q   What I would like to do -- this is one I think,
16    Sandra, I am going to need you to print out -- I
17    would like to take maybe just about a five-minute
18    break or so.  I'd like you to look at Exhibit 7,
19    which is the job description that is dated 2011.
20    And my memory from -- from other communications
21    that we have had is that you thought that was
22    outdated, and so my question is going to be, what
23    was different once you had the job?  What is
24    different from the job description that I see?
25  A   Okay.

Page 61

1  Q   Okay.  So you can -- let's see.  My watch says that
2    it is 11:19.
3  A   Okay.
4  Q   So you can stretch, you can get a drink of water,
5    whatever.  But if you could also look at that
6    document, why don't we plan to reconvene at 11:30,
7    and I will pick up with my questions there?
8  A   Okay.
9  Q   All right.
10      (Whereupon a recess was taken.
11      Off the record at 11:19 a.m.  Back
12      on the record at 11:29 a.m.)
13      (Marked for identification,
14      Deposition Exhibit 7.)
15  BY MS. NORRIS:
16  Q   Have you had a chance to look at Exhibit 7?
17  A   I have.
18  Q   And Exhibit 7 is called the Housing Service
19    Component Director.
20  A   Correct.
21  Q   Is that the job that you were promoted to, or is
22    that a different job?
23  A   It's the job I was promoted to, but the job
24    description is -- is inadequate and inaccurate.
25  Q   So let's start with, what is inaccurate about it?

16 (Pages 58 - 61)

Page 62

1      In other words, things that you think are wrong.
2  A   Okay.  Item number one, the AMCAB housing policy
3      advisory committee had been disbanded.
4           Item number four, we were no longer doing
5      any construction projects.
6           And the two things that were most
7      noticeably missing were negotiating subcontracts
8      with other community action agencies and
9      supervising the personnel from other agencies.
10          And then any and all responsibilities
11     related to property management.  In 2011, CAAM did
12     not manage any properties.  That -- that's
13     basically it.
14          I rewrote this job description.
15 Q   Do you have a copy of the job description that was
16     in effect that -- that you rewrote that reflected
17     your job?
18 A   No.  I submitted it to the executive director, who
19     at the time was Amy Lerlie.
20 Q   And do you know if it was ever adopted?
21 A   It was never -- it was never discussed with me
22     after that.
23 Q   So the job description that was on file was, as far
24     as you know, the most recent job description, but
25     it did not reflect changes that had been made not

Page 63

1      only in the job, but in the whole organization?
2  A   Correct.
3           (Whereupon a brief off-the-record
4             discussion was held.)
5  BY MS. NORRIS:
6  Q   So you've told me both some things that were on
7      there that were no longer correct, and some things
8      that weren't there that needed to be there.  Are
9      there any other significant changes that needed to
10     be made to this job description?
11 A   No.
12 Q   Now, part of your job remained, if I am correct --
13          I am sorry.  Let me just go put them in
14     another room.
15          (Whereupon a brief recess was
16             taken.)
17 BY MS. NORRIS:
18 Q   Part of your job, if I am correct, continued to
19     be -- it was in the job description and continued
20     to be -- developing and recommending and
21     implementing administrative policies related to the
22     housing services; is that correct?
23 A   Correct.
24 Q   And part of your job continued to be program budget
25     issues; is that right?

Page 64

1  A   Correct.
2  Q   And when you started this job, how many employees
3      were direct reports to you?
4  A   Oh, my gosh.  There were a spade of us all hired
5      within about two month was each other.  I would
6      say -- one, two, three, four, five -- five direct
7      reports.
8  Q   Okay.  And how many people, approximately, under
9      them?  In other words, how many non-direct reports
10     did you have?
11 A   Four more.
12 Q   And did that change over time?
13 A   Yes.
14 Q   Did it get bigger?
15 A   It got bigger, and it included subcontract
16     personnel.
17 Q   So what was the most number of direct reports you
18     had?
19 A   I think six or seven.
20 Q   And then not counting contractor people, what was
21     the most sort of non-direct reports that you had
22     that were CAAM employees?
23 A   I would say about the same number, six or seven.
24 Q   All right.  And then as I understand it, you took
25     responsibility for supervising people who worked

Page 65

1      for other organizations, but through CAAM programs;
2      is that right?
3  A   I took responsibility for program supervision as
4      implemented by them.  They were still the employees
5      of another agency.
6  Q   So they would be employees of someplace else, but
7      their day-to-day direction or supervision would be
8      coming from you?
9  A   Yes.
10 Q   And about -- can you give me examples -- can you
11     give me examples of what other agencies?
12 A   Dickinson-Iron Community Service Agency,
13     Menominee-Delta-Schoolcraft Community Action
14     Agency, and Chippewa-Luce-Mackinaw Community Action
15     Agency.
16 Q   And what kinds of employees would they send you?
17 A   Housing resource specialists.
18 Q   And about how many of those people did you have?
19 A   I had four.
20 Q   So I want to talk -- focus on the time now while
21     you were still reporting directly to Amy Lerlie.
22     She is your immediate supervisor, right?
23 A   Yes.
24 Q   And there were -- were there still two other
25     directors?

17 (Pages 62 - 65)

Page 66

1 A   Yes.

2 Q   Okay.  And where -- where did all of you work?

3    Where did you go to work?

4 A   At -- on Commerce Drive.

5 Q   In Marquette?

6 A   Yes.

7 Q   Okay.  And then these -- these non-employee

8    employees, these people you were supervising, who

9    are not CAAM people, were they working there or

10    were they out at sites someplace?

11 A   I had -- I had employees at Lost Creek, which is

12    this Marquette.  I had employees at Grand View

13    Marquette, which is in Marquette.  I had

14    subcontract -- I had an employee in Munising at the

15    CAAM office in Munising.  I had subcontract

16    employees in Escanaba, Iron Mountain, and

17    Sault Saint Marie.  So I had --

18 Q   How many --

19 A   -- another -- I had another direct employee at

20    Orianna Ridge in Marquette.

21 Q   How many people did you have in Sault Saint Marie?

22 A   One.

23 Q   How many in Iron Mountain?

24 A   Two.

25 Q   How many in Escanaba?

Page 67

1 A   One.

2 Q   How many in Munising?

3 A   One?

4 Q   How many on site in Marquette?

5 A   One, two, three -- four.

6 Q   And how many off site in Marquette?

7 A   Five, seven -- eight.

8 Q   Now, were you responsible for training these

9    people?

10 A   I was responsible for making sure they were

11    trained.  In some cases, I did it directly.  In

12    some cases, I -- they were trained by coworkers or

13    subordinates of mine.

14 Q   Were you responsible for employment evaluations?

15 A   I was.

16 Q   Were you responsible for hiring or terminating,

17    if -- if they didn't work out?

18 A   Yes.  In conjunction with the executive director.

19 Q   Am I right that Amy Lerlie became the executive

20    director around February of 2015?

21 A   Somewhere between December and January or February.

22    There was -- there was a -- a two or three-month

23    transition there.

24 Q   And when that transition was finalized, did you get

25    another raise?

Page 68

1 A   No.  Once I -- once I assumed the duties of housing

2    director, which I did not do until Earl Hawn left,

3    that's when I got the raise.

4 Q   Okay.  Did -- did you get annual raises, then, or

5    did your pay just stay the same?

6 A   We got annual cost of living adjustments that were

7    mandated by the Early Childhood Education Program,

8    which was the largest component in the number of

9    personnel, and they were -- that raise was

10    extrapolated to the other components.

11 Q   Do you remember what your final salary was?

12 A   If you multiply 29.53 and -- times 20.80, whatever

13    that works out to be.  It was about $60,000 a year.

14 Q   Am I correct that you received favorable

15    performance reviews in 2015, 2016?

16 A   Yes.

17 Q   Did you ever get a negative performance review --

18 A   No.

19 Q   -- while you were --

20        Did you ever -- at any time, did you

21    contest a performance review in any way?

22 A   No.

23 Q   Did you have to fill out something called an

24    employment satisfaction survey?

25 A   A self-evaluation form for -- prior to my annual

Page 69

1    evaluation, yes.

2 Q   And this would ask questions like, how do you feel

3    about your position?  Are there skills that you

4    think are -- aren't being used?  How can you be

5    more successful?  Those kinds of things; is that

6    right?

7 A   That's correct.

8 Q   And am I correct a that when you filled those out

9    in 2000 -- in the fall of 2015 and in the fall of

10    2016, you were very happy with your job?

11 A   Yes.

12 Q   And that's what you related, correct?

13 A   I believe so.

14 Q   So I am going to read it to you.  If we need to go

15    look at the exhibit, we can.  I am just trying to

16    save that process as much as we --

17 A   Yeah.  I don't remember anything that I objected to

18    or -- or had an issue with.

19 Q   So if the question was, "Overall are you satisfied

20    with your job, "What are things that bother you

21    about your job?" You would not dispute that in

22    November of 2015, you said, "Yes.  Happy.

23    Nothing."

24 A   I would believe that, yes.

25 Q   And the following year, same questions.  You said,

18 (Pages 66 - 69)

Page 70

1  "I wake up every morning at 4:00 a.m. without an
2  alarm clock and begin thinking about the day ahead,
3  the things I have to do, the people I need to talk
4  to, the guidance and direction I need to give and
5  to take, and I am anxious to get to work.  I love
6  my job and the people with whom I work;" is that
7  right?
8  A   I recall that.
9  Q   And that was true at the time, correct?
10 A   It was at the time.
11 Q   When was the first time that that wasn't true?  In
12     other words, at what point did you decide you
13     had --
14 A   It wasn't --
15     (Multiple simultaneous voices.)
16 BY MS. NORRIS:
17 Q   -- the job?
18 A   It wasn't a set date.  It was an evolution of
19     working conditions.
20 Q   Okay.  Describe to me what happened.
21 A   I was routinely required to run interference
22     between the executive director and Stacia Lynn.  I
23     was not a property manager, and I had no property
24     management responsibilities.  Stacia Lynn was the
25     site manager, and Amy Lerlie was the property

Page 71

1  manager, but Stacia Lynn was my employee.  And they
2  were frequently at odds, is the best you can say.
3  Q   Can you explain what you mean by -- she was your
4      employee, but it sounds like she was doing things
5      that weren't your responsibility?
6  A   No.  She was doing things that were my
7      responsibility, except -- you have to look at the
8      Michigan State Housing Development Authority
9      hierarchy of property management.  I had no
10     property management experience, and I was not
11     confident to be the property manager.  And a
12     property manager typically oversees more than one
13     site manager, making sure they follow all the rules
14     for Fair Housing Standards, Michigan Development --
15     Housing Authority rules and regulations.  And
16     Amy Lerlie was an experienced property manager, and
17     so she kept that authority to herself.
18         But at the same time, Stacia Lynn.  She
19     was my employee.  She was my subordinate.  What --
20     it manifested itself in the executive director
21     giving instruction, correction, and redirection to
22     a subordinate of mine and not telling me about it,
23     and then expecting me to follow through and make
24     sure that her correction or redirection was
25     accomplished, which -- if I didn't know about it, I

Page 72

1  couldn't do it.
2  Q   So procedurally, this wasn't working well for you?
3  A   It had for a year, but then it proceeded to get
4      worse as the antagonism that Amy displayed towards
5      Stacia increased.
6  Q   And do you know why Amy Lerlie had that antagonism
7      towards Stacia Lynn?
8  A   I did at the end.  At the time, I did not.
9  Q   Okay.  When -- when did you learn what caused that?
10 A   I -- I can -- I can say October 6th of 2017, when
11     Stacia came to my office two weeks after I gave her
12     the chance to take herself-evaluation back, and
13     then she told me that she had been the victim of
14     sexual harassment.
15 Q   So I thought, but I may have heard wrong -- I
16     thought that when Stacia Lynn first told you about
17     harassment, she did not say anything about sexual?
18 A   She did not.
19 Q   And -- and what she was complaining to you about
20     was not sexual, and you said, "But if you say
21     harassment, I have some duties here."
22 A   Yes.  Harassment or discrimination, but she did not
23     mention sexual harassment.
24 Q   When did you learn she was complaining of sexual
25     harassment?

Page 73

1  A   On October 6th of that year.
2  Q   Okay.  And what -- how did you learn that?
3  A   She came to my office and asked me if I could take
4      a walk with her around the block because she had
5      some things to tell me, and she told me that she
6      had been the victim of sexual harassment when she
7      first became employed.  She told me that she had
8      filed an EEOC complaint, and she told me that she
9      had retained counsel to represent her, and she told
10     me that she was going to take family medical leave.
11 Q   But when she told you all of this, this is after
12     you had seen a progressive deterioration of the
13     relationship; is that right?
14 A   Yes.
15 Q   And do you know if she ever complained to anybody
16     before she told you this?
17 A   I believe she complained to the HR director at the
18     time.  The HR director and I had a conversation
19     with her.
20 Q   So at the same -- so she -- the HR director learned
21     at the same time?
22 A   About the EEOC complaint?  No.
23 Q   Yes.
24 A   I assume she learned immediately that day because
25     she filed the complaint that day.

19 (Pages 70 - 73)

Page 78

1  A    After I filed my complaint, yes.  Then many
2      employees reached out to me to tell me they had
3      similar experiences.
4  Q    Okay.  I would like you to look at Exhibit 10, and
5      this may -- this is one I am going to have some
6      questions about, Sandra, so you -- you may want to
7      print this one out.
8          MS. BURINK:  Okay.  Give me one second.
9          MS. NORRIS:  I'll leave that up to you.
10      You do whatever you want, but it -- it seems like
11      paper works better when I -- when I have to -- when
12      I am referring to specific things in the document.
13          (Whereupon a brief off-the-record
14          discussion was held.)
15  BY MS. NORRIS:
16  Q    While Sandra is printing, am I correct that the
17      Human Resources Director at the time was
18      Lucy Grove?
19  A    Correct.
20          I remember these documents.
21          (Marked for identification,
22          Deposition Exhibit 10.)
23  BY MS. NORRIS:
24  Q    Okay.  So Exhibit 10, the first page is just a --
25      sort of a blank page with a paragraph on it, no

Page 79

1      headings or signatures or anything.  It says, "The
2      members of the Community Action Alger-Marquette
3      Board of Directors need to investigate the hostile
4      work environment at the agency.  Talk to any staff
5      member.  Talk to all staff members, and you will
6      find well-documented stories of harassment, sexual
7      harassment, and abuse of authority.  It has to
8      stop."
9          Is that right?
10  A    Yes.
11  Q    Did you write this?
12  A    No.
13  Q    Did you learn about this?
14  A    Yes.
15  Q    How did you learn about it?
16  A    Amy Lerlie showed it to the senior staff.
17  Q    And what did she say?
18  A    She wanted to know who wrote it and whether or
19      not -- if we knew who wrote it.
20  Q    And did you all say no and no?
21  A    We -- nobody knew.
22  Q    Okay.  Did you understand that this went to the
23      board?
24  A    I believe she said it was -- went -- it went to all
25      the board members.

Page 80

1  Q    Okay.  Other than the conversation where Amy Lerlie
2      shared it with you all, did you discuss this with
3      Amy Lerlie at any other time?
4  A    Not that I recall, no.
5  Q    Do you know who wrote this?
6  A    I do not.
7  Q    If you turn to the next page, the next page is
8      dated November 15, 2017.
9          But let me back up.  Do you know what
10      date the anonymous complaint was made?
11  A    Before November 15th.
12  Q    If I -- if I said that the board received it on
13      November 10, 2017, does that sound about right to
14      you?
15  A    Yeah.  I would believe that, yes.
16  Q    Okay.  So then on November 15, you sent an email to
17      the entire board; is that right?
18  A    I did.
19  Q    And if you look at the second page of -- of this
20      email, it looks like just before sending an email
21      to the board, you sent an email to Lucy Grove; is
22      that right?
23  A    That's correct.
24  Q    So, first, at 7:34 in the evening, you sent an
25      email to Lucy Grove entitled "Hostile work

Page 81

1      environment complaint," and you said that you were
2      making a formal complaint against Amy Lerlie about
3      the hostile work environment; is that right?
4  A    Yes.
5  Q    And one of the incidents that you cited had to do
6      with Amy Lerlie accusing you of having an affair
7      with Stacia Lynn; is that right?
8  A    That's correct.
9  Q    But then you also mentioned there has been a lot of
10      harassment and unspecified threats and that -- that
11      Amy Lerlie had used against the staff, you and --
12      and the rest of the staff, and it had to stop,
13      correct?
14  A    I -- I wrote that, yes.
15  Q    Yep.
16          And then you told her you were going to
17      tell the board; is that right?
18  A    I believe so.
19  Q    And you sent the -- the email that is dated
20      November 15 at 9:07 p.m.; is that right?
21  A    Yes.
22  Q    And so what you said is, you -- sort of your first
23      issue, if you will, is that if there's a problem
24      with the executive director, there was no avenue to
25      complain.  That's what we talked about earlier; is

21 (Pages 78 - 81)

Page 82

1  that right?
2  A   Correct.
3  Q   So -- and then you said she was abusing her
4  authority because nobody could do anything about
5  it, right?
6  A   Correct.
7  Q   And then you said "Twenty or thirty staff members
8  are ready to file a complaint today."
9       How many staff members did CAAM have?
10  A   140.
11  Q   Okay.  These 20 or 30, were they all in Marquette?
12  A   As far as I know.
13  Q   Okay.  And did they include your fellow directors?
14  A   I don't know.
15  Q   Okay.  How do you know that 20 or 30 were ready to
16  do this?
17  A   I -- it was a -- a hyperbolic guess.  Between
18  October and November -- that's okay.
19       Between October and November, that's all
20  anybody talked about at the agency, and they got
21  very bold about the stories they told each other.
22  Q   And you -- you said that the board needed to
23  initiate an investigation into a hostile work
24  environment, abuse of authority, harassment, sexual
25  harassment, and there were a lot of complaints

Page 83

1  coming, correct?
2  A   Yes.
3  Q   And that Amy Lerlie was a pathological liar; is
4  that right?
5  A   Yes.
6  Q   And she would go after anybody who was contrary to
7  her in any way?
8  A   Yes.
9  Q   When you wrote this, you were in the hospital; is
10  that right?
11  A   Correct.
12  Q   And you were about to have emergency heart surgery;
13  is that right?
14  A   Correct.
15  Q   When did you first have any kind of heart problem?
16  A   I would guess within three days of the 14th of
17  November.  In retrospect, I think I had what they
18  describe as TIAs.  I believe I had three in the
19  three or four days before I was hospitalized.
20  Q   What caused -- what -- can you tell me what a TIA
21  is?
22  A   It's a -- it's a mini heart attack.  I don't know
23  the exact medical term, but that's how they
24  referred to it.
25  Q   Had you ever had heart problems before this?

Page 84

1  A   No.
2  Q   Had you ever been checked out for any heart
3  problems before this?
4  A   No.
5  Q   So it's possible that this just came on at the
6  time.  It's also possible that you had issues that
7  you just didn't realize you had; is that correct?
8  A   I am not a doctor.
9  Q   Fair enough.
10       So you -- you obviously were sick enough
11  to land in the hospital, and you felt strongly
12  enough about this to write this letter.
13       If you would then turn the page, there's
14  a third letter, or a third set of emails dated
15  November 17.  Do you see those?
16  A   Yes.
17  Q   Lucy Grove acknowledged receipt of your complaint.
18  She said that the executive committee had directed
19  an investigation be conducted.  You'd be told who
20  was handling the investigation, but meanwhile, take
21  care of your health; is that right?
22  A   Yes.
23  Q   And you expressed concern about the investigator
24  and made it clear you didn't think it could be
25  Lucy Grove because she served at the -- at the

Page 85

1  pleasure of the executive director; is that right?
2  A   That is correct.
3  Q   And then if you go to the last page, this is a
4  separate -- a separate complaint; is that right?
5  Or it looks -- no.  It looks to me like it's
6  just -- it's just the same as the one we already
7  saw attached to a different email; is that right?
8  A   There's some back and forth there.
9  Q   Yep.
10       Prior to November 15, 2017, did you ever
11  complain to anybody at CAAM about a hostile work
12  environment or harassment or sexual harassment?
13  A   Did I ever complain?
14  Q   Yes.
15  A   I had discussed it with the HR manager.
16  Q   When did you first do that?
17  A   I'd say early October when Stacia Lynn put it on
18  the front burner.  I discussed it with Lucy Grove
19  that day.  She confided that she had heard other
20  complaints.
21  Q   Did she tell you what kinds of complaints?
22  A   No.
23  Q   So you don't know if they were sexual harassment
24  complaints or just the other kinds of behavior that
25  we've been talking about with -- with Amy Lerlie;

22 (Pages 82 - 85)

Page 86

1  is that right?
2  A  She was very discreet.  She just let me know that I
3     was not the only person expressing the concern
4     about the executive director's behavior.
5  Q  In your email, you said that you had extensive
6     documentation.  What kind of documentation did you
7     have?
8  A  Mainly emails between me and Amy Lerlie.
9  Q  Do you still have those?
10 A  No.  I turned them all in to you, as a matter of
11    fact.  I have --
12 Q  So how --
13 A  I have no access to my email from those days.
14    Though CAAM would have.
15 Q  So whatever I have would be everything.
16 A  No, not necessarily.  But CAAM would have whatever
17    email exchanges.  That, and there were -- there
18    were free consequent witnesses to her outbursts,
19    and I included that in -- as part of that broad
20    statement.
21 Q  Did -- when you went out for your heart surgery,
22    did you go out an FMLA?
23 A  Yes.  That's the second --
24 Q  You requested --
25 A  Yeah.  I am sorry.

Page 87

1  Q  Okay.
2  A  I didn't --
3  Q  That's okay.
4        I thought so, but so --
5        So you went out on FMLA.  You requested
6     FMLA, you were granted FMLA, and you were out on
7     FMLA; is that right?
8  A  Yes.  I requested it.  I was directed to request it
9     by the HR director, and I -- I think I was out on
10    FMLA for three weeks.
11 Q  In your -- in your email, you said that you had a
12    stressful job, and that "the challenges of my job
13    create a good stress."  What is good stress?
14 A  I enjoyed the challenge of the job.  I enjoyed
15    negotiating contracts.  I enjoyed building
16    partnerships.  I enjoyed solving problems.  I
17    enjoyed helping people who were desperate, and I
18    enjoyed supervising a very competent and
19    professional staff, all of whom faced challenges.
20    And that was the good stress part of the job.
21 Q  Am I correct that when you returned from your FMLA
22    leave you were granted accommodations during your
23    recovery?
24 A  I was granted two weeks of working part-time out of
25    the Munising office so that I could write the grant

Page 88

1  application for the Supportive Services with
2  Veterans Families Program, as I was the only one
3  capable of doing it.
4  Q  And your doctor submitted a doctor's note saying
5     that you needed to work part-time from
6     December 18, 2017 through January 3, 2018; is that
7     right?
8  A  That's correct.
9  Q  And your doctor also said you could not do long
10    distance driving until February 1st, 2018; is that
11    right?
12 A  That's correct.
13 Q  And so you were allowed to work out of Munising
14    during that time?
15 A  That's correct.
16 Q  While you were on leave, there was an investigation
17    into Amy Lerlie's conduct, wasn't there?
18 A  I believe an investigation was started.  It did
19    not -- it did not conclude.  I am not sure when it
20    concluded.
21 Q  Lucy Grove did not conduct that investigation; is
22    that right?
23 A  That is correct.
24 Q  Do you know who was retained to conduct that
25    investigation?

Page 89

1  A  Laura Reilly, a prominent local attorney.
2  Q  And how did you learn that?
3  A  She interviewed me.
4  Q  As part of her investigation?
5  A  Yes.
6  Q  Now, before she interviewed you, I interviewed you,
7     didn't I?
8  A  Yes.
9  Q  Because you wanted to make sure, before you
10    underwent your surgery, that you got your story
11    out, correct?
12 A  That's correct.
13 Q  You also wrote up a fairly lengthy statement,
14    didn't you?
15 A  I submitted a grievance in multiple parts.  It was
16    lengthy, yes.  Or no.  I am sorry.  Different --
17    different --
18 Q  If you could -- you don't need to --
19 A  No.
20 Q  If you could take a --
21 A  Sorry.
22 Q  If you could, take a look at Exhibit 12.  Yeah.
23    You don't need to print.  If you can -- if it's
24    possible for you to just look at the second page,
25    there's a statement that is dated December 1, 2017,

23 (Pages 86 - 89)

Page 90

1  and I just want you to confirm that this is the
2  statement that you made and that you communicated
3  to me.
4      MS. BURINK:  Do you want me to just print
5  this off so you can see it?
6      THE WITNESS:  Yeah.  I'm going to have to
7  read that.
8      MS. BURINK:  Here.  Let me print it off
9  for you.
10 BY MS. NORRIS:
11 Q   While she is printing, am I right that you had
12     worked with Laura Reilly on a previous matter?
13 A   Laura Reilly had represented the City of Munising
14     on a couple of labor issues in years past.
15 Q   And you thought she was good and that she would be
16     impartial; is that right?
17 A   I did.
18 Q   And Laura Reilly did not work for CAAM, right?
19 A   No, she did not.
20 Q   Do you know if anyone at CAAM directed her in any
21     way in terms of what she should find or what
22     results she should return, anything like that?
23 A   Not as far as I know.
24 Q   Do you have any reason to challenge the
25     investigation that she conducted or the conclusions

Page 91

1  she reached?
2  A   I was not privy to the results of that
3      investigation, so I can't answer that question.
4  Q   Okay.  Do you know how many people she interviewed?
5  A   She told me 14.
6  Q   Do you have the document in front of you now,
7      Exhibit 12?
8  A   I do.
9          (Marked for identification,
10         Deposition Exhibit 12.)
11 BY MS. NORRIS:
12 Q   Okay.  Exhibit 12 starts with an email from -- from
13     you to me, dated December 1, 2017; is that right?
14 A   That's correct.
15 Q   And you say that you are attaching a written
16     summary of the things that we discussed on the
17     17th; is that right?
18 A   That's correct.
19 Q   And the 17th is when I interviewed you by phone; is
20     that right?
21 A   Yeah.  If you say so, I believe it.
22 Q   Okay.
23 A   I don't recall.  I know I was in the hospital.
24 Q   Yep.
25         And then if you look at the next page,

Page 92

1  it's the -- it's a statement dated
2  December 1, 2017.  It is a multi-page statement.
3  A   Yes.
4  Q   And am I correct, this is what you gave me?
5  A   This is correct.
6  Q   And it -- towards the end, there's an email
7      exchange between us where I inform you that CAAM is
8      using Laura Reilly; is that right?
9  A   I see that, yes.
10 Q   And then did you, in fact, return to work part-time
11     for the last couple weeks of December and the
12     beginning of January?
13 A   I did.  I worked from the Munising office.
14 Q   And then did you go full-time after that?
15 A   January 3rd.
16 Q   And you returned to your previous position; is that
17     right?
18 A   Yes, I did.
19 Q   Same pay, same duties?
20 A   Same pay, same general duties.
21 Q   Okay.  How did the duties change?
22 A   Amy Lerlie insisted that I take over as the
23     property manager with property manager
24     responsibilities, for which I had had inappropriate
25     training and no experience.

Page 93

1  Q   And did you do that?
2  A   To the best of my ability.
3  Q   And ultimately, after the investigation was done,
4      Amy Lerlie's employment with CAAM ended, didn't it?
5  A   Ended is an appropriate word.
6  Q   Right.
7          Your understanding is that she resigned
8      in lieu of termination, isn't it?
9  A   That is correct.
10 Q   And you don't know -- and you can correct me if I
11     am wrong, but you don't know what the exact
12     findings of the report were or what exactly the
13     board was given; is that right?
14 A   I do not know what the executive committee was
15     given.  I do know that the rest of the board did
16     not see the report --
17 Q   Okay.
18 A   -- because they said as much at a board meeting.
19     And I do not know the terms of her departure, other
20     than -- and a member of the executive committee,
21     John Fegan telling me, "We really like Amy, and we
22     are sorry she has to go."
23 Q   But they decided she had to go, right?
24 A   I don't know the answer to that question.  She
25     left.

24 (Pages 90 - 93)

Page 102

1    in which you -- you go through, in some detail,
2    what this whole property management thing looks
3    like from your end; is that right?
4  A   Yes.
5        MS. BURINK:  Okay.  Are you there?
6        THE WITNESS:  This one.
7        MS. BURINK:  Yeah.
8        MS. NORRIS:  Page nine -- or page three,
9    I mean.
10       THE WITNESS:  Page three?
11       MS. NORRIS:  Yes, yes.
12 BY MS. NORRIS:
13 Q   If you look down at the very bottom of page three,
14   you see the paragraph where it starts with "Banned
15   is the wrong word"?
16 A   Yes.
17 Q   So here you say, "You forbade Stacia from entering
18   the Lost Creek property.  You refused to let Stacia
19   train and mentor Amy Matson."
20       When you were asked by the human
21   resources person to reach out to Stacia to see if
22   she could come back, was that after Amy Lerlie was
23   gone?
24 A   Yes.  She left, I believe, the first week of --
25 Q   The end of this --

Page 103

1        Right.
2        So in other words, Stacia Lynn hadn't
3    come back initially, at least according to what you
4    write here, because Amy Lerlie wouldn't let her
5    come back; is that right?
6  A   She would not.  She -- she would let her come back.
7    She offered her a three or four-dollar-an-hour cut
8    in pay, and told her she could take the site
9    manager job at Grand View Marquette to assist with
10   the lease up.
11 Q   And then when Amy Lerlie left, human resources said
12   to you, "You reach out to Stacia.  Amy is gone.  We
13   would like Stacia back."  Is that -- is that right?
14 A   The second time I reached out to Stacia.  I
15   originally communicated Amy's offer to Stacia while
16   Amy was still there, and she outright didn't --
17   rejected it.  It was not something she was going to
18   do.
19 Q   At the end of this email, you told Amy Lerlie that
20   you were going to file a retaliation complaint with
21   the EEOC; is that right?
22 A   Yes.
23       Which email are you talking about?
24       MS. BURINK:  That one.
25

Page 104

1  BY MS. NORRIS:
2  Q   So this is -- it's the email that starts at the top
3    of page three, and it goes over --
4        (Multiple simultaneous voices.)
5        THE WITNESS:  -- retaliation complaint?
6        MS. BURINK:  No.
7  BY MS. NORRIS:
8  Q   No.  The subject line is, "Picks are ready for the
9    Grand View Marquette."  And then on page three --
10   the page --
11       Do you see the page numbers at the
12   bottom?
13 A   I do.
14 Q   Okay.  Do you see page three?
15 A   Yes.
16 Q   Turn to page four, same email.
17       And the last paragraph says, "I have no
18   recourse but to file a retaliation complaint with
19   the EEOC."
20 A   Yes.
21 Q   Which you then did; is that right?
22 A   I did.
23 Q   Your EEOC charge, which you filed on
24   January 24, 2018, you said, "In or around
25   September 2017, I opposed retaliation against my

Page 105

1    subordinate by the executive director."
2        What action did you take in September of
3    2017 that you were considering opposing retaliation
4    against your subordinate, who I assume is
5    Stacia Lynn?
6  A   Yes.
7  Q   So what --
8  A   I am sorry.  I don't --
9  Q   What action were you taking --
10       Yes.
11 A   I am just --
12 Q   So my question, in September of 2017, what action
13   were you taking that was -- that was opposing
14   retaliation?
15 A   Amy Lerlie told me that I had yet to do anything
16   about Stacia Lynn having sex on the property at
17   Lost Creek, something she brought up once a month.
18   And she said, "You still have nothing -- you still
19   haven't done anything about that."  And she said,
20   "This is something she did back in 2014, and you
21   haven't done anything about it yet."
22       And -- and I had to repeatedly tell her
23   that there was nothing I could do about what
24   happened in 2014 before I started working at
25   Community Action.

27 (Pages 102 - 105)

Page 106

1 Q   But in -- in September of 2017, what was Amy Lerlie
2     retaliating against?  Like what action had
3     Stacia Lynn taken that was causing Amy Lerlie to
4     retaliate?
5 A   I don't know that Stacia took any action.  I think
6     the retaliation was rather spontaneous because
7     threats of retaliation against her became
8     commonplace during that time --
9 Q   Right.  But you understand that --
10 A   -- and --
11 Q   You understand that retaliation is -- is the second
12     act.  In other words, there's -- there's an action,
13     and then --
14 A   Oh.
15 Q   -- somebody retaliates against that action?
16 A   I do remember.
17        We were getting ready for the grand
18     opening of Grand View Marquette.  And Stacia had
19     come back to work, and she was going to sign the
20     very first lease at Grand View Marquette during the
21     open house.  And Amy forbade her from going to
22     Grand View Marquette, or being in the building, or
23     signing the lease, and actually she threw her out
24     of the building.  She made her leave.
25 Q   Had Stacia Lynn already filed her EEOC claim at

Page 107

1     that point?
2 A   Yes.
3 Q   Do you know when she filed her EEOC claim?
4 A   She told me she was going to file it on
5     October 6th, and I assumed she filed it the next --
6     within the next week.
7 Q   Okay.  This is why I'm confused.
8 A   I'm confused, too.
9        (Marked for identification,
10        Deposition Exhibit 14.)
11 BY MS. NORRIS:
12 Q   So why don't -- can you look at Exhibit 14 for me?
13 A   Forgive me, Megan.  It was a chaotic time.
14 Q   It's okay.
15 A   I do remember --
16 Q   And then if it's okay with everybody else, I would
17     like to sort of finish up this line of questioning,
18     and then we can take a break for lunch.
19 A   Okay.  Okay.  I am familiar with it.
20 Q   Okay.  All right.  So if you look at the -- at page
21     one of this, which is the charge itself, which is
22     dated January 24, 2018, you say, "I began my
23     employment with the above-named employer on or
24     about November 7th, 2014."
25        Do you see that?

Page 108

1 A   Yes.
2 Q   And then right below that, it says, "In or around
3     September 2017, I opposed retaliation against my
4     subordinate."
5        Do you see that?
6 A   Yes.
7 Q   So what I am trying to find out is, what had
8     Stacia Lynn done that Amy Lerlie was retaliating
9     against in September 2017?
10 A   This was on or about the time that she came to me
11     with her self-evaluation.
12 Q   Which mentioned harassment?
13 A   Right.  Which mentioned harassment and
14     discrimination, which she retracted.
15 Q   Right.  So Amy Lerlie didn't see that, correct?
16 A   She did not.
17 Q   I mean, to retaliate, Amy Lerlie would have to know
18     she had complained, correct?
19 A   I would guess.  I would guess.  I don't -- you
20     know, I am trying to recall this -- the specific
21     circumstance.  I do not.
22 Q   You did not tell Amy Lerlie about the evaluation,
23     right?
24 A   No.  I told the HR manager, and we sat down and had
25     a counseling session with -- with Stacia on how to

Page 109

1     deal with the confrontational techniques that
2     Amy Lerlie was using on her.
3 Q   Okay.  Do you know if -- do you know if -- if the
4     HR manager spoke to Amy Lerlie about that?
5 A   I do not know.
6 Q   Ultimately, you withdrew your charge; is that
7     right?
8 A   That's correct.
9 Q   Now, when Amy Lerlie left, her position was vacant.
10     The executive director position was vacant; is that
11     right?
12 A   Yes.  Correct.
13 Q   And you applied for that position; is that right?
14 A   I did.
15 Q   And you were a finalist for the position; is that
16     right?
17 A   I'm sorry?
18 Q   You were a finalist for the position; is that
19     right?
20 A   I was.
21 Q   And you were not selected; is that correct?
22 A   That's correct.
23 Q   And you thought that you were the best candidate,
24     right?
25 A   I thought I was a very good candidate, yes.

28 (Pages 106 - 109)

Page 114

1 A   I do understand that.
2 Q   Now, my understanding is that Mr. Fegan spoke to
3     you personally; is that right?
4 A   Yes.
5 Q   And he said something to the effect of, "We liked
6     Amy, and it's because of you that she is gone;" is
7     that right?
8 A   Yes.
9 Q   As far as you know, up until the board received the
10     complaints and ultimately the report, as far as you
11     know, they did like Amy, didn't they?
12 A   As far as I know.
13 Q   Amy was quite successful, wasn't she?
14 A   The agency was quite successful.
15 Q   Yeah.  And she was the executive director of the
16     agency?
17 A   Yes.
18 Q   So as far as the board knew, before it received
19     complaints, the agency was running well, the
20     executive director was doing a good job, the board
21     didn't have to do too much because the executive
22     director was taking care of it, and that's what
23     boards like, right?
24 A   I would -- that would require an assumption and a
25     conclusion on my part.  I have served on many

Page 115

1     different boards, and there are certain fiduciary
2     and management responsibilities that board members
3     have.  Some board members don't always execute
4     them.
5 Q   Sure.
6         But a big part of the board's job is to
7     make sure the executive director is doing the
8     executive director's job, right?
9 A   Correct.
10 Q   And if the executive director is doing the
11     executive director's job well, that relieves a
12     significant amount of pressure from the board; is
13     that right?
14 A   Yes.
15 Q   Okay.  And so the board thought Amy Lerlie was
16     doing well.  The board got complaints, and
17     ultimately concluded that Amy Lerlie had to go; is
18     that right?
19 A   I am not sure what they used to make their decision
20     on, but that's what happened.
21 Q   All right.  And nobody from the -- you didn't tell
22     the board, "She has to go," did you?
23 A   No.
24 Q   And nobody from the board came and talked to you
25     about --

Page 116

1 A   No.
2 Q   -- whether she had to go, correct?
3 A   Correct.
4 Q   So the board came to this conclusion.  And you
5     understand that part of how it got from A, being
6     happy with Amy Lerlie and the job the executive
7     director was performing, to B, deciding that
8     Amy Lerlie had to go, was that the board received
9     complaints, including a complaint from you, had an
10     investigation done that included at least 14
11     witnesses as you were told, and make the conclusion
12     that she had to go; is that right?
13 A   Yes.
14 Q   Now, in the -- in this process, all of these
15     discussions about the complaint process and all of
16     that -- in this process, did anybody say anything
17     to you about your age?
18 A   No.
19 Q   Did anybody say anything to you about the fact that
20     you had needed to take a leave of absence?
21 A   No.
22 Q   Did anybody say anything to you about the fact that
23     you had a disability?
24 A   Are you talking about board members?
25 Q   Yes.

Page 117

1 A   No.
2 Q   Okay.  In other words, the people that -- that you
3     are -- I mean, you are calling out two people as
4     retaliating against you.  None of them said
5     anything about any of those things, did they?
6 A   No.
7 Q   They were aware that you made a complaint, weren't
8     they?
9 A   Yes.
10 Q   They were also aware that there was a separate,
11     anonymous complaint, weren't they?
12 A   I assume so.
13 Q   And they were aware that a number of witnesses had
14     been interviewed and had said things, correct?
15 A   Correct.
16       MS. BURINK:  I am just going to object to
17     how do -- he doesn't know what the board knew and
18     what they were -- what the board was aware of and
19     whatnot, so I am just going to object to that.
20       But you can answer.
21       THE WITNESS:  The board didn't discuss
22     their decision-making process with me.
23 BY MS. NORRIS:
24 Q   Now, you, as -- as you testified earlier, you were
25     asking at the time for two things.  One is, you

30 (Pages 114 - 117)

Page 126

1    her suspect they knew their position was going to
2    be eliminated."
3  A   Okay.
4  Q   And she was --
5        (Multiple simultaneous voices.)
6        THE WITNESS:  -- September 26th, I said
7    that, yes.
8  BY MS. NORRIS:
9  Q   Okay.  So nothing about this grievance has anything
10   about age discrimination, race discrimination, sex
11   discrimination, retaliation for filing a previous
12   complaint, or anything like that; is that right?
13  A   Correct.
14  Q   Did anything come of that grievance?
15  A   It was left unresolved.  We requested a meeting
16   with the executive director and asked her to
17   explain why she was making this accusation, and she
18   gave us the details and -- and we assured her that
19   we understood personnel matters were not to be
20   discussed, and that it was possible that he had
21   overheard our conversation.  He was known for
22   eavesdropping on people's computers, and that he
23   found out about this through a method other than
24   the three of us telling him that.
25  Q   Now, your second grievance, also filed on

Page 127

1    September 26th, 2018, is entitled "Suspected
2    Fraud."  And this has to do with actions that you
3    believe, as -- as you write in some detail, that
4    incorrect information was provided regarding a HUD
5    grant; is that right?
6  A   A Michigan -- that originally with HUD, yes.
7  Q   Okay.  And you believe that Michelle LaJoie
8    provided the incorrect information; is that right?
9  A   She directed me, and I provided it.
10  Q   And so you -- you end this with, "I have now
11   discharged my duty as a director of the agency by
12   reporting suspected fraud by the executive director
13   to the chairman of the board of directors.  I don't
14   know what Michelle told MSHDA," which is all caps
15   MSHDA --
16  A   Right.
17  Q   -- "If she gave Doug Russel an opportunity to
18   correct the letter he signed, I would know.  I am
19   afraid to ask him.  I am afraid to tell him.  I am
20   afraid to ask" -- you mention other people.  "I am
21   afraid that if word of this gets out to our local
22   partners, it will destroy the agency's
23   credibility;" is that right?
24  A   That's correct.
25  Q   What came of that?

Page 128

1  A   I don't know.  We were -- we were awarded the -- I
2    think it was a $14,000 grant, so -- and I don't
3    know.  But it was based upon a false performance.
4  Q   How do you know it was based upon a false
5    performance?
6  A   The benchmark that we had to achieve was -- the two
7    grantees for that HUD grant had to spent at least
8    93-and-a-half percent of the previous year's funds.
9        In years previous -- or prior to that,
10   both grantees -- one of which was CAAM, and the
11   other one Lutheran Social Services -- routinely
12   spent all of their money.  But I needed to verify
13   that.  I drafted a letter, because it was a simple
14   requirement, for the chairman of the Continuum of
15   Care, Doug Russel, to sign, saying that both
16   grantees had spend out the previous year's grant.
17   And I said, "But please let me verify this with
18   Lutheran Social Services before we send it."
19       And I reached out to Lutheran Social
20   Services, and they verified that they had not spent
21   93 percent of their grant, but the letter was
22   signed and sent anyway.  And I advised the
23   executive director that that false -- or incorrect
24   pretense was being used to justify getting the
25   additional $14,000.

Page 129

1  Q   Nothing in this had anything to do with age
2    discrimination, did it?
3  A   No.
4  Q   Or harass -- sexual harassment, or a disability, or
5    FMLA, or anything like that; is that right?
6  A   That's correct.
7  Q   Then you have Grievance 3a, which is "Personal
8    Harassment and Financial Mismanagement."  And this
9    also has to do with a HUD grant; is that right?
10  A   I am looking at it.
11  Q   Yep.
12  A   This has to do with a number of things.
13  Q   So here, you are talking about some things that
14   start in September 2017.  And then down near the
15   bottom, you -- of the first page you say, "In June,
16   I reported to the executive director that we were
17   going to run out of money."
18       Was that Michelle LaJoie?
19  A   Yes.
20  Q   And then you say you asked for permission to
21   spend -- you asked for permission to -- to spend
22   the funds, and she said she didn't want to start
23   using them until October; is this right?
24  A   Yes.
25  Q   And then you say in July you again asked, and she

33 (Pages 126 - 129)

Page 130

1   said no, and asked you to prepare a plan; is that
2   right?
3  A   Yes.
4  Q   What is it that you think she did here that was
5   improper, like something that's against the law?
6  A   Did I say it was against the law?
7  Q   No. I'm asking that. Did -- are -- are you
8   alleging that anything here is against the law?
9  A   It was a grievance against her administrative
10   actions that prohibited me from doing my job.
11  Q   Nothing here would -- had anything to do with age,
12   nothing here had anything to do with disability,
13   nothing here had anything to do with FMLA, and
14   nothing here had to do with the fact that you had,
15   before she was ever hired, made complaints against
16   the agency, did it?
17  A   No.
18  Q   All right. Then we have 3b. Again, the same date.
19   This one is entitled "Harassment." And here you
20   are talking about discriminatory and abusive
21   behavior.
22  A   Yes.
23  Q   And here you talk about her suggesting that you
24   should go on FMLA; is that right?
25  A   She recommended that I go on FMLA.

Page 131

1  Q   Okay. What -- what was the context of this? In
2   other words, where does this fit with your medical
3   issues and when you actually took leave?
4  A   We had a meeting with senior staff, at which time
5   we pointed out that everybody in the agency had
6   been traumatized by the actions of Amy Lerlie and
7   her removal or -- I can't think of a good term.
8   Her -- her -- she was gone. I said the -- the
9   whole experience had been incredibly traumatizing
10   for all who were involved, me included. And that's
11   when she suggested I go on FMLA.
12  Q   In fact, you had been on FMLA leave for a heart
13   issue, and you had claimed that the heart issue was
14   aggravated by all of the trauma that was going on
15   in the workplace, hadn't you?
16  A   It contributed to it because of the high degree of
17   stress that I was under.
18  Q   And now you were raising with her that stress,
19   correct?
20  A   I was raising with her that the agency had been
21   traumatized. Every person in the agency had been
22   traumatized.
23  Q   But not every person in the agency had the health
24   issue that you had, that you had already tied to
25   that trauma, correct?

Page 132

1  A   Correct.
2  Q   Did she force you to go on FMLA? Did you go on
3   FMLA at that time?
4  A   No, I did not.
5  Q   Did you received any discipline or anything for not
6   going on FMLA?
7  A   No, I did not.
8  Q   Nothing here -- I mean, you -- you make a lot of
9   allegations of poor management, things like that.
10   But nothing here has anything to do with your age,
11   does it?
12  A   I believe I made a statement that felt -- that I
13   felt I was being discriminated against my age.
14  Q   You do.
15  A   My --
16  Q   You do. You are correct. You do make that
17   statement.
18       But Michelle LaJoie has never said
19   anything to you about your age, has she?
20  A   No.
21  Q   And she has never said anything to you about the
22   fact that you're a male and -- in a negative sense,
23   has she?
24  A   No.
25  Q   She has never said anything to you negative about

Page 133

1   taking leave. In fact, she encouraged you to take
2   leave if you were having issues, correct?
3  A   Correct.
4  Q   She has never said anything negative to you about
5   your medical condition, has she?
6  A   Not as far as I know.
7  Q   And she has never said anything negative to you
8   about the complaints that you and so many others
9   made against Amy Lerlie, did she?
10  A   No.
11  Q   Now, the fact is, the two of you were competitors
12   for the same job, right?
13  A   At one point, yes.
14  Q   Right. And she got the job, right?
15  A   That's correct.
16  Q   And that can be awkward, can't it?
17  A   It was not when she took over.
18  Q   So what changed?
19  A   I don't know. She started treating me differently
20   than the other two program coordinators.
21  Q   But you don't have any idea why?
22  A   I don't. But I know what she did.
23  Q   Is it possible she didn't think you were doing a
24   good job?
25  A   I guess it's within the realm of possibility.

34 (Pages 130 - 133)

Page 134

1 Q   Where did you send these grievances? Who got these
2      grievances?
3 A   Dave Torongo.
4 Q   Do you know if he shared them with anybody?
5 A   I do not know. I know he shared them with the
6      executive director.
7 Q   How do you know that?
8 A   Because she questioned that the other two program
9      directors about them, that -- within a week after
10     they were sent.
11 Q  Do you know if she knew what was in the grievances,
12     or simply that a grievance -- that grievances had
13     been made?
14 A  I do not know.
15 Q  And what is your understanding of what she has
16     asked the other executive directors about?
17 A  Whether or not they were -- they thought -- they
18     knew about the grievance beforehand, and whether or
19     not they were party to the grievance.
20 Q  And they told you that?
21 A  Yes, they did.
22 Q  And what were their answers?
23 A  They told me that.
24 Q  No. But did they -- what were their answers in
25     terms of whether they knew in advance --

Page 135

1 A   Oh.
2 Q   -- and whether they were part of it?
3 A   I believe they both told her that they did not
4      know.
5 Q   In the meeting that you had with your fellow
6      directors and the executive director,
7      Michelle LaJoie was critical of the work that all
8      of you had previously done; is that right?
9 A   She was specifically critical of the work that I
10     did.
11 Q  Well you -- you wrote, "She quickly made it clear
12     that, in her view, nothing we had done over the
13     last four years was adequate, correct, or good
14     enough;" is that right?
15 A  I was speaking about the housing component in that
16     statement.
17 Q  But that was to all three of you; is that right?
18 A  Well I am -- I have to go back and read. Where are
19     you at?
20 Q  This is in the 3B.
21 A  Okay. It's a 9-page document, Megan. You are
22     going to have to --
23 Q  Yeah. Give me just a second. It is indeed.
24     MS. BURINK: Second paragraph from the
25     bottom on the first page.

Page 136

1      MS. NORRIS: There you go.
2      THE WITNESS: "She told me that nothing I
3      did --
4      "She told me that nothing I did, or had
5      done, was good enough, that nothing the housing
6      services component did was good enough, and that
7      our partner agencies were complaining to her that
8      we delivered poor services and did not provide
9      enough support."
10     She is talking about me and my -- and my
11     staff.
12     MS. NORRIS: So --
13     THE WITNESS: Do you need some time,
14     Megan?
15     MS. NORRIS: No. Just give me a minute.
16     I'll figure out if I have another question on this
17     or not.
18     THE WITNESS: Thank you.
19     MS. NORRIS: You can just enjoy breathing
20     for a moment.
21 BY MS. NORRIS:
22 Q   You also took exception to the fact that
23     Michelle LaJoie said you couldn't have sort of
24     alternative work schedules anymore, didn't you?
25 A   Yes.

Page 137

1 Q   And that's something that -- that directors had
2      been allowed to do in the past; is that right?
3 A   That's correct.
4 Q   That's within the executive director's right, isn't
5      it?
6 A   She is the executive director.
7 Q   And she didn't limit this to you or your staff.
8      She said everyone had to work 7:30 to 4:00 or
9      8:00 to 4:30, five days a week; is that right?
10 A  That's correct.
11 Q  So this affected you, but it also affected
12     everybody else, right?
13 A  I believe my staff was the only one that had
14     alternative work schedules. I don't know how the work
15     schedules of the other component directors.
16 Q  Michelle LaJoie was critical of the fact that you
17     had sent your site managers to realtor training; is
18     that right?
19 A  That's correct.
20 Q  What did she say about that?
21 A  She said that it was stupid and that it was a waste
22     of money and that they didn't need to go, even
23     though I had direction from the regional property
24     manager that it was a requirement of their job.
25 Q  Did you tell her that?

35 (Pages 134 - 137)

Page 138

1   A   Yes, I did.
2   Q   And what did she say?
3   A   She said that the -- that the requirements had
4        changed.
5   Q   Was that true?
6   A   I don't know.  Her statement was in conflict with
7        the regional property manager.
8   Q   Throughout all of this, you remained the director
9        of housing; is that right?
10  A   I did.
11  Q   And your pay stayed the same; is that right?
12  A   That's correct.
13  Q   Your benefits stayed the same?
14  A   Correct.
15  Q   Is it reasonable to have a new executive director
16       do things differently than the way previous
17       executive directors had done them?
18  A   Of course.
19  Q   And does that sometimes cause tension?
20  A   Certainly.
21  Q   Do you think it's possible that the fact that you
22       thought you should have gotten the job affected
23       your behavior or attitude towards her at all?
24  A   No.
25  Q   Why are you so certain?

Page 139

1   A   I was relieved that I did not get the job.
2   Q   Is that true?
3   A   Yes.  The board had no faith in me.  They made that
4        clear to me.  And I had no faith in the board, and
5        I would have been uncomfortable reporting directly
6        to a board that had no faith in me and that I had
7        no faith in.
8   Q   Then why were you a candidate and why did you
9        remain as a finalist?
10  A   Because I felt it was necessary to apply for the
11       job I was qualified for.
12  Q   There is no requirement that you seek a promotion.
13  A   No.
14  Q   I mean, that's something that you chose to do?
15  A   Personal decision.
16  Q   And you wanted the job?
17  A   No, not really.
18  Q   Then -- then why did you apply?
19  A   Because I thought it was appropriate for me to do
20       so because I was a qualified candidate.
21  Q   Were you just testing the board to see if they
22       would -- if they would give you the job?  Is that
23       what it was?
24  A   I guess part of me thought that I would be a good
25       executive director, but it was not a job that I

Page 140

1        really wanted.  It would have been a job that I
2        really wanted under different circumstances.
3   Q   But you knew that Michelle LaJoie was an applicant,
4        didn't you?
5   A   I did.
6   Q   And you knew that she was going to be a strong
7        applicant, didn't you?
8   A   I knew she was the preferred candidate.
9   Q   No.  But you -- you personally knew her, and knew
10       she was a strong candidate, didn't you?
11  A   We were colleagues and peers for several years.
12  Q   And you thought she was a strong candidate, didn't
13       you?
14  A   And I thought she would make a good executive
15       director.
16  Q   Right.  And you understood that she might get the
17       job because she was a strong candidate, right?
18  A   I was relatively certain she would get the job.
19  Q   Right.  And you had worked with her in the past,
20       right?
21  A   I had.
22  Q   And that had been a good working relationship,
23       hadn't it?
24  A   Yes.
25  Q   But she was not your boss, nor were you her boss,

Page 141

1        correct?
2   A   Correct.
3   Q   And you understand that sometimes the dynamic
4        changes when somebody's position becomes different?
5   A   Yes.
6   Q   Then Michelle raised an issue with you about a
7        conference call that you had, that you did not
8        include her on; is that right?
9   A   Yes.
10  Q   And who was that conference call with?
11  A   Jessica Vail.
12  Q   And who is Jessica Vail?
13  A   She was at the time the homeless program specialist
14       for the UP at the Michigan State Housing
15       Development Authority.
16  Q   And what --
17  A   She was our granting -- she was our granting
18       officer.
19  Q   And so she is -- she is sort of a customer; is that
20       right?
21  A   She is a revenue source.
22  Q   Yeah.  And how -- what was this conference call
23       about?
24  A   She had come up and she had given a presentation at
25       a meeting at Lost Creek.  I was the collaborative

36 (Pages 138 - 141)

Page 142

1  applicant for the local Continuum of Care, which
2  meant that I processed the two grant applications
3  into a combined application to be sent to HUD. And
4  she had advised me during that presentation that
5  there were additional funds available for
6  collaborative applicants to apply for planning and
7  for administrative assistance to the continuum
8  of -- Continuum of Care, which had no staff. And
9  Michelle directed me to work with her to try and
10 obtain those grant funds.
11 Q  And, in fact, you had a phone conversation with
12    Jessica about this from Michelle's office, didn't
13    you?
14 A  No. It was from my office.
15 Q  Were you aware that Michelle was interested in this
16    and was aware of it?
17 A  I was.
18 Q  And Michelle expressed that she was disappointed
19    that you did not include her in the call; is that
20    right?
21 A  Yes. You have the email exchange.
22 Q  Yep.
23 A  It should be clearly noted that Jessica Vail called
24    me. I did not initiate that phone call. Michelle
25    was not available.

Page 143

1 Q  Why do you say that Michelle LaJoie was holding you
2    to a different standard than the other two program
3    directors?
4 A  She let the other program directors direct their
5    staff. She let the other program directors manage
6    their budgets. She let the other program directors
7    set their own personal schedules, and she
8    restricted me from all -- from doing all of those
9    things.
10 Q  What was Michelle LaJoie's previous position?
11 A  As a housing director at Chippewa-Luce-Mackinaw
12    Community Action Agency.
13 Q  In other words, she did what you do, right?
14 A  She did it on a much smaller scale.
15 Q  Sure.
16    But housing is her thing, right?
17 A  She was -- she was an experienced housing director.
18 Q  Right.
19    So isn't it understandable that somebody
20    whose thing is housing is going to take a different
21    interest in what you are doing in her job than she
22    might take in the other program directors?
23 A  It was assumed, yes.
24 Q  Right.
25    She -- because you are talking her

Page 144

1  language, right?
2 A  Yes.
3 Q  Right. So is it surprising that the -- that the
4    direction she would be giving you is more
5    particular and specific than the direction she
6    might be giving other people who are doing things
7    she hasn't done?
8 A  That doesn't surprise me at all.
9 Q  Did Michelle LaJoie ever raise with you the fact
10    that you had filed grievances before she arrived?
11 A  We discussed, at one staff meeting, the process and
12    the timeline and chronology of Amy Lerlie's
13    departure, but I don't recall how specific she got.
14    She knew that I had --
15 Q  But --
16 A  -- initiated the grievances.
17 Q  But did she ever suggest to you that she thought
18    you did something wrong or had a problem with that
19    in any way?
20 A  No.
21 Q  Did she ever express an opinion about Amy Lerlie?
22 A  Not that I recall.
23 Q  Did Michelle LaJoie ever say anything to you about
24    your EEOC charges?
25 A  No.

Page 145

1    (Marked for identification,
2    Deposition Exhibit 19.)
3 BY MS. NORRIS:
4 Q  Could you look at Exhibit 19 for me, and just
5    confirm that, in fact, this is an email that you
6    sent to the board?
7 A  Yeah. I -- it's -- it's too hard to read that way.
8 Q  I am sorry. I am trying to make it easier.
9    MS. BURINK: No, no. I know. No. I
10    appreciate it. I just think it's easier just to
11    print it.
12    MS. NORRIS: Do you have it?
13    THE WITNESS: I do. It's --
14    MS. BURINK: He is reviewing it.
15    THE WITNESS: For a point of
16    clarification, Megan, this happened during a very
17    chaotic period two years ago. And in the interim I
18    have done my very best not to think about it, so it
19    takes a minute for me to refresh my memory.
20    MS. NORRIS: No problem.
21    THE WITNESS: Okay.
22 BY MS. NORRIS:
23 Q  So January 15, 2019, you sent a letter to the
24    entire board; is that right?
25 A  Yes.

37 (Pages 142 - 145)

Page 154

1  A   Two treatments by my counselor, or by my primary --
2      I think I am referring to my primary care doctor.
3  Q   Okay.  And this said that for the moment you could
4      not work at all due to anxiety; is that right?
5  A   Yes.
6  Q   And so this asked that you have two weeks of leave
7      from October 2 through October 16; is that right?
8  A   That's correct.
9  Q   And then it anticipated that you could have some
10     follow-up appointments; is that right?
11 A   Yes.
12 Q   And it also indicated that you could have episodic
13     flare ups if you continue to work in a hostile work
14     environment, right?
15 A   That was the determination of my primary care
16     physician, yes.
17 Q   Well you are the one that told the primary care
18     physician about the environment, right?
19 A   Yes.
20 Q   The physician wouldn't have any firsthand knowledge
21     about the environment at all, correct?
22 A   Correct.
23 Q   And this didn't have anything to do with your age,
24     did it?
25 A   No.

Page 155

1  Q   And this didn't have anything to do with the fact
2      that you had a heart condition, did it?
3  A   No.
4  Q   And the fact that there was, in your words, a
5      hostile work environment wasn't because you
6      suffered from anxiety or anything else.  In fact,
7      you were claiming the opposite, that the anxiety or
8      whatever it was was because of the environment,
9      correct?
10 A   Correct.
11 Q   And this -- is it your position that this had to do
12     with complaints you had previously filed?
13 A   It's my position that it had to do with the
14     harassment that I endured from the executive
15     director.
16 Q   And that harassment is what caused you to file
17     complaints, as opposed to being after the
18     complaints; is that right?
19 A   I believe the two were symbiotic.
20 Q   Well you filed a complaint because the harassment,
21     in your view, had already occurred, right?
22 A   It had, yes.  It had reached a point where it was
23     starting to negatively impact my physical health.
24 Q   And in terms of how often this might flare up, at
25     this point, the doctor said, "Didn't know,"

Page 156

1      correct?
2  A   He didn't know, and that he would appreciate input
3      from my counselor.
4  Q   Now, when did you learn that your FMLA leave was
5      granted?
6  A   I don't recall.
7          (Marked for identification,
8          Deposition Exhibit 22.)
9  BY MS. NORRIS:
10 Q   Okay.  If you would, look at Exhibit 22.
11 A   Okay.  October 2nd?
12 Q   Yes.
13 A   I believe, though, that I received this a couple of
14     days later.  And at that point, Shari Mahoski and I
15     decided that communication via email would be more
16     efficient.
17 Q   Okay.  So the doctor that filled out your FMLA
18     form, was that Dr. Olson?
19 A   Dr. Kurt Olson.
20 Q   And Dr. Kurt Olson is a family practitioner; is
21     that right?
22 A   He is.
23 Q   He does not have any specialty in psychology or
24     psychiatry, correct?
25 A   Not that I know of.

Page 157

1  Q   And as I understand it, you had been consulting
2      with a counselor through the EAP program; is that
3      right?
4  A   That's correct.
5  Q   Was that person a psychiatrist or psychologist?
6  A   He was an MSW.
7  Q   You FMLA was approved without you having to provide
8      any additional documentation, right?
9  A   The original two weeks were, yes.
10 Q   Yes.  At that point, you didn't have to get a
11     second opinion.  You didn't have to go back and get
12     further information.  It was just granted; is that
13     right?
14 A   Correct.
15 Q   Do you think that the agency did anything wrong in
16     how it handled your initial request for FMLA leave?
17 A   In retrospect, yes.
18 Q   And what do you think they did wrong?
19 A   They neglected to inform me of my rights.
20 Q   So you did not get the Department of Labor Notice
21     of Rights and Responsibilities form; is that right?
22 A   If that's what I was required to get, no, I did
23     not.
24 Q   Okay.  And do you know what's on that form?
25 A   Not off the top of my head, no.

40 (Pages 154 - 157)

Page 158

1 Q   Okay.  Do you know what rights that the Department
2     of Labor form advises you of?
3 A   Based upon what I looked up afterwards, I believe
4     they were supposed to describe my return-to-work
5     eligibility, a number -- the number of days that I
6     could take for FMLA.  I -- quite frankly, I don't
7     remember specifically.
8 Q   Okay.  But you knew that your request for leave had
9     been granted, right?
10 A   Uh-huh.
11 Q   And you knew that you had a right to return to work
12     at the end of your FMLA leave, didn't you?
13 A   I believe so, yes.
14 Q   Yeah.  And you knew that they were entitled to have
15     medical documentation of your need for leave,
16     right?
17 A   Yes.
18 Q   So there's information you weren't provided, but
19     there weren't any -- there weren't any benefits
20     that you didn't get, were there?
21 A   I don't know.
22 Q   Have you ever gone and looked up the form online?
23 A   I did later, several weeks later, when they started
24     extending my FMLA against my will.
25 Q   And was there anything in the form online that --

Page 159

1     that suggested you had been denied something you
2     were supposed to get?
3 A   Oh.  From what I understood, and I am a layperson,
4     I came to the conclusion that they could not extend
5     my FMLA without my consent.
6 Q   How did you come to that conclusion?
7 A   Based upon what I read on the FMLA website.
8 Q   Did you understand that they were not required to
9     return you to work until you had medical release
10     saying that you could return to work?
11 A   Originally, no.
12 Q   Okay.  Do you understand that now?
13 A   I do.
14 Q   Okay.  On October 3rd, you indicated that you hoped
15     to return to work on October 15, and asked what
16     date your doctor had put down; is that right?
17 A   Yeah.  And there was a discrepancy, I think, of a
18     day.
19         (Marked for identification,
20         Deposition Exhibit 24.)
21 BY MS. NORRIS:
22 Q   Okay.  What -- could you look at Exhibit 24, for
23     me?
24 A   Yes.
25 Q   Okay.  This is -- this is communication from two

Page 160

1     people.  One is a communication from Patrice Evans
2     to Dr. Olson, and one is from Dr. Olson to
3     Shari Mahoski; is that right?
4 A   That's correct.
5 Q   So the communication from Patrice Evans to
6     Dr. Olson --
7         Patrice Evans was your EAP counselor; is
8     that right?
9 A   That's correct.
10 Q   And she said that she had been seeing you, and she
11     was concerned about the severity of your anxiety
12     and its impact on your health; is that right?
13 A   Yes.
14 Q   And she -- she indicated that you wanted a
15     temporary accommodation of working out of Munising,
16     and she supported that; is that right?
17 A   That's correct.
18 Q   And then Dr. Olson sent something so Shari, which
19     basically said the same thing; is that right?
20 A   Correct.
21 Q   And he said you could perform all the essential
22     functions of the job, if you were allowed an
23     alternate location; is that right?
24 A   That's correct.
25 Q   At that point in time, in October of 2018, how many

Page 161

1     people were working in Munising?
2 A   We had one staff member there who was off on
3     maternity leave.
4 Q   So that office was closed at the time; is that
5     right?
6 A   That office was available at the time.
7 Q   But there was nobody working there, right?
8 A   I worked there every Wednesday up until
9     October 1st.
10 Q   And your doctor did not allow you to return to
11     Marquette at that time; is that right?
12 A   That's correct.
13 Q   So if you needed to be in Marquette, medically you
14     could not be, correct?
15 A   My doctor did not allow me to return to work on a
16     daily basis in Marquette.
17 Q   Could you look at Exhibit 25, please?
18         MS. BURINK:  One moment.  I didn't pull
19     that one up.
20         MS. NORRIS:  Yep.
21         THE WITNESS:  Okay.
22         (Marked for identification,
23         Deposition Exhibit 25.)
24 BY MS. NORRIS:
25 Q   Do you understand that -- and it -- I understand

41 (Pages 158 - 161)

Page 162

1   you are not an FMLA lawyer.  So if you don't,
2   that's okay.
3        But do you understand that FMLA leave is
4   not about accommodations?  It's about can you work
5   or can you not work.  What you -- what you get if
6   you can't work is you get the leave.
7  A   I understand --
8  Q   Do you understand that?
9  A   -- they are separate issues.
10 Q   Pardon me?
11 A   I understand that they are separate issues.
12 Q   Right.  The Americans with Disabilities Act
13   addresses the issue of accommodation.  Do you
14   understand that?
15 A   Among other things, yes.
16 Q   Okay.  So you had taken leave from your job, and
17   your doctor had said you can only return to work if
18   you work out of the Munising office.  As of -- as
19   of October 10, that was your doctor's position; is
20   that right?
21 A   Yes.
22 Q   All right.  So then the question is whether that's
23   a reasonable accommodation or not, correct?
24 A   I don't understand that question.
25        MS. BURINK:  I will just object as to --

Page 163

1   he is not a lawyer, so I mean --
2        MS. NORRIS:  Yeah.  Fair enough, but he
3   is making a complaint.  So I'm trying to understand
4   where his grievance is, so --
5        THE WITNESS:  The two items are
6   interrelated, but they are separate.  And I
7   understand the distinct between them.  And there
8   was[sic] events that transpired between
9   October 10th and -- October 2nd, and October 10th
10   that prompted me to put in the ADA accommodation
11   request.
12 BY MS. NORRIS:
13 Q   Right.  And so -- so then, on October 12, you got a
14   letter from Shari Mahoski -- this is the second
15   page of Exhibit 25 -- saying that she is following
16   up on your email request for a disability
17   accommodation.  And she says that your doctor
18   requested that you be allowed to work in Munising
19   for the next 30 days, correct?
20 A   Correct.
21 Q   And she says it's not clear how that enables you to
22   perform the essential functions of your job, since
23   all the people you supervise are in Marquette.
24 A   That was an incorrect statement.
25 Q   Right.  And we talked early today about where your

Page 164

1   people were, correct?
2  A   Yep.
3  Q   The majority of them are in Marquette, right?
4  A   Marquette County, yes.
5  Q   And a number of them are actually in the Marquette
6   office, and others are in Marquette, and then
7   there's like one in one place, and one in another
8   place, and so on and so forth, correct?
9  A   Correct.
10 Q   She then says, "We are committed to engaging in the
11   interactive process, but we need more understanding
12   about how the Munising" -- you know, "being put in
13   Munising would help you perform the essential
14   functions of the job."
15        And she gives you a form to fill out; is
16   that right?
17 A   That's correct.
18 Q   Then in Exhibit 26, you respond.
19        THE WITNESS:  Thank you.
20        MS. NORRIS:  You got it?
21        THE WITNESS:  Yeah.  Give me a second.
22        MS. NORRIS:  Yep.
23        THE WITNESS:  Okay.
24        (Marked for identification,
25        Deposition Exhibit 26.)

Page 165

1 BY MS. NORRIS:
2  Q   So as of October 13, 2018, where -- where were the
3   people that -- that you were supervising?  Let's --
4   let's start with the ones not in Marquette for a
5   minute.
6        Did have you anybody in Alger County?
7  A   I had an administrative assistant who was out on
8   medical leave.
9  Q   Was -- but she was still employed as of October 13;
10   is that right?
11 A   Yes.
12 Q   Am I correct that she resigned in late November of
13   2018?
14 A   I -- I don't recall.
15        Oh.  Yes, she did.
16 Q   Okay.  Do you know why?
17 A   I believe she requested -- I believe -- and I can't
18   be certain.  I believe that she requested to be
19   able to work from her home.
20 Q   And that was denied?
21 A   I believe so.  I am -- I cannot be certain, though.
22 Q   Okay.  Were you involved in that decision?
23 A   No.  I was -- I was not involved in that decision.
24 Q   And is that because you were out on leave?
25        Let me ask it differently.  Normally,

42 (Pages 162 - 165)

Page 166

1   would you have been involved in that decision, if
2   you know?
3 A   I would think that I would be, yes.  I was her
4   supervisor.
5 Q   Okay.  And do you know how -- how old was she?
6 A   I would guess she was in her early 20s.
7 Q   Okay.  And do you know if she had ever made any
8   kind of discrimination or harassment or other sort
9   of protected complaint against the agency?
10 A   I do not know.
11 Q   Do you know if she made any sort of complaint about
12   this, about -- about her resignation?
13 A   I do not know.
14 Q   She had been allowed to return from her FMLA leave
15   as far as you know; is that right?
16 A   I don't know.
17 Q   In what --
18 A   After October 1, I had no contact whatsoever with
19   any of the staff.
20 Q   After she resigned, was there anybody in Munising?
21 A   No.  As far -- I believe Kendra nelson was detailed
22   there once a week for a couple of -- couple of
23   weeks.  I am not sure.
24 Q   And what was Kendra's job?
25 A   She was Housing Program Coordinator.

Page 167

1 Q   And she reported directly to you?
2 A   Yes.
3 Q   And did you have some people in Dickinson County?
4 A   I had two people at the Dickinson-Iron Community
5   Services Agency?
6 Q   Okay.  So were they -- were they people that were
7   employed by somebody else, but you were
8   supervising?
9 A   They were employed by the Dickinson-Iron Community
10   Service Agency, and I provided program supervision.
11 Q   What does that mean, program supervision?
12 A   IF they had a question about what they should do,
13   as regards to delivering the services they were
14   contracted to provide, they asked me.
15 Q   About how often did that happen?
16 A   Daily.
17 Q   Okay.  When you were in Marquette, did they just
18   call you by phone or use email?
19 A   Email or by phone.
20 Q   Then did you have someone in Delta County?
21 A   Yes, I did.
22 Q   Who was that?
23 A   At the time, I believe her name was Julie Hardy.
24 Q   What was her position?
25 A   She was a housing resource specialist with

Page 168

1   Menominee-Delta-Schoolcraft Community Action
2   Agency.
3 Q   So, again, an outside employee?
4 A   Yes.
5       I'm sorry.  I can't hear you, Megan.
6       MS. BURINK:  You're muted, Megan.
7       THE WITNESS:  You're muted.
8 BY MS. NORRIS:
9 Q   Did you have someone in Chippewa County?
10 A   I did.
11 Q   And who was that?
12 A   Oh.  First, I had a gentleman named
13   Lonnie Bork[phonetic], and then I had another
14   gentleman named -- it escapes me at the moment.
15 Q   Okay.  And were they direct employees, or were they
16   through another organization?
17 A   They worked for the Chippewa-Luce-Mackinaw
18   Community Action Agency.
19 Q   And then in Marquette, my memory is, you had people
20   who were in the office in Marquette, and then you
21   also had people who were in Marquette, but not in
22   the office; is that right?
23 A   That's correct.
24 Q   So -- and then I think you told me you had four or
25   five, or six or seven -- I am sorry, I don't

Page 169

1   remember -- in the office?
2 A   I had four in the -- in the Cornerstone or
3   Commerce Street office -- Commerce Drive office.  I
4   had one at Orianna Ridge.  I had two at Grant View
5   Marquette.  And I had five at Lost Creek.
6 Q   And these are properties that -- that CAAM oversaw;
7   is that right?
8 A   Lost Creek, we owned and managed.  Grand View
9   Marquette, we managed the front of the house as
10   they describe.  And we had a social worker at
11   Orianna Ridge under the -- oh -- permanent
12   supportive housing program.
13 Q   Now, in your communications, you made it clear that
14   your anxiety and stress was caused by
15   Michelle LaJoie; is that right?
16 A   Correct.
17 Q   And so if you didn't have to see Michelle LaJoie,
18   then you could work, right?
19 A   I felt so, yes.
20 Q   But she is your boss, right?
21 A   Yes.
22 Q   Was that the only thing you couldn't do?  In other
23   words, could you do everything else, except work
24   directly face-to-face with Michelle LaJoie?
25 A   I thought that I could, yes.  If I didn't have the

43 (Pages 166 - 169)

Page 170

1   daily harassment face-to-face.
2 Q   But she has the right to know what you are doing,
3   doesn't she?
4 A   Of course.
5 Q   And she has the right to interact with you, doesn't
6   she?
7 A   Of course.
8 Q   And if she thinks face-to-face meetings are
9   important with her subordinates.  That matters,
10  doesn't it?
11 A   We are face to face right now.
12 Q   We are, but these are unusual times, aren't they?
13 A   That was a very unusual time, too.
14 Q   So her other subordinates were directly in the
15  office, weren't they?
16 A   Yes.  They were extraordinary circumstances.
17 Q   Can you look at Exhibit 27, please?
18      MS. BURINK:  Sure.  One minute.
19      THE WITNESS:  Okay.
20      (Marked for identification,
21      Deposition Exhibit 27.)
22 BY MS. NORRIS:
23 Q   So this is the -- the communication that we looked
24  at earlier with the form filled out, right?
25 A   Right.

Page 171

1 Q   We previously looked at the blank form, and then
2   your doctor filled it out, right?
3 A   Correct.
4 Q   And this is Dr. Olson; is that right?
5 A   Dr. Kurt Olson, and I specify that because his
6   brother is also a doctor.
7 Q   That's helpful.  Thank you.
8       Did he fill this out on his own, or did
9   he talk to you about it and fill it out, or did you
10  fill it out?
11 A   He filled it out.  This is his handwriting.
12 Q   So he diagnoses you with severe anxiety adjustment
13  disorder; is that right?
14 A   That's what he wrote.
15 Q   Okay.  And the major life activity that is affected
16  is working; is that right?
17 A   That's what he wrote.
18 Q   And as I understand it, you could do everything
19  except work directly with Michelle LaJoie; is that
20  right?
21 A   Yes.  If I didn't have to endure the daily
22  harassment face to face, I felt that I could.
23 Q   Right.  So the only -- the only limitation you had
24  as a result of your -- your severe anxiety
25  adjustment disorder was a limitation against

Page 172

1   working face to face with Michelle LaJoie on a
2   regular basis; is that right?
3 A   Yes.
4       Can I stop for a minute and ask my lawyer
5   a question?
6 Q   Yeah, you can.  You can put us on mute and talk all
7   you want.
8       MS. BURINK:  Yeah.  I will.  Let me do
9   that.
10      (Whereupon a brief off-the-record
11      discussion was held.)
12      THE WITNESS:  I'd like to make a
13  statement, Megan.  Is that allowed?
14      MS. NORRIS:  Yeah.
15      THE WITNESS:  When I requested the ADA
16  accommodation, it was after I was -- found out that
17  the board chairman, David Torongo, had violated the
18  agency's grievance policy they had just adopted,
19  and had advised the executive director of my
20  grievances.  I knew that that was going to escalate
21  the hostility of the work situation.  Mr. Torongo
22  also advised me that he was initiating an
23  investigation within the next 30 days.  And I
24  thought that I could still do my job and we could
25  still function if I did not have to have day-to-day

Page 173

1   face-to-face contact in an -- in an escalated
2   hostile fashion, which is why I asked the ADA
3   accommodation.
4 BY MS. NORRIS:
5 Q   Okay.  You then had a meeting with Shari Mahoski to
6   discuss the reasonable accommodation; is that
7   right?
8 A   I assumed -- I -- I believed that's why I was
9   there, yes.
10 Q   Okay.  Was Michelle LaJoie also present at that
11  meeting, or just Shari?
12 A   Shari and Francella Quinnell, a board member.
13 Q   Can you say that name for me question?
14 A   Francella, I can't -- I cannot pronounce that.  And
15  Quinnell, Q-u-i-n-n-e-l-l, I believe.
16 Q   What was discussed in this meeting?
17 A   I was presented with a list of conditions that I
18  had to explain how I would satisfy.
19 Q   Like what?
20 A   It was proposed that I would work two-and-a-half
21  days in Munising and two-and-a-half days in
22  Marquette.  And then I would have to explain how I
23  was going to supervise my staff, how I was going to
24  train my staff, how I was going to participate in
25  meetings.  There were 10 or 12 bullets on the list.

44 (Pages 170 - 173)

Page 174

1  I -- I don't have it in front of me, but --
2 Q  Who proposed the two-and-a-half/two-and-a-half
3  split?
4 A  Shari Mahoski.
5 Q  Did you think that was a reasonable accommodation,
6  or no?
7 A  No, I did not, considering there was an
8  investigation that was supposed to be going on.
9 Q  Well you -- you -- there had been investigations
10  into previous complaints, right?
11 A  Concerning --
12 Q  We have talked about we have talked today about a
13  number of grievances you filed, a number of, you
14  know --
15 A  I filed a grievance against Amy Lerlie, and I filed
16  a grievance against Michelle LaJoie.
17 Q  Right. When you filed a grievance against
18  Amy Lerlie, you came back to work after your heart
19  attack, right, or your heart surgery?
20 A  Four weeks later. I worked in Munising for three
21  weeks.
22 Q  Right. But then you came back while the issues
23  with Amy Lerlie were still pending, right?
24 A  Yes.
25  The investigation, though, was conducted

Page 175

1  by an internal -- or an external investigator.
2  (Marked for identification,
3  Deposition Exhibit 28.)
4 BY MS. NORRIS:
5 Q  According to Exhibit 28 --
6 A  Thank you.
7 Q  -- on the same day that -- that you had your
8  meeting with Shari Mahoski, you got -- received a
9  designated -- a designation notice regarding FMLA;
10  is that right?
11 A  Yes.
12 Q  And this extended your leave through October 24th;
13  is that right?
14 A  Yes.
15 Q  And as of this time, as of October 19, your doctor
16  was still taking the position that you could not
17  work face to face with -- with Michelle LaJoie on a
18  regular basis; is that right?
19 A  Correct.
20 Q  Did CAAM ask you to respond to the proposed
21  accommodation by a particular date?
22 A  They may have, but I don't recall.
23 Q  Okay. Did you receive a document that was called
24  an Employee Individual Accommodation Plan?
25 A  I don't recall. If I saw the document, I could

Page 176

1  tell you.
2  (Marked for identification,
3  Deposition Exhibit 29.)
4 BY MS. NORRIS:
5 Q  Could you look at Exhibit 29?
6 A  I don't remember the first page. I do remember the
7  second page. It was the list that she gave me
8  during our first meeting.
9 Q  So this -- this second page, it has things typed
10  in. Is that something Shari typed in, or is that
11  something you filled out?
12 A  She gave that to me at our first meeting.
13 Q  Okay. And it said date of initial contact was
14  October 11, 2018. Is that when you first requested
15  the accommodation to work in Munising?
16 A  I believe so.
17 Q  And then it says the date documentation was
18  requested was October 12, the date documentation
19  was received was October 15. As far as you know,
20  is that correct?
21 A  That's as far as I know it is, yes.
22 Q  And then it -- it says, "The employee concerns are
23  anxiety and face-to-face interactions with his
24  supervisor, Executive Director Michelle LaJoie;" is
25  that right?

Page 177

1 A  That's correct.
2 Q  And so the area to be accommodated is a change in
3  work location part-time; is that right?
4 A  Temporary.
5 Q  Yep. Thirty days right?
6 A  Right.
7 Q  And then if you look at that last page, it sets out
8  the parameters for all of this?
9 A  Correct.
10 Q  Did you agree to this?
11 A  No.
12 Q  Why not?
13 A  The interactive dialogue -- or the meeting for the
14  interactive dialogue was conducted as an
15  interrogation. Every one of my answers to these
16  questions were rejected by Shari Mahoski as being
17  unsatisfactory.
18 Q  So the form that we just looked at, did you have
19  that -- get that before or after the meeting?
20 A  The form, I don't recall seeing. I may have, but I
21  just don't recall it, Megan.
22 Q  This -- the second page --
23  (Multiple simultaneous voices.)
24  THE WITNESS: -- because we discussed it
25  twice.

45 (Pages 174 - 177)

Page 178

1 BY MS. NORRIS:
2 Q   The second page and the third page that we just
3       looked at --
4 A   Yeah.  This -- this form, Employee Individual
5       Accommodation --
6 Q   Yes.
7 A   -- Plan?
8             I don't recall seeing this before.
9 Q   How about the third page where it says, "Our
10      recommendations"?
11 A   Those -- that list of recommendations was given to
12      me on the October 19th meeting, and then she asked
13      me bullet by bullet what my response was in a
14      hostile interrogation fashion.
15 Q   Did they grant or not grant that accommodation?
16 A   They did not.
17 Q   They didn't -- they said you couldn't do it half
18      time?
19 A   They did not -- they said -- I told them that I did
20      not feel two-and-a-half workdays in Munising,
21      two-and-a-half work days at Cornerstone would have
22      been acceptable because it would have put me in
23      face-to-face contact with Michelle LaJoie three
24      days a week.
25 Q   Right.  So you are the one that said no.  In other

Page 179

1       words, they were prepared for 30 days -- they
2       weren't saying forever.  For 30 days, they were
3       prepared to have, after they questioned you --
4       whether they were interrogating you or not, after
5       they questioned you about the various duties, they
6       were prepared to say, "You can do two-and-a-half
7       days in Munising, two-and-a-half days in
8       Marquette."  And you said no, correct?
9 A   That's right.  I agreed and explained how I would
10      accommodate every other point on the list.
11 Q   Did you propose an alternative?
12 A   My original request.
13 Q   So you still wanted just Munising only?
14 A   For 30 days while the investigation was ongoing,
15      which I thought was ongoing, but it turned out they
16      did not start it until mid-November.
17 Q   What was the -- what was the magic of the
18      investigation?  Why would the -- why would whether
19      the investigation was ongoing or not make a
20      difference in whether you could work there in
21      person?
22 A   Because I would have been in the same building with
23      a supervisor who had already demonstrated her
24      hostility to me, and I would have been in a
25      situation where that hostility was increased

Page 180

1       exponentially.
2 Q   What --
3 A   That resulted in an unbearable anxiety on my part.
4 Q   So I'm trying to understand why.  Not why it would
5       result in unbearable anxiety, but why the timing of
6       the investigation versus non-investigation --
7 A   Because Dave Torongo told me the investigation
8       would take 30 days.
9             (Marked for identification,
10            Deposition Exhibit 30.)
11 BY MS. NORRIS:
12 Q   Could you look at Exhibit 30, please?
13 A   Yes.
14 Q   This is an October 24, 2018 communication to you.
15      It starts with, "I understood you were going to
16      consider our proposed alternative accommodation."
17            Is that proposed alternative
18      accommodation the two-and-a-half/two-and-a-half
19      split?
20 A   I agreed to consider it.
21 Q   Okay.  And did you agree that you would respond by
22      Monday?
23 A   I agreed to respond, and I did respond in the time
24      I was asked to respond, if I recall correctly.
25 Q   Okay.  This says, "It is Wednesday morning, and I

Page 181

1       haven't heard from you.  Please reach out to me by
2       the end of the day."
3 A   Yeah.  I believe I reached out to her by the end of
4       that day.
5             Can I ask what is blacked out on this?
6 Q   Yes, you can.  I think we blacked out -- and we
7       probably didn't get all of them.  It is our normal
8       practice to black out the first part of email
9       addresses so that if the documents are filed in a
10      court or something, people don't have all like --
11 A   Okay.
12 Q   Strange people that go look at things don't have
13      access to those emails addresses.
14 A   Thank you.
15 Q   I've seen a few documents today where it looks like
16      maybe we blacked it out, but the document that was
17      printed for me had unlifted the blackout.  Between
18      you and me, I am not worried about it.  But when we
19      file in court, we don't like to have those showing.
20            Could you look at 31, please?  And
21      when -- while you are at it, you might as well get
22      32 ready.
23            MS. BURINK:  Yep.
24            (Whereupon a brief off-the-record
25            discussion was held.)

46 (Pages 178 - 181)

Page 182

1      (Marked for identification,
2      Deposition Exhibit 31.)
3      THE WITNESS:  Okay.
4  BY MS. NORRIS:
5  Q   Your position as of October 24 was Munising or
6      nothing, right?
7  A   And I'll note that this is the day she asked for a
8      response.
9  Q   Noted.
10     Your position was Munising or nothing?
11 A   It was a temporary accommodation to facilitate the
12     investigation, and relieve me of my anxiety while
13     the investigation was in progress.
14 Q   But you did not propose any alternative
15     accommodation.  You stuck with your original
16     demand, correct?
17 A   My original request.
18 Q   Right.  But when they came back with alternatives,
19     you said no.  You stuck with your original one,
20     right?
21 A   Yes.
22 Q   And your doctor was saying that -- that you could
23     not go to Marquette, correct?
24 A   He was saying that I needed an alternate work site
25     to reduce my anxiety.

Page 183

1      (Marked for identification,
2      Deposition Exhibit 32.)
3  BY MS. NORRIS:
4  Q   Could you look at Exhibit 32, please?
5      If you look at the second paragraph, it
6      says, "I understand your response to the agency's
7      proposed accommodation was to restate your first
8      proposed accommodation."
9      That's correct, isn't it?
10 A   Yes.
11 Q   And then, "As I stated" -- I, being
12     Shari Mahoski -- "during our first interactive
13     process meeting on October 19, 2018, your first
14     proposed accommodation is not reasonable to the
15     agency."
16     That has always been the agency's
17     position, correct?
18 A   That I -- yes.
19 Q   The agency had offered a compromise, correct?
20 A   They had offered an unacceptable compromise.
21 Q   Right.  But they had offered a compromise, right?
22 A   Correct.
23 Q   You did not offer a compromise, did you?
24 A   I hadn't -- I had -- I had none to offer.
25 Q   Okay.  She says, "I would like to get our

Page 184

1      interactive process back on track.  The agency is
2      committed in good faith to try and find a
3      reasonable accommodation."  And she asserts, "We
4      are going to need you here sometimes.  It's an
5      interactive job.  It requires some face-to-face.
6      You have to see the people you supervise.  The
7      people who supervise you have to see you."
8      And she asks you to please go back to
9      your doctor to see if there is any accommodation
10     that would be effective, that would enable you to
11     be present in the main office at least some time,
12     correct?
13 A   Can I ask a question?
14 Q   Uh-huh.
15 A   Do you have a -- the documentation of my answers to
16     these original proposals?  Because I gave her a
17     solid responsive answer to each point on that list.
18 Q   So I have Exhibit 31, which -- which we touched on,
19     where you say, "I have given the agency's
20     counter-proposal for my accommodations serious
21     consideration.  I find it unacceptable for the
22     following reasons."  And you have, I think, six
23     detailed points.
24     Is that what you are talking about?
25 A   Interactive dialogue to find a reasonable

Page 185

1      accommodation, which was conducted more in the form
2      of a hostile interrogation.  This list of -- of --
3      this list of -- I -- I consider demands, was
4      presented as, "How are you going to do this?"  And
5      then she rejected every single answer I gave her.
6  BY MS. NORRIS:
7  Q   But what she says in Exhibit 32, in the bottom of
8      the first page, is -- she asks you to go back to
9      your doctor to see if there's some type of
10     accommodation that would be -- allow you to be
11     physically present in the -- the Cornerstone office
12     at least part of the time.
13     And she then says, "We have suggested a
14     half-and-half telework and an in-person schedule,
15     but perhaps there is some other combination of this
16     schedule that will be effective.  We're also open
17     to changes in schedule, work setting, et cetera,
18     during the time you are here in the Cornerstone
19     main office, if your doctor believes those
20     techniques will be effective."
21     So she was -- she was asking you to
22     suggest a compromise.  And she was saying that the
23     agency was open to not only having it be something
24     other than two-and-a-half/two-and-a-half, but also
25     to discussing what the circumstances would be when

47 (Pages 182 - 185)

Page 186

1   you are in Marquette.  They were open to that,
2   correct?
3  A   I considered her request lacking sincerity, based
4      upon the way I was treated when I went in for my
5      interactive dialogue.
6  Q   So you just didn't consider it?
7  A   I did consider it, but I did not consider her
8      request sincere.
9  Q   Well she provided you some resources for possible
10     accommodations for anxiety disorder; is that right?
11 A   I don't take mental health advice from a
12     poorly-trained human resource professional.
13 Q   Could you look at Exhibit 37?  I am sorry.  It's a
14     little out of order.
15         MS. BURINK:  Okay.  One moment.  Let
16     me --
17         MS. NORRIS:  Yep.
18         MS. BURINK:  -- find it.
19         (Marked for identification,
20         Deposition Exhibit 37.)
21         THE WITNESS:  Okay.
22 BY MS. NORRIS:
23 Q   All right.  Exhibit 37, up in the top-left corner,
24     it says it comes from JAN, J-A-N, the Job
25     Accommodation Network; is that right?

Page 187

1  A   Yes.
2  Q   Are you familiar with Job Accommodation Network?
3  A   No.
4  Q   Okay.  Are you aware that it is -- an agency that
5      is part of the federal government that is
6      specifically designed to make recommendations to
7      employers regarding possible accommodations for
8      various disabilities under the ADA?
9  A   Okay.
10 Q   All right.  So you said you don't take medical
11     advice from a human resources person, but she
12     wasn't asking you to take medical advice from her.
13     She was providing you a resource and asking you to
14     discuss it with your doctor; is that right?
15 A   Yes.  I don't believe she was sincere.
16 Q   Did you discuss it with your doctor?
17 A   I believe I did, but --
18 Q   Okay.  Did your doctor go through these things and
19     tell you why these kinds of accommodations might or
20     might not work for you?
21 A   I don't recall.
22 Q   Okay.  Did you ever come back to her with a
23     counter-proposal?
24 A   I didn't.
25 Q   You did not, correct?

Page 188

1  A   I did not.
2  Q   And she said she would extend your FMLA leave to
3      allow you an opportunity to talk to your doctor so
4      that they could see if they could get the
5      interactive process back on track; is that right?
6  A   She did extend my FMLA leave without my consent.
7  Q   Well your doctor wasn't releasing you to work, was
8      he?
9  A   With the reasonable accommodation that I requested,
10     he was.
11 Q   But he was -- but if they didn't agree to that -- I
12     mean, then you are holding them hostage.  It's
13     like, this is my accommodation.  This is it.  No
14     negotiation, or else I don't come back.  That's
15     what you were saying, right?
16 A   I was a senior director of the agency, liked and
17     well-respected by all the employees.  I was out
18     with an illness.  I was treated like a hostile
19     entity.  I was escorted in the building.  Every
20     answer to every question I gave was dismissed, and
21     I was treated like a prisoner in a courtroom.
22 Q   Or alternatively --
23         (Multiple simultaneous voices.)
24         THE WITNESS:  -- her sincerity.
25

Page 189

1  BY MS. NORRIS:
2  Q   Or alternatively, you were an employee who had
3      requested and had been granted leave, who had
4      requested an accommodation that they had not
5      previously provided to anybody at your high level.
6      They made it clear they were willing to consider
7      alternatives, and you made it clear you would not.
8      Isn't that --
9  A   They also made it clear that they were going to
10     start an investigation, and they lied about that.
11 Q   Well who was doing the investigation?
12 A   Shari Mahoski.
13 Q   So she was supposed to investigate something -- I
14     mean, how was -- how far was what happened in the
15     investigation going to affect your medical ability
16     to work or not?
17 A   The investigation would have been concluded at the
18     end of the 30 days, as I was told by Mr. Torongo.
19 Q   And how does the investigation being concluded
20     change when you can work or not?
21 A   I actually felt that the executive director would
22     have been disciplined.
23         (Marked for identification,
24         Deposition Exhibit 33.)
25

48 (Pages 186 - 189)

Page 194

1  A   "I will need confirmation of this meeting on 11/13
2      as to whether mornings or afternoons work better
3      for you."
4          I am not really sure.
5  Q   No.  I am a paragraph above you.
6  A   Oh, okay.
7  Q   I am in the second paragraph of the letter.
8          MS. BURINK:  The last sentence --
9          THE WITNESS:  Okay.
10         MS. NORRIS:  Yeah.  He was on vacation.
11     I remember.
12 BY MS. NORRIS:
13 Q   Okay.  But you told her that you would talk to him
14     about these proposed accommodations, correct?
15 A   Yes.
16 Q   You did not say to her at this point, "No
17     accommodation will work."  You said, "I will talk
18     to him about it, but I can't do that right away
19     because he is not here."
20         And so she said, "Okay.  We will extend
21     your leave," right?
22 A   Yes.
23 Q   Is there anything inappropriate about that?
24 A   No.  That extension was probably appropriate.
25 Q   Okay.  And then she said, "But I want to keep this

Page 195

1      on track, so I am going to schedule another meeting
2      and, you know, after -- after you meet with your
3      doctors."
4          And so she suggested November 15; is that
5      right?
6  A   Yes.  I believe we actually met on the 19th.
7  Q   It looks to me -- if you want to look at it, you
8      can, but we don't need to make it an exhibit if
9      it's not necessary.
10         It looks to me like you told her you were
11     unavailable the week of November 20 --
12     November 15-22.
13 A   We did meet that week.
14 Q   Okay.
15 A   We met and had a phone meeting.
16 Q   The week of November 15?
17 A   Yes.
18 Q   What do you remember about that phone meeting?
19 A   She had just started the investigation.
20 Q   Okay.  Do you remember --
21 A   Asked --
22 Q   -- anything else?
23 A   -- me a bunch of questions, and I answered them.
24     And I requested a transcript of that, that I did
25     not receive.

Page 196

1  Q   Who is Sam?
2  A   Sam?
3  Q   Yes.
4  A   I have a daughter named Sam.  Sam used to be our IT
5      guy at CAAM.
6  Q   Okay.  It -- in a communication, you write, "Good
7      for Sam for reporting me.  I suggested it as the
8      preferred alternative to my request."
9          Do you know what that's talking about?
10 A   Yes.  While I was at CAAM, I ran the Supportive
11     Services for Veterans Family's Program.  As part of
12     that, I was a member of various veterans groups,
13     including the American Legion in Munising.  And I
14     had permission from Amy Lerlie to use my work
15     laptop to record the minutes of American Legion
16     meetings.  And when I left and I lost access to my
17     laptop, it had three years worth of meeting minutes
18     on it, and I requested them from Shari.  She said
19     no.  And I requested them from Sam, the IT guy, and
20     he -- he very appropriately reported that to
21     Michelle LaJoie, and they refused to give me the
22     minutes of those meetings.
23 Q   Okay.
24 A   It was not part of my job.  It was -- it was
25     ancillary.

Page 197

1  Q   Did you have an interactive process meeting on
2      November 26, 2018?
3  A   With Shari Mahoski?
4  Q   I --
5  A   Yes.
6  Q   -- think so.
7  A   And Fran Quinnell.
8  Q   Where was this meeting?
9  A   In the HR director's office.
10 Q   In Marquette?
11 A   Yes.
12 Q   Was Michelle LaJoie there?
13 A   No.
14 Q   Did you know in advance she would not be there?
15 A   I don't know.
16 Q   Did you -- did she ask if you had seen your doctor
17     to consider the alternative accommodations?
18 A   You know, I don't recall.  The meeting was
19     truncated early at my instigation because of the
20     hostile nature of the interrogation that I was
21     subjected to.
22 Q   Well do you remember if they asked you if you had
23     gotten more information from your doctor?
24 A   I don't recall, Megan.
25 Q   I mean, based on her previous letter, that was the

50 (Pages 194 - 197)

Page 202

1         (Marked for identification,
2         Deposition Exhibit 36.)
3  BY MS. NORRIS:
4  Q    Could you look at Exhibit 36, please?
5  A    Yes.
6  Q    This is a letter dated December 18, 2018 to you
7       from Shari Mahoski; is that right?
8  A    That's correct.
9  Q    And this confirms that your doctor has not cleared
10      you to return to work unless you can work entirely
11      from Munising, right?
12 A    Until the end of the investigation, yes.
13 Q    Well that's -- this letter says, "Right now, you
14      are not cleared to return to work unless you can
15      work entirely from Munising."
16         That's true, correct?
17 A    Yes.
18 Q    All right.  And so it says, "You are still FMLA
19      eligible, so we will extend your leave," correct?
20 A    Yes.
21 Q    And it says, "Until you have spoken to your doctors
22      about our proposed alternatives for reasonable
23      accommodation," correct?
24 A    Yes.
25 Q    And then your FMLA was going to run out, correct?

Page 203

1  A    Correct.
2  Q    And your pay had run out, correct?
3  A    Correct.
4  Q    So she told you what you needed to do to continue
5       your insurance; is that right?
6  A    Yes.
7  Q    And she provided you the FMLA designation notice,
8       right?
9  A    Yes.
10 Q    Did you send the letter to the board after this?
11 A    I forgot the date.  But on or about this time.
12      This was December?
13 Q    Yes.
14 A    December -- I believe I sent it in January.
15 Q    And what was that letter?
16 A    You have it.  We discussed it.
17 Q    So that's the one we already talked about?
18 A    Yes.
19 Q    That was to Dave Torongo; is that right?
20 A    To all the board members, yes, because there was a
21      January 17th board meeting.
22 Q    Did you have any communication with Michelle LaJoie
23      after sending that letter?
24 A    No.  Until we started working together in my
25      current capacity.

Page 204

1  Q    How does that work?
2  A    We are both professionals.  I work routinely with
3       several members of the CAAM staff.
4  Q    Could you go to Exhibit 39, please?
5         MS. BURINK:  Printing it off now.
6         THE WITNESS:  Okay.
7         (Marked for identification,
8         Deposition Exhibit 39.)
9  BY MS. NORRIS:
10 Q    This is an email from you dated January 17, 2019,
11      and it goes to a long list of people; is that
12      right?
13 A    Yes.
14 Q    Who are these people?  I don't mean by name.  I see
15      all their names.  But what group are they?
16 A    These were mainly the staff at Cornerstone office?
17 Q    Was it all of the staff at Cornerstone, except for
18      Michelle LaJoie and Shari Mahoski?
19 A    Yes.
20 Q    And the title of this is "The rumors of my demise
21      have been greatly exaggerated," correct?
22 A    Yes.
23 Q    And the first -- the opening salutation says,
24      "Former Colleagues and Friends."
25 A    Yes.

Page 205

1  Q    All of these people were current employees of CAAM;
2       is that right?
3  A    Yes.
4  Q    So if they were former colleagues, that's because
5       you were no longer, correct?
6  A    I felt that I was no longer working there.
7  Q    You had not been terminated --
8  A    I --
9  Q    You had not been terminated, had you?
10 A    I had had no communication with CAAM since their
11      letter of December 28th, and I had been -- when my
12      FMLA terminated, I had been cast adrift and left to
13      fend for myself.
14 Q    Well you had not responded to any -- the FMLA was
15      extended to December 28th to give you a chance to
16      get a response from your doctor, and you had not
17      provided that, correct?
18 A    No.
19 Q    But you had not received any letter of termination,
20      just a letter that your FMLA time had run out,
21      correct?
22 A    I had no idea what my status was.
23 Q    Right.  Nobody sent you a letter of termination,
24      did they?
25 A    No.

52 (Pages 202 - 205)

Page 206

1 Q   Nobody sent you a COBRA notice, did they?
2 A   I believe I did receive a COBRA notice.
3 Q   When?
4 A   I did receive a COBRA notice.  I don't remember
5     when.
6 Q   If you look at Exhibit 38 -- just let me know when
7     you have it.
8          MS. BURINK:  Yeah.  I had it, but I lost
9     it, so.
10         MS. NORRIS:  That's all right.
11         MS. BURINK:  Bear with me.  Okay.
12 BY MS. NORRIS:
13 Q   While she is looking, I'll ask you some questions.
14         Normally, when you're receiving a regular
15    paycheck, your employee share of your health care
16    premiums was taken out of your paycheck; is that
17    right?
18 A   Yes.
19 Q   And during much of your FMLA leave, you were paid
20    using your PTO banks, RO, PTO, that sort of thing;
21    is that right?
22 A   Correct.
23 Q   And your insurance -- employee portion of your
24    insurance premiums was taken out of those checks,
25    correct?

Page 207

1 A   Correct.
2 Q   Then in late December of 2018, you're out of paid
3     leave, correct?
4 A   Correct.
5 Q   Now, you understand that an employee can be on
6     unpaid leave, right?
7 A   I'm not sure what our personnel policy said about
8     unpaid leave.
9 Q   They don't say anything to say you can't do that,
10    do they?
11 A   I don't know.
12 Q   And, in fact, FMLA is unpaid leave.  It's just that
13    sometimes you have other PTO to pay you, right?
14 A   I know that FMLA can be unpaid.
15 Q   Okay.  So you are out of your paid leave.  If your
16    insurance is going to continue, the -- there is no
17    check to deduct the employee share from, correct?
18 A   That's correct.
19         (Marked for identification,
20         Deposition Exhibit 38.)
21 BY MS. NORRIS:
22 Q   So you got two letters -- one we already discussed,
23    and now Exhibit 38 -- that talk about just
24    mechanically how to get your insurance paid for
25    since you are not getting checks, correct?

Page 208

1 A   Correct.
2 Q   All right.  But this is just the employee share of
3     the insurance.  This is not like a full cost of the
4     insurance, right?
5 A   Correct.  But I understand that if I did not pay
6     it, my insurance would not be continued.
7 Q   Sure, sure.
8          But this is not a COBRA notice, where you
9     pick up the cost of your insurance.  You never got
10    a COBRA notice prior to January 17, did you?
11 A   No.  But I do believe I got a COBRA notice.
12 Q   You may very well have after January 17.
13 A   Okay.  Then --
14 Q   But prior to January 17, you never got one, did
15    you?
16 A   No, as far as I know.
17 Q   So how are you cast adrift?  You are getting a
18    letter, the most recent is January 9.  Exhibit 38
19    is January 9.  You're getting a letter telling you
20    how to continue your employer-provided insurance.
21    In other words, you just have to pay your -- your
22    employee share of it.
23         How is that telling you you are no longer
24    employed?
25 A   I had no contact with the agency after my FMLA

Page 209

1     expired on January -- or on December 28th.
2 Q   Well you got a January 9 letter.
3 A   That was -- that was two weeks later.
4 Q   Yeah.  That's before January 17.
5 A   What is significant about January 17?
6 Q   Because January 17 is when you refer to all of your
7     colleagues as former colleagues and friends.
8 A   That's because I -- I felt like I was no longer
9     employed by CAAM.
10 Q   I am asking, given that you got a January 9 letter
11    telling you how to continue your employee
12    insurance, what makes you think you are no longer
13    employed?
14 A   I didn't have a job.
15 Q   You had a job.  You were on a leave from it.
16 A   I just -- I just felt that I was no loner part of
17    CAAM.
18 Q   Okay.  So -- so that's your position, right?
19 A   Yes.
20 Q   All right.  And then you say in this, "It's
21    becoming increasingly apparent I won't be coming
22    back.  I tried, but it was not to be."
23         You are the one who stopped negotiating
24    accommodations, correct?
25 A   They were not negotiating in good faith.

53 (Pages 206 - 209)

Page 210

1 Q   So you are the one who stopped them, correct?
2 A   Yes.
3 Q   And then you go through what you don't like about
4    the job. I mean, what, you know -- the problems
5    with it. "I grew weary of being told every day
6    that my staff was overpaid, you know, things like
7    that."
8       And then you say, "I am sorry. I can't
9    anymore. I will no longer risk my physical,
10   mental, emotional, and spiritual health. I will
11   not die for this cause."
12      So you decided you couldn't work there,
13   right?
14 A   I could not work there under those conditions.
15 Q   Yeah. That was your decision?
16 A   No. I don't believe it was. I believe it was
17   CAAM's decision.
18 Q   CAAM didn't tell you to send this letter.
19 A   No. But they harassed me. They --
20 Q   But they didn't --
21 A   -- lied --
22 Q   But they did not tell you you could not work there,
23   correct?
24 A   They told me that I could not receive the
25   accommodation that I requested.

Page 211

1 Q   So do you understand what interactive process
2    means?
3 A   Interactive dialogue, yes. It's --
4 Q   Okay --
5 A   -- interactive. Let's sit down and let's talk
6    about what will work.
7 Q   Right.
8 A   And at our first session of an interactive
9    dialogue, I was presented with a pre-determined
10   list of conditions.
11 Q   And you presented them with a pre-determined list
12   of conditions. You said --
13 A   I agreed --
14 Q   -- Munising --
15      Just a minute. My questions.
16      You said Munising or nothing. They said
17   you are supposed to be in the office. They
18   proposed a compromise, and you never proposed a
19   compromise, correct?
20 A   I agreed to every one of their pre-determined list
21   of conditions except the first one, because the
22   chairman of the board had violated their own
23   personnel policies and divulged my grievances to
24   Michelle LaJoie, which exacerbated the
25   already-hostile work environment I was forced to

Page 212

1    work in, which contributed significantly to my
2    anxiety.
3 Q   What did Michelle LaJoie do against you in October
4    or November, December, January?
5 A   Daily in front of staff, she harassed, made
6    personal attacks against me, told me everything I
7    had ever done was wrong and --
8 Q   You weren't seeing -- you weren't -- you were
9    having almost no communications with
10   Michelle LaJoie during this time. Your doctor had
11   put you on leave --
12 A   Oh, you are -- I am sorry.
13 Q   -- and most of your communications were with
14   Shari Mahoski.
15 A   I am talking about the hostile work environment
16   that prompted my original request for FMLA.
17 Q   Right. And then they proposed alternatives. You
18   said no. They proposed other alternatives. You
19   said no. Nobody was harassing you during that
20   time.
21 A   No.
22      (Marked for identification,
23      Deposition Exhibit 40.)
24 BY MS. NORRIS:
25 Q   On January 17, 2019, you got Exhibit 40; is that

Page 213

1    right?
2 A   Yes.
3 Q   And this reiterates that you had been on paid
4    leave, which expired on December 7. That's true,
5    correct?
6 A   Correct.
7 Q   And you are on FMLA, which expired on December 28.
8    That's correct, right?
9 A   Correct.
10 Q   And since then, you've been unpaid leave. That's
11   correct, right?
12 A   Correct. I did not know my status after
13   December 28th.
14 Q   You didn't ask anybody, did you?
15 A   No.
16 Q   And you got a letter about your employee insurance
17   premiums, correct?
18 A   Yes.
19 Q   And then this says, "In an acknowledgment to many
20   of the staff, it has been brought to our attention
21   that you have indicated to them you will not be
22   returning."
23      And that's true, correct?
24 A   I knew -- I was quite certain that I would not be
25   allowed to return.

54 (Pages 210 - 213)

Page 214

1  Q   That's not what your letter says.  Your letter
2     doesn't say they won't let me.  Your letter says,
3     "I can't anymore."
4  A   It says, "It was not to be.  I tried."
5  Q   And it says, "And I can't anymore."
6  A   I could not put up with anymore of their lying and
7     intimidation.
8  Q   Right.  So I am not arguing with you at this moment
9     about whether that's a legitimate position.  What I
10    am saying is, that was your decision, and they
11    interpreted it exactly as you communicated it to
12    all of your peers.  "I --
13 A   I left --
14 Q   -- "can't do that anymore."
15       So they interpreted it as a resignation,
16    and that's what you did.  You can say you did it
17    with no choice.  We can argue about that.  But you
18    pulled that trigger, correct?
19 A   I disagree.
20 Q   Why?
21 A   Because I have -- I was left to do whatever.  I had
22    no income.  I had no income to pay my portion of
23    the insurance premium.
24 Q   And you did not propose any compromise for any
25    accommodation that might allow you to have income,

Page 215

1     did you?
2  A   I felt they were not dealing in good faith with me.
3  Q   My question is a yes-or-no question.
4       Did you propose any compromise?
5  A   No.
6  Q   You then contested that you resigned, correct?
7  A   Yes.
8  Q   And you said you were terminated, right?
9  A   Yes.
10 Q   And you got a letter back saying --
11 A   That's when I --
12 Q   -- "We did not -- we did not terminate you"?
13 A   When I filed for unemployment, there was no
14    category for what I was in.  I was not terminated.
15    I did not quit.  And that's what I indicated on my
16    unemployment application.
17 Q   Why do you say, "I did not quit"?
18 A   Because I didn't quit.
19 Q   What does, "I am sorry.  I can't anymore.  I'm
20    proud and grateful to have been," past tense,
21    "associated with you."  What about this is not you
22    quitting?  "Fair winds and following seas."
23 A   Policies require that when you resign, you send a
24    letter to the executive director and the human
25    resource manager, and I deliberately left them off

Page 216

1     that correspondence.
2  Q   But you told your colleagues, "I am not going to
3     see you again --
4  A   Yeah.
5  Q   -- "in this function."
6  A   I had not been allowed to communicate with them
7     since October 1st.
8       (Marked for identification,
9       Deposition Exhibit 43.)
10 BY MS. NORRIS:
11 Q   Can you please look at Exhibit 43?  Do you see
12    that?
13 A   Yes.
14 Q   The first communication is a January 26
15    communication from you to Jerry Irby; is that
16    correct?
17 A   Yes.  If I am reading it backwards, yes.
18 Q   Irby is I r-b-y.
19 A   Correct.
20 Q   And who is Jerry Irby?
21 A   He was a member of the board of directors.
22 Q   And when you sent this to him -- what's your
23    purpose in sending this?
24 A   I was no longer a CAAM employee.  I was still the
25    leader of my community, and I knew that there were

Page 217

1     funds that were earmarked for spending in
2     Alger County, and I wanted to make sure they got
3     spent appropriately.
4  Q   Did you think they were being spent
5     inappropriately?
6  A   Yeah.  They had closed the Munising office.
7  Q   Well there was nobody there, right?
8  A   Up until then, I had been there.
9  Q   Well you haven't been there full-time ever,
10    correct?
11 A   No.
12 Q   And you were no longer an employee, correct?
13 A   Correct.
14 Q   So were they supposed to keep it open for nobody?
15 A   The residents of Alger County.  It is Community
16    Action Alger-Marquette.
17 Q   Right.  But the residents of Alger County don't
18    work in that office, do they?
19 A   No.  But I was the Mayor of the City of Munising,
20    which is in Alger County, and I have an obligation
21    to my constituents.
22 Q   The next email is to Lori Stephens-Brown, and she
23    says, "There's a witch hunt going on here."
24       What did she tell you about that?
25 A   She didn't.  I never got that email.  By then,

55 (Pages 214 - 217)

Page 218

1    Michelle LaJoie had taken over my email account.
2  Q   Did you speak to Lori Stephens-Brown about this?
3  A   Yes, I did.  I apologized for her getting in
4    trouble because of me, and then I ceased all
5    contact with her.
6  Q   Did she tell you what the witch hunt was?
7  A   No.
8  Q   You then filed a second charge with the EEOC; is
9    that right?
10  A   What second charge?
11  Q   So you -- you filed one charge back at the time of
12    the -- Stacia Lynn and subsequent investigation --
13  A   Yes.
14  Q   -- right?
15    And that charge, the first charge -- I'll
16    call that the first charge, was a retaliation
17    claim.  You claimed that you were retaliated
18    against for speaking up, correct?
19  A   Yes.
20  Q   Okay.  And my memory of that charge is that it --
21    you filed it.  Miller Canfield filed a position
22    statement.  The EEOC sent you our position
23    statement, and you withdrew your charge; is that
24    right?
25  A   In regards to Amy Lerlie?

Page 219

1  Q   Right.
2    And then you filed a separate charge
3    regarding the events arising out of being
4    supervised by Michelle LaJoie is that right?
5  A   My attorney had filed it on my behalf, yes.
6  Q   Right.
7    And am I correct that that charge was
8    withdrawn?
9  A   Was withdrawn?
10  Q   Well you got -- you got a Right to Sue Notice, but
11    it never went through an investigation; is that
12    right?
13  A   That's correct.
14  Q   Okay.  And why didn't it go through an
15    investigation?
16  A   The lack of adequate staff at the City of Detroit
17    EEOC office, is what we were told.
18  Q   Was that for an investigation, or was that if you
19    wanted to go to mediation, if you know?
20  A   I believe they had no staff to conduct the
21    investigation, and there's a time limit on when
22    they can do that.
23  Q   And then you filed an unemployment complaint; is
24    that right?
25  A   That's correct.  I filed an unemployment

Page 220

1    application.
2  Q   Right.
3    And you had a hearing on that; is that
4    right?
5  A   Yes.
6  Q   And the unemployment judge ruled against you; is
7    that right?
8  A   Yes.
9  Q   Other than what we have discussed -- and I know it
10    has been a long day.
11    Other than what we have discussed, do you
12    have any other evidence of harassment, retaliation,
13    any unlawful activity?
14  A   Evidence?  What do you mean by evidence?
15    Documentation, or witnesses, or what?
16  Q   Oh.  Fair enough.
17    No, no.  I am looking more towards, are
18    there events that we haven't discussed?  And by
19    discussed, if it was in a lengthy email, you can
20    consider it discussed.
21  A   No.
22  Q   I have been alerted to it.
23  A   I don't believe there are other events that we
24    haven't discussed.
25  Q   Did anybody at any time, board member, anybody,

Page 221

1    ever suggest any of these decisions had anything to
2    did with your age?
3  A   I am sorry?
4  Q   At any time, did anybody, from the janitor up to a
5    board member -- did anybody suggest that any
6    actions taken with regard to you had to do with
7    your age?
8  A   No.
9  Q   At any time, did anybody suggest to you that you
10    could not take FMLA leave?
11  A   No.
12  Q   Now, I understand that there is a dispute regarding
13    the duty to accommodate.  You believe that you were
14    not properly accommodated, and CAAM believes that
15    you were properly accommodated; is that right?
16  A   We disagree on that point.
17  Q   Right.
18    And am I correct that the accommodation
19    we're talking about is whether you needed to work
20    in the -- in the Marquette office for any amount of
21    time during the October, November, December, 2018
22    period we've discussed; is that right?
23  A   I requested a temporary leave for 30 days, which I
24    believed to be the duration of the investigation
25    that I thought would be conducted.

56 (Pages 218 - 221)