# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RODNEY DES JARDINS,

    Plaintiff,

                        Case No. 2:19-cv-00252
                        Hon. Paul L. Maloney

-vs-

COMMUNITY ACTION ALGER-
MARQUETTE,

    Defendant.
_____/

PAGES 1 TO 225

    The Deposition of RODNEY DES JARDINS,
    Taken via Veritext Remote
    Commencing at 10:07 a.m.
    Thursday, November 5, 2020
    Before Ravin Neal, CSR-8420

        Court reporter, attorneys &
        witness appearing remotely.

Page 44

```
 1         lot better than the original offer?
 2   A     Yes.
 3   Q     Am I right that you started to work for CAAM on
 4         November 10, 2014?
 5   A     I believe that's correct, yes.
 6   Q     Okay.  And if my math is right, were you about 55
 7         years old at that time?
 8   A     Yes.
 9   Q     How old was Amy Lerlie?
10   A     I believe she was 45.
11   Q     And how old was Earl Hawn?
12   A     I don't recall.
13   Q     When you were --
14   A     I never asked him.
15   Q     -- hired -- when you were hired, were you provided
16         information about CAAM's policies?
17   A     Yes, I was.
18   Q     Did you receive a handbook of some kind?
19   A     I had access to a handbook online, yes.
20   Q     Okay.
21   A     Electronic version.
22   Q     Okay.  And did you go look at it?
23   A     I am sorry?  You broke up there, Megan.  I didn't
24         hear the question.
25   Q     Did you -- did you go look at the handbook?
```

Page 50

1  Q   Okay. How many times?
2  A   Once.
3  Q   And was the one time that you actually reported it
4      the time that -- that you ended up making a
5      complaint to the board, or was there a different
6      time?
7  A   It was the episode with Stacia Lynn. I was doing
8      her annual performance evaluation, which required
9      her to write a self-evaluation. And she wrote a
10     self-evaluation and told me in that self-evaluation
11     that she felt she was being harassed and
12     discriminated against.
13             And I said, "If you give me this, I have
14     to take certain documents -- I have to take certain
15     actions. Are you sure you want to do this?"
16             And she said no, and she yanked it back
17     from me, and tore it up and stuck it in her pocket.
18 Q   Did you -- did you understand that an employee
19     might use words like harassment to talk about
20     behavior that is not against the law. It might
21     just be a not-nice boss, for example?
22 A   That is why we had that conversation. I told her,
23     "If you use the word harassment and discrimination,
24     they have very specific meanings and I have to take
25     very specific actions. Do you want to use these

Page 72

```
 1         couldn't do it.
 2    Q    So procedurally, this wasn't working well for you?
 3    A    It had for a year, but then it proceeded to get
 4         worse as the antagonism that Amy displayed towards
 5         Stacia increased.
 6    Q    And do you know why Amy Lerlie had that antagonism
 7         towards Stacia Lynn?
 8    A    I did at the end.  At the time, I did not.
 9    Q    Okay.  When -- when did you learn what caused that?
10    A    I -- I can -- I can say October 6th of 2017, when
11         Stacia came to my office two weeks after I gave her
12         the chance to take herself-evaluation back, and
13         then she told me that she had been the victim of
14         sexual harassment.
15    Q    So I thought, but I may have heard wrong -- I
16         thought that when Stacia Lynn first told you about
17         harassment, she did not say anything about sexual?
18    A    She did not.
19    Q    And -- and what she was complaining to you about
20         was not sexual, and you said, "But if you say
21         harassment, I have some duties here."
22    A    Yes.  Harassment or discrimination, but she did not
23         mention sexual harassment.
24    Q    When did you learn she was complaining of sexual
25         harassment?
```

```
                                                        Page 73
 1   A    On October 6th of that year.
 2   Q    Okay.  And what -- how did you learn that?
 3   A    She came to my office and asked me if I could take
 4        a walk with her around the block because she had
 5        some things to tell me, and she told me that she
 6        had been the victim of sexual harassment when she
 7        first became employed.  She told me that she had
 8        filed an EEOC complaint, and she told me that she
 9        had retained counsel to represent her, and she told
10        me that she was going to take family medical leave.
11   Q    But when she told you all of this, this is after
12        you had seen a progressive deterioration of the
13        relationship; is that right?
14   A    Yes.
15   Q    And do you know if she ever complained to anybody
16        before she told you this?
17   A    I believe she complained to the HR director at the
18        time.  The HR director and I had a conversation
19        with her.
20   Q    So at the same -- so she -- the HR director learned
21        at the same time?
22   A    About the EEOC complaint?  No.
23   Q    Yes.
24   A    I assume she learned immediately that day because
25        she filed the complaint that day.
```

Page 80

```
 1   Q    Okay.  Other than the conversation where Amy Lerlie
 2        shared it with you all, did you discuss this with
 3        Amy Lerlie at any other time?
 4   A    Not that I recall, no.
 5   Q    Do you know who wrote this?
 6   A    I do not.
 7   Q    If you turn to the next page, the next page is
 8        dated November 15, 2017.
 9             But let me back up.  Do you know what
10        date the anonymous complaint was made?
11   A    Before November 15th.
12   Q    If I -- if I said that the board received it on
13        November 10, 2017, does that sound about right to
14        you?
15   A    Yeah.  I would believe that, yes.
16   Q    Okay.  So then on November 15, you sent an email to
17        the entire board; is that right?
18   A    I did.
19   Q    And if you look at the second page of -- of this
20        email, it looks like just before sending an email
21        to the board, you sent an email to Lucy Grove; is
22        that right?
23   A    That's correct.
24   Q    So, first, at 7:34 in the evening, you sent an
25        email to Lucy Grove entitled "Hostile work
```

Page 81

```
 1         environment complaint," and you said that you were
 2         making a formal complaint against Amy Lerlie about
 3         the hostile work environment; is that right?
 4    A    Yes.
 5    Q    And one of the incidents that you cited had to do
 6         with Amy Lerlie accusing you of having an affair
 7         with Stacia Lynn; is that right?
 8    A    That's correct.
 9    Q    But then you also mentioned there has been a lot of
10         harassment and unspecified threats and that -- that
11         Amy Lerlie had used against the staff, you and --
12         and the rest of the staff, and it had to stop,
13         correct?
14    A    I -- I wrote that, yes.
15    Q    Yep.
16              And then you told her you were going to
17         tell the board; is that right?
18    A    I believe so.
19    Q    And you sent the -- the email that is dated
20         November 15 at 9:07 p.m.; is that right?
21    A    Yes.
22    Q    And so what you said is, you -- sort of your first
23         issue, if you will, is that if there's a problem
24         with the executive director, there was no avenue to
25         complain.  That's what we talked about earlier; is
```

```
                                                      Page 82
 1        that right?
 2   A    Correct.
 3   Q    So -- and then you said she was abusing her
 4        authority because nobody could do anything about
 5        it, right?
 6   A    Correct.
 7   Q    And then you said "Twenty or thirty staff members
 8        are ready to file a complaint today."
 9             How many staff members did CAAM have?
10   A    140.
11   Q    Okay.  These 20 or 30, were they all in Marquette?
12   A    As far as I know.
13   Q    Okay.  And did they include your fellow directors?
14   A    I don't know.
15   Q    Okay.  How do you know that 20 or 30 were ready to
16        do this?
17   A    I -- it was a -- a hyperbolic guess.  Between
18        October and November -- that's okay.
19             Between October and November, that's all
20        anybody talked about at the agency, and they got
21        very bold about the stories they told each other.
22   Q    And you -- you said that the board needed to
23        initiate an investigation into a hostile work
24        environment, abuse of authority, harassment, sexual
25        harassment, and there were a lot of complaints
```

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

Page 83

```
 1        coming, correct?
 2   A    Yes.
 3   Q    And that Amy Lerlie was a pathological liar; is
 4        that right?
 5   A    Yes.
 6   Q    And she would go after anybody who was contrary to
 7        her in any way?
 8   A    Yes.
 9   Q    When you wrote this, you were in the hospital; is
10        that right?
11   A    Correct.
12   Q    And you were about to have emergency heart surgery;
13        is that right?
14   A    Correct.
15   Q    When did you first have any kind of heart problem?
16   A    I would guess within three days of the 14th of
17        November.  In retrospect, I think I had what they
18        describe as TIAs.  I believe I had three in the
19        three or four days before I was hospitalized.
20   Q    What caused -- what -- can you tell me what a TIA
21        is?
22   A    It's a -- it's a mini heart attack.  I don't know
23        the exact medical term, but that's how they
24        referred to it.
25   Q    Had you ever had heart problems before this?
```

```
                                                     Page 84
 1   A   No.
 2   Q   Had you ever been checked out for any heart
 3       problems before this?
 4   A   No.
 5   Q   So it's possible that this just came on at the
 6       time.  It's also possible that you had issues that
 7       you just didn't realize you had; is that correct?
 8   A   I am not a doctor.
 9   Q   Fair enough.
10           So you -- you obviously were sick enough
11       to land in the hospital, and you felt strongly
12       enough about this to write this letter.
13           If you would then turn the page, there's
14       a third letter, or a third set of emails dated
15       November 17.  Do you see those?
16   A   Yes.
17   Q   Lucy Grove acknowledged receipt of your complaint.
18       She said that the executive committee had directed
19       an investigation be conducted.  You'd be told who
20       was handling the investigation, but meanwhile, take
21       care of your health; is that right?
22   A   Yes.
23   Q   And you expressed concern about the investigator
24       and made it clear you didn't think it could be
25       Lucy Grove because she served at the -- at the
```

```
 1         pleasure of the executive director; is that right?
 2    A    That is correct.
 3    Q    And then if you go to the last page, this is a
 4         separate -- a separate complaint; is that right?
 5         Or it looks -- no.  It looks to me like it's
 6         just -- it's just the same as the one we already
 7         saw attached to a different email; is that right?
 8    A    There's some back and forth there.
 9    Q    Yep.
10              Prior to November 15, 2017, did you ever
11         complain to anybody at CAAM about a hostile work
12         environment or harassment or sexual harassment?
13    A    Did I ever complain?
14    Q    Yes.
15    A    I had discussed it with the HR manager.
16    Q    When did you first do that?
17    A    I'd say early October when Stacia Lynn put it on
18         the front burner.  I discussed it with Lucy Grove
19         that day.  She confided that she had heard other
20         complaints.
21    Q    Did she tell you what kinds of complaints?
22    A    No.
23    Q    So you don't know if they were sexual harassment
24         complaints or just the other kinds of behavior that
25         we've been talking about with -- with Amy Lerlie;
```

Page 143

1  Q  Why do you say that Michelle LaJoie was holding you
2     to a different standard than the other two program
3     directors?
4  A  She let the other program directors direct their
5     staff.  She let the other program directors manage
6     their budgets.  She let the other program directors
7     set their own personal schedules, and she
8     restricted me from all -- from doing all of those
9     things.
10 Q  What was Michelle LaJoie's previous position?
11 A  As a housing director at Chippewa-Luce-Mackinaw
12    Community Action Agency.
13 Q  In other words, she did what you do, right?
14 A  She did it on a much smaller scale.
15 Q  Sure.
16            But housing is her thing, right?
17 A  She was -- she was an experienced housing director.
18 Q  Right.
19            So isn't it understandable that somebody
20    whose thing is housing is going to take a different
21    interest in what you are doing in her job than she
22    might take in the other program directors?
23 A  It was assumed, yes.
24 Q  Right.
25            She -- because you are talking her